# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHY A. HARRIS, in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board,<br><br>    Plaintiff,<br><br>  -against-<br><br>SCOTT BESSENT, in his official capacity as Secretary of the Treasury, TRENT MORSE, in his official capacity as Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office, SERGIO GOR, in his official capacity as Director of the White House Presidential Personnel Office, HENRY J. KERNER, in his official capacity as Acting Chairman of the Merit Systems Protection Board, DONALD J. TRUMP, in his official capacity as President of the United States of America, RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget,<br><br>    Defendants. | Civil Case No. 1:25-cv-00412-RC<br><br><br><br><br><br>**ORAL ARGUMENT RESPECTFULLY REQUESTED** |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND JUDGMENT ON THE MERITS

Plaintiff Cathy A. Harris moves for the entry of a preliminary injunction and a judgment on the merits under Federal Rule of Civil Procedure 65(a)(2). For the reasons stated in the accompanying memorandum, Plaintiff's motion should be granted and the Court should enter judgment on the merits in favor of Plaintiff. A proposed order is attached.

Respectfully submitted,

Dated: February 23, 2025
      Washington, D.C.

/s/ Jeremy D. Wright
MICHAEL J. KATOR, D.C. Bar No. 366936
JEREMY D. WRIGHT, D.C. Bar No. 483297
KERRIE D. RIGGS, D.C. Bar No. 995784
KATOR, PARKS, WEISER & WRIGHT,
  P.L.L.C.
1150 Connecticut Ave., NW, Suite 705
Washington, DC 20036
(202) 898-4800
(202) 289-1389 (fax)
mkator@katorparks.com
jwright@katorparks.com
kriggs@katorparks.com

LINDA M. CORREIA, D.C. Bar No. 435027
CORREIA & PUTH, PLLC
1400 16th Street, NW, Suite 450
Washington, D.C. 20036
(202) 602-6500
lcorreia@correiaputh.com

NEAL KUMAR KATYAL, D.C. Bar No. 462071
  *pro hac vice application pending*
NATHANIEL A.G. ZELINSKY, D.C. Bar No. 1724093
  *pro hac vice application pending*
EZRA P. LOUVIS, D.C. Bar No. 90005185
  *pro hac vice application pending*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com
nzelinsky@milbank.com
elouvis@milbank.com

*Attorneys for Plaintiff Cathy A. Harris*

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHY A. HARRIS, in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board, <br><br> Plaintiff, <br><br> -against- <br><br> SCOTT BESSENT, in his official capacity as Secretary of the Treasury, TRENT MORSE, in his official capacity as Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office, SERGIO GOR, in his official capacity as Director of the White House Presidential Personnel Office, HENRY J. KERNER, in his official capacity as Acting Chairman of the Merit Systems Protection Board, DONALD J. TRUMP, in his official capacity as President of the United States of America, RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget, <br><br> Defendants. | Civil Case No. 1:25-cv-00412-RC <br><br><br><br><br> **ORAL ARGUMENT RESPECTFULLY REQUESTED** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND JUDGMENT ON THE MERITS

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

INTRODUCTION ............................................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ..................................................................... 3

    I.      Legal Background. ..................................................................... 3

    II.     Factual Background. ................................................................... 7

    III.    Procedural History. .................................................................. 8

LEGAL STANDARD ....................................................................................................... 9

ARGUMENT ...................................................................................................................11

    I.      This Case Falls Squarely Within The Heartland Of *Humphrey's Executor* And Its Progeny...................................................................................11

           A.     The Board Does Not Wield Substantial Executive Power. ...................... 12

           B.     The Board Is A Traditional Multimember Body. ..................................... 17

           C.     Ruling For Defendants Would Upend Constitutional Law. ..................... 20

           D.     The Government's Arguments On The Merits Are Wrong. ..................... 23

    II.     This Court Should Provide The Full Relief Harris Seeks.................................... 27

CONCLUSION................................................................................................................ 37

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

C<small>ASES</small>:

*In re Al Baluchi*,
  952 F.3d 363 (D.C. Cir. 2020) ................................................................35

*Archuleta v. Miller*,
  562 F. App'x 978 (Fed. Cir. 2014) ...........................................................16

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015).................................................................................31

*AstenJohnson, Inc. v. Columbia Cas. Co.*,
  562 F.3d 213 (3d Cir. 2009).....................................................................34

*Berry v. Reagan*,
  No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ........................29, 34

*Bessent v. Dellinger*,
  No. 24A790 (U.S. Feb. 16, 2025) .............................................................31

*Brown v. Alabama Dep't of Transp.*,
  597 F.3d 1160 (11th Cir. 2010) ................................................................30

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024).................................................................................22

*Chamber of Com. Of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ...........................................................32, 33

* *Collins v. Yellen*,
  594 U.S. 220 (2021)........................................................................ *passim*

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981).................................................................................22

*Dellinger v. Bessent*,
  No. 25-0385, 2025 WL 471022 (D.D.C. Feb. 12, 2025)................. *passim*

*Dellinger v. Bessent*,
  No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025)......9, 31, 32, 33

*\*Authorities on which we principally rely are marked with asterisks.*

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988)..................................................................................................15

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006).............................................................................................11, 28

*Food & Water Watch, Inc. v. Vilsack,*
    79 F. Supp. 3d 174 (D.D.C. 2015)...........................................................................10

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992)..................................................................................................31

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010).............................................................................................11, 18

*Glenn v. Thomas Fortune Fay,*
    222 F. Supp. 3d 31 (D.D.C. 2016)...........................................................................27

*Gulfstream Aerospace Corp. v. Mayacamas Corp.,*
    485 U.S. 271 (1988)..................................................................................................34

*Hanes Corp. v. Millard,*
    531 F.2d 585 (D.C. Cir. 1976)..................................................................................10

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)..................................................................................................31

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir. 2017) ...................................................................................31

*Heffernan v. Dep't of Health and Human Servs.,*
    2007 MSPB 246, MSPB Dkt DC-0752-04-0756-P-1 (Oct. 19, 2007) ......................5

*Hollingsworth v. Dep't of Hous. and Urb. Dev.,*
    MSPB Dkt. No. DC-315H-21-0101-I-1 (Nov. 26, 2024) ..........................................4

* *Humphrey's Executor v. United States,*
    295 U.S. 602 (1935)........................................................................................... *passim*

*Kaplan v. Conyers,*
    733 F.3d 1148 (Fed. Cir. 2013).............................................................................5, 15

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)......................................................................................30

*Mar. for Life v. Burwell,*
    128 F. Supp. 3d 116 (D.D.C. 2015)..........................................................................10

\* *Marbury v. Madison*,
  5 U.S. 137 (1803).............................................................................20, 32, 36

*McCray v. Biden*,
  574 F. Supp. 3d 1 (D.D.C. 2021) ................................................................31

*Mistretta v. United States*,
  488 U.S. 361 (1989) ....................................................................................18

\* *Morrison v. Olson*,
  487 U.S. 654 (1988)..............................................................................1, 12, 24

\* *Myers v. United States*,
  272 U.S. 52 (1926)................................................................................13, 18, 20

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ...................................................................32

*New York v. Biden*,
  636 F. Supp. 3d 1 (D.D.C. 2022) ...............................................................27

*Patrie v. U.S. Postal Serv.*,
  MSPB Dkt. No. PH-4324-18-0222-I-2 (Aug. 23, 2023) ..............................5

*Perry v. MSPB*,
  582 U.S. 420 (2017)....................................................................................16

*POM Wonderful LLC v. F.T.C.*,
  894 F. Supp. 2d 40 (D.D.C. 2012) .............................................................28

*President v. Vance*,
  627 F.2d 353 (D.C. Cir. 1980) ...................................................................10

*Ramirez v. U.S. Immigr. & Customs Enf't*,
  568 F. Supp. 3d 10 (D.D.C. 2021) .............................................................28

*Robinson v. D.C. Gov't*,
  No. 97-CV-787, 1997 WL 607450 (D.D.C. July 17, 1997) .......................35

\* *Sampson v. Murray*,
  415 U.S. 61 (1974).............................................................................28, 33, 35

*In re Sawyer*,
  124 U.S. 200 (1888) ....................................................................................35

\* *Seila L. LLC v. CFPB*,
  591 U.S. 197 (2020).......................................................................... *passim*

*Service v. Dulles*,
    354 U.S. 363 (1957)..................................................................34

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2023)..................................................11

*Smith v. Dep't of the Army*,
    2022 MSPB 4, MSPB Dkt No. PH-1221-16-0010-W-1 (Apr. 13, 2022)..................5

*Special Couns. v. Sims*,
    2006 MSPB 151, MSPB Dkt No. CB-1216-05-0013-T-1, CB-1216-05-0012-
    T-1 (June 12, 2006)..................................................................5

*Stuart v. Laird*,
    5 U.S. 299 (1803)..................................................................22

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996)..................................................32

\* *United States v. Perkins*,
    116 U.S. 483 (1886)..................................................2, 13, 20

*Vitarelli v. Seaton*,
    359 U.S. 535 (1959)..................................................................34

*White v. Dep't of Veterans Affs.*,
    MSPB Dkt. No. DA-3330-15-0044-P-2 (Feb. 24, 2023)..................5, 34

\* *Wiener v. United States*,
    357 U.S. 349 (1958)................................................... *passim*

*Wilkinson v. Legal Servs. Corp.*,
    27 F. Supp. 2d 32 (D.D.C. 1998)..................................................33

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................11

## CONSTITUTIONAL PROVISIONS:

U.S. Const. art. II, § 2..................................................................13

## STATUTES:

5 U.S.C. § 1201..................................................................6

5 U.S.C. § 1202(d)..................................................................27

5 U.S.C. § 1203..................................................................8

5 U.S.C. § 1204(f)(1)(A) .................................................................................................13

5 U.S.C. §§ 1204(f) ........................................................................................................26

5 U.S.C. § 2302(b)(1) ......................................................................................................4

5 U.S.C. § 2302(b)(8) ..................................................................................................5, 26

5 U.S.C. § 3330a .............................................................................................................5

5 U.S.C. § 3592(a) .......................................................................................................5, 15

5 U.S.C. § 7324 ...............................................................................................................5

5 U.S.C. § 7511 ..........................................................................................................5, 15

5 U.S.C. § 7701(a) .........................................................................................................13

5 U.S.C. § 7702 ...............................................................................................................5

5 U.S.C. § 7703(a) ......................................................................................................5, 16

5 U.S.C. § 7703(d) .................................................................................................6, 16, 26

28 U.S.C. § 2201 ...........................................................................................................10

29 U.S.C. § 153(a) .........................................................................................................21

29 U.S.C. § 661(b) .........................................................................................................21

30 U.S.C. § 823(b) .........................................................................................................21

38 U.S.C. §§ 4312-15 ......................................................................................................5

39 U.S.C. § 502(a) .........................................................................................................21

42 U.S.C. § 5841(e) .......................................................................................................21

42 U.S.C. § 7171(b) .......................................................................................................21

42 U.S.C § 7412(r)(6) .....................................................................................................21

46 U.S.C. § 46101(b) .....................................................................................................21

**LEGISLATIVE MATEIRALS:**

124 CONG. REC. 27535 (1978) ..........................................................................................3

124 CONG. REC. 27536 (1978) ..........................................................................................4

124 CONG. REC. 27566 (1978) .............................................................................3

S. Rep. No. 95-969 (1978) ..................................................................................3

An Act to Amend Section Fifty-Three Hundred and Fifty-Two of the Revised
    Statutes of the United States, in Reference to Bigamy, and for Other Purposes
    47 Cong. Ch. 47, 22 Stat. 30 (1882) ..........................................................21

Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111 (1978)........................3, 4

Federal Reserve Act, Pub. L. No. 63-48, 38 Stat. 251 (1913) ......................................21

Federal Trade Commission Act, Pub. L. No. 63-203, 38 Stat. 717 (1914) ...................21

Interstate Commerce Act, Pub. L. No. 49-104, 24 Stat. 379 (1887)........................11, 21

**EXECUTIVE MATERIALS:**

Exec. Order No. 14,215 (2025)............................................................................22, 23

**RULES:**

Fed. R. Civ. P. 65(a)(2)....................................................................................9, 10

Fed. R. Civ. P. 65(b)(2).................................................................................2, 3, 37

**OTHER AUTHORITIES:**

Alexander Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar
    of Politics* (1962)..................................................................................13

Jimmy Carter, *Civil Service Reform Act of 1978 Statement on Signing S, 2640
    Into Law,* THE AMERICAN PRESIDENCY PROJECT (Oct. 13, 1978),
    https://www.presidency.ucsb.edu/documents/civil-service-reform-act-1978-
    statement-signing-s-2640-into-law .........................................................4

Jimmy Carter, *Federal Civil Service Reform Message to the Congress*, THE
    AMERICAN PRESIDENCY PROJECT (Mar. 2, 1978),
    https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-
    message-the-congress ............................................................................3

*Mediation Appeals Program (MAP),* U.S. MERIT SYSTEMS PROTECTION BOARD,
    https://www.mspb.gov/appeals/mediationappeals.htm........................................6, 15

William Spencer, *MSPB Welcomes Acting Chairman Cathy A. Harris*, MERIT
    SYSTEMS PROTECTION BOARD (June 6, 2022),
    https://www.mspb.gov/publicaffairs/press_releases/Cathy_Harris_Press_Relea
    se_1930967.pdf.......................................................................................7

William Spencer, *New MSPB Chairman and Vice Chairman*, U.S. MERIT
  SYSTEMS PROTECTION BOARD (Mar. 14, 2024),
  https://www.mspb.gov/publicaffairs/press_releases/New_MSPB_Chairman_a
  nd_Vice%20Chairman.pdf..............................................................................................................7

## INTRODUCTION

There are hard constitutional cases where the law remains unsettled and the Supreme Court has not spoken. This case is not among them. As the Court explained in its TRO decision (at 8), this case is "on all fours with *Humphrey's Executor*" and its progeny. The Merit Systems Protection Board is a "multimember body," whose members must be experts in federal employment law, which by law must be "balanced along partisan lines," and which exercises quintessential "quasi-judicial duties." Mem. Op. ("TRO Op.") at 8-9, ECF No. 9 (quoting *Seila L. LLC v. CFPB*, 591 U.S. 197, 216 (2020), and *Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935)). The "three-member 'adjudicatory body,'" *Seila Law*, 591 U.S. at 216 (quoting *Wiener v. United States*, 357 U.S. 349, 356 (1958)), "conducts preliminary adjudication of federal employees' claims, which may then be appealed" to an Article III court. TRO Op. at 9. The Board does not "wield substantial executive power," *Seila Law*, 591 U.S. at 218, and its limited authority does not "interfere impermissibly with" the President's "constitutional obligation to ensure the faithful execution of the laws," *Morrison v. Olson*, 487 U.S. 654, 693 (1988). And to ensure this bipartisan adjudicatory Board would remain insulated from politics, Congress mandated that its members may only be removed for good cause. Under *Humphrey's Executor*, that removal standard is unquestionably constitutional.

In fact, it is difficult to point to a body that would fall more squarely on the constitutional side of the line than the Merit Systems Protection Board. As this Court has underscored, the Board's unique "mission and purpose require independence." TRO Op. at 10. The Board does not make policy by filling up vaguely defined statutes to regulate unfair competition or set reasonable prices. The Board hears targeted case-specific claims regarding unlawful abuse within the executive branch—including adverse actions taken against civil servants based on partisan

discrimination or in retaliation for whistleblowing. Congress reasonably determined that the Board

cannot fulfill that adjudicatory mission if its members face a risk that, when they apply the laws

Congress passed to "limit, restrict, and regulate the removal" of federal employees, the members

will be subject to political retribution. *United States v. Perkins*, 116 U.S. 483, 485 (1886).

Now more than ever, the Board's actual impartiality and the appearance of impartiality are

critical. Recent executive orders regarding federal employees have resulted in a ten-fold increase

in the number of cases before the Board. It is imperative that everyone—civil servants, courts,

and the public at large—has confidence in the Board's ability to do its job, free from fear or favor.

It is in the government's interest, too, to ensure impartiality, so that when the Board rules for the

government over an employee, everyone accepts its decisions as fair.

In opposing a temporary restraining order, Defendants attempted to distinguish the Merit

Systems Protection Board from *Humphrey's Executor* and its progeny. Their arguments are paper

thin. At the end of the day, even the government acknowledges that "*Humphrey's Executor* is

binding on this Court," and signals that it desires to create a vehicle with which to ask the Supreme

Court to "overturn" landmark precedent. Defs' TRO Resp. at 8 n.1, ECF No. 6. But let's be clear:

If the members of the Merit Systems Protection Board cannot enjoy a modicum of protection from

arbitrary removal, then no multimember commission can—and perhaps not even ordinary civil

servants. This Court should reject Defendants' request to ignore binding Supreme Court precedent,

rule for Plaintiff on the merits, and issue both a declaratory judgment and a permanent injunction

in her favor.[1]

---

[1] To the extent the Court does not issue its decision within 14 days of the entry of the TRO, Plaintiff requests that the Court extend the TRO. Good cause exists for an extension. *See* Fed. R. Civ. P. 65(b)(2). None of the harms from denying temporary relief have dissipated during the pendency of this case. Defendants have not, and will not, identify "impending injury or alleged constitutional error" that would "outweigh" that harm. *See Dellinger v. Bessent*, No. 25-0385,

## FACTUAL AND LEGAL BACKGROUND

### I.    Legal Background.

In 1978, Congress passed the Civil Service Reform Act to address widespread public concerns about the federal civil service and to ensure "efficient and effective" government "impartially administered" by employees selected and retained on merit rather than by political favoritism.  S. Rep. No. 95-969, at 4 (1978); *see* Pub. L. No. 95–454, 92 Stat. 1111 (1978).  A critical piece of the Act was the new Merit Systems Protection Board, which assumed the former Civil Service Commission's federal employee adjudicatory authority.

In a letter to Congress, President Carter proposed what eventually became the Civil Service Reform Act, and specifically requested that Congress create a "Merit Protection Board" whose members would be removable only for cause.  He explained that the board was necessary to "guarantee independent and impartial protection to employees" and "safeguard the rights of Federal employees who 'blow the whistle' on violations of laws or regulations by other employees, including their supervisors."[2]

Over the following seven months, Congress formulated President Carter's proposal into legislation.  Throughout the process, members of Congress from both parties emphasized that a "strong Merit Systems Protection Board" was essential to "absolutely insure against any form of destructive political manipulation" of the civil service.  124 CONG. REC. 27566 (1978) (statement of Sen. Percy); *see* 124 CONG. REC. 27535 (1978) (statement of Sen. Ribicoff); S. Rep. No. 95-

---

2025 WL 471022, at *13 (D.D.C. Feb. 12, 2025).  If it is necessary to extend the TRO beyond that additional 14-day period and if the government does not consent to an extension of the TRO, *see* Fed. R. Civ. P. 65(b)(2), Plaintiff also requests that the Court grant Plaintiff's motion for a preliminary injunction.

[2] Jimmy Carter, *Federal Civil Service Reform Message to the Congress*, THE AMERICAN PRESIDENCY PROJECT (Mar. 2, 1978), https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress.

969, at 6 (1978) (explaining that a "strong and independent" Board was necessary to serve as a "vigorous protector" of merit principles).

To ensure the new Board's independence, Congress provided that its members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111, 1122 (1978) (codified at 5 U.S.C. § 1202). In Congress's assessment, the Civil Service Commission's lack of for-cause protections had hampered its ability to protect the merit-based civil service. 124 CONG. REC. 27536 (1978). When President Carter signed the Civil Service Reform Act into law, he declared that the "landmark legislation" would create "a new system of excellence and accountability."[3]

The Board's primary mission is "to provide the people of the United States with a competent, honest, and productive Federal workforce," and to ensure that "Federal personnel management is implemented consistent with merit systems principles and free from prohibited personnel practices," including discrimination and reprisal for whistleblowing. Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111, 1112 (1978).

The Board has a carefully tailored jurisdiction and exists only to conduct a "*preliminary* adjudication of federal employees' claims." TRO Op. at 9 (emphasis added). It hears a narrow range of inward-facing personnel matters, including:

- Claims of federal employees being targeted due to partisan political affiliation. 5 U.S.C. § 2302(b)(1). *See, e.g., Hollingsworth v. Dep't of Hous. and Urb. Dev.*, MSPB Dkt. No. DC-315H-21-0101-I-1 (Nov. 26, 2024) (considering claim that HUD employee was terminated because she was a Republican and did not support President Biden in the 2020 election).

---

[3] Jimmy Carter, *Civil Service Reform Act of 1978 Statement on Signing S, 2640 Into Law,* THE AMERICAN PRESIDENCY PROJECT (Oct. 13, 1978), https://www.presidency.ucsb.edu/documents/civil-service-reform-act-1978-statement-signing-s-2640-into-law.

- Claims of whistleblower retaliation against federal employees for having reported a violation of any law, rule, or regulation, or gross mismanagement, among other abuses of authority. 5 U.S.C. § 2302(b)(8). *See, e.g., Smith v. Dep't of the Army*, 2022 MSPB 4, MSPB Dkt No. PH-1221-16-0010-W-1 (Apr. 13, 2022) (finding actions against employee were influenced by her complaints about the U.S. military's mishandling of the remains of her husband, who had been killed in action while deployed in Iraq).

- Claims that federal employees have violated the Hatch Political Activities Act by engaging in prohibited political activities while on duty. 5 U.S.C. § 7324. *See, e.g., Special Couns. v. Sims*, 2006 MSPB 151, MSPB Dkt No. CB-1216-05-0013-T-1, CB-1216-05-0012-T-1 (June 12, 2006) (reversing dismissal of claim against federal employee who forwarded an email while on duty with the subject line stating "Why I am supporting John Kerry for President").

- Claims of discrimination raised in response to an adverse personnel action. 5 U.S.C. § 7702. *See e.g., Heffernan v. Dep't of Health and Human Servs.*, 2007 MSPB 246, MSPB Dkt DC-0752-04-0756-P-1 (awarding compensatory damages to Roman Catholic priest Chaplain who was fired due to religious discrimination and retaliation).

- Claims by U.S. military service members and veterans who had been denied the right to be reemployed in their federal civil service positions upon return from military service. 38 U.S.C. §§ 4312-15. *See, e.g., Patrie v. U.S. Postal Serv.*, MSPB Dkt. No. PH-4324-18-0222-I-2 (Aug. 23, 2023), *vacated as moot*, MSPB Dkt. No. PH-4324-18-0222-R-1 (Jan. 25, 2024) (finding violation of reemployment rights of National Guard member who sought reemployment at USPS following honorable discharge from active duty in the Global War on Terrorism, including "Operation Noble Eagle" and "Operation Enduring Freedom").

- Claims that veterans' preference rights were violated. 5 U.S.C. § 3330a. *See, e.g., White v. Dep't of Veterans Affs.*, MSPB Dkt. No. DA-3330-15-0044-P-2 (Feb. 24, 2023) (finding violation where applicant's veterans' preference-eligible status was not considered in making hiring decision).

The Board's jurisdiction is also limited in other respects. For example, the Board may not hear adverse action appeals by political appointees, 5 U.S.C. § 7511, it has limited authority to hear certain appeals by senior civil servants, *see id*. § 3592(a), and it cannot adjudicate the merits of issues regarding national security. *See Kaplan v. Conyers*, 733 F.3d 1148, 1166 (Fed. Cir. 2013) (en banc). An employee may appeal the Board's adverse determination to an Article III court, which is usually but not always the Federal Circuit. *See* 5 U.S.C. § 7703(a). The

government through the director of the Office of Personnel Management may similarly petition an Article III court to hear cases that "will have a substantial impact on a civil service law, rule, regulation, or policy directive." *See id.* § 7703(d)(1)-(2).

The Merit Systems Protection Board is structured as a traditional multimember adjudicatory body with three members. All members must be nominated by the President and confirmed by the Senate. By law, each member must be an "individual[] who, by demonstrated ability, background, training, or experience are especially qualified to carry out the functions of the Board." 5 U.S.C. § 1201. Once confirmed, members serve seven-year terms and, if a successor has not yet been appointed, a member may serve an additional year. The members' terms are staggered, and no more than two of the three Board members may be adherents to the same political party. *Id.*

In the nearly half-century of its existence, the Board has adjudicated well over one hundred fifty thousand employee appeals. While small and largely unheralded, the Board is truly a workhorse. The Board's administrative judges issue roughly 5,000 decisions each year, and "about 400-600 cases are filed each year at the appellate level" before the Board. Ex. 1, Harris Decl. ¶ 16; *see id.* ¶ 34 (describing "400 new appeals per month at the regional level"). Additionally, the Board offers parties access to the Mediation Appeals Program, which uses trained mediators to mediate cases and seek informal resolutions.[4]

In the past few weeks, the Board has seen an extraordinary surge in new filings. Ordinarily the Board will receive about 400 new appeals per month at the regional level. But since February 9, 2025, the Board has received more than 1,600 new appeals. *See id.* ¶ 34.

---

[4] *See Mediation Appeals Program (MAP)*, U.S. MERIT SYSTEMS PROTECTION BOARD, https://www.mspb.gov/appeals/mediationappeals.htm.

II.    **Factual Background.**

The facts of this case are straightforward and undisputed.  Plaintiff Cathy Harris was nominated by President Biden to be a member of the Merit Systems Protection Board in January 2022.  The Senate confirmed her on May 25, 2022, and she was sworn in on June 1, 2022.[5]  Harris's current term expires on March 1, 2028.  Shortly after being sworn in, President Biden designated her as Vice Chairman, and she served as Acting Chairman of the Board until March 6, 2024, when the Senate confirmed her as Chairman.  Harris was sworn in as Chairman of the Board on March 14, 2024.[6]

On February 11, 2025, Harris received an email from Trent Morse, Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, which stated in its entirety: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately.  Thank you for your service[.]"  Ex. 2.

The one-sentence email does not allege any inefficiency, neglect of duty, or malfeasance in office.  Nor would there have been a basis for such an allegation.  During her time as a member of the Board, Harris has been extremely efficient and effective.  Between 2017 and 2022, the Board lacked a quorum and could therefore not vote on any appellate-level cases.  This produced a backlog of 3,793 cases.  When she joined the Board as a member in June 2022, Harris was told it would take five to six years to issue decisions on those thousands of outstanding cases.  *See* Harris

---

[5] William Spencer, *MSPB Welcomes Acting Chairman Cathy A. Harris*, U.S. MERIT SYSTEMS PROTECTION BOARD (June 6, 2022), https://www.mspb.gov/publicaffairs/press_releases/Cathy_Harris_Press_Release_1930967.pdf.

[6] William Spencer, *New MSPB Chairman and Vice Chairman*, U.S. MERIT SYSTEMS PROTECTION BOARD (Mar. 14, 2024), https://www.mspb.gov/publicaffairs/press_releases/New_MSPB_Chairman_and_Vice%20Chairman.pdf.

Decl. ¶9.  Since that time, however, the Board has been able to issue decisions on all but 32 of those 3,793 cases, while simultaneously keeping up with newly filed cases.  *See id.* ¶15.

## III.    Procedural History.

Harris filed this action on February 11, 2025—the day after she received notice of her unlawful termination.  Compl., ECF No. 1.  In addition to requesting a writ of mandamus and any other appropriate relief, the Complaint requests: (1) a declaration that her purported termination was unlawful and that she remains a member of the Board who may be removed " 'only for inefficiency, neglect of duty or malfeasance in office,' " *id.* at 11; and (2) an order enjoining Defendants from removing Harris from office, treating her as being removed, or exercising authority with respect to the Board "without regard" to Harris's position as a board member, *id.*[7]

On the same day that she initiated this suit, Harris moved for a temporary restraining order to preserve the status quo while the parties briefed injunctive relief and the merits.  ECF No. 2; ECF No. 2-1 at 5-6.  One week later, on February 18, the Court granted Harris's motion and issued a temporary restraining order stating that Harris would continue to serve as Chairman of the Board and enjoining Defendants from removing her from office.  ECF No. 9.[8]

In the opinion accompanying the TRO, the Court explained that Harris would likely succeed on the merits because *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), "appears to dictate the outcome of this case."  *Id.* at 6.  The Court found irreparable harm based on

---

[7] For ease of reference, references to the Complaint use the document's ECF pagination.

[8] Harris does not contest that the President may remove her from her position as Chairman of the Board, leaving her as a member.  The post of Chairman is not subject to for-cause removal.  5 U.S.C. § 1203(a).  At the time of her removal, the President had announced that he intended to designate member Henry J. Kerner as Acting Chair, although the President had not yet designated Kerner as Vice Chairman, which in turn would permit Kerner to become Acting Chair.  *Id.* § 1203(b).  At this time, Harris does not request that she be reinstated as Chairman, but instead merely as a Board member, and requests that the Court modify the TRO accordingly.

Harris's "loss of the ability" to perform the mission "specifically directed" by Congress, the resulting deprivation of her "statutory right" to function as a Board member, and the corresponding harm to the Board's independence. *Id.* at 15 (quotation marks omitted). The Court also determined that the remaining injunctive relief factors favored Harris because there is a strong public interest in "governmental agencies abiding by the federal laws." *Id.* at 20 (same).

When it issued the TRO, the Court ordered expedited preliminary injunction briefing and scheduled a preliminary injunction hearing for March 3. ECF No. 8 at 2. The next day, the parties filed a joint status report confirming their agreement to consolidate the motion for preliminary injunction with the merits of the case. ECF No. 13 at 1.

On February 20, Defendants appealed the TRO after it had been in effect for just two days and moved for an emergency stay pending appeal. ECF No. 14, 16. The Court denied emergency relief based on the already-expedited briefing schedule and found that the government would not be irreparably harmed by following the law in the interim, "particularly one supported by at least ninety years of Supreme Court precedent." ECF No. 18 at 2. Defendants' TRO appeal remains pending as of the filing of this motion.[9]

## LEGAL STANDARD

Courts apply the summary judgment standard where a preliminary injunction hearing is consolidated with a trial on the merits under Rule 65(a)(2), "the record is sufficient for a determination on the merits," and there "are no material fact disputes." *Mar. for Life v. Burwell*,

---

[9] On February 15, 2025, the D.C. Circuit dismissed a similar appeal for lack of jurisdiction in a case involving the purported removal of the Special Counsel, in which Judge Jackson also issued a TRO. *See Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) (per curiam). The government sought an application in the Supreme Court seeking vacatur of Judge Jackson's TRO. On February 21, 2025, the Supreme Court issued a decision holding the application in abeyance until February 26, 2025, the date Judge Jackson will hear a motion for a preliminary injunction.

128 F. Supp. 3d 116, 124 (D.D.C. 2015); *see also* Minute Order, *Dellinger v. Bessent*, No. 25-cv-385 (D.D.C. Feb. 15, 2025) (ordering the case consolidated pursuant to Rule 65(a)(2) and directing the parties to submit cross motions for summary judgment).

Pursuant to the Declaratory Judgement Act, a court may declare the rights and legal relations of any party that requests it in a case of actual controversy within its jurisdiction. 28 U.S.C. § 2201. When assessing whether to grant declaratory relief, courts have looked to "whether it would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of 'procedural fencing'; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided." *Hanes Corp. v. Millard*, 531 F.2d 585, 591 n.4. (D.C. Cir. 1976). Courts in this Circuit have traditionally granted a declaratory judgement when doing so would either " 'serve a useful purpose in clarifying the legal relations in issue' " or "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' " *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980).

The preliminary injunction factors mirror those the Court applied in granting a TRO: Plaintiff must show (1) she is "likely to succeed on the merits"; (2) that she is "likely to suffer irreparable harm" absent preliminary relief; (3) that the "balance of equities" tips in her favor; and (4) that an injunction is in "the public interest." *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 185 (D.D.C.), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

A plaintiff seeking a permanent injunction must demonstrate: (1) "an irreparable injury, (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that

injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). For a permanent injunction, a plaintiff must show "actual success" on the merits. *Winter*, 555 U.S. at 32. Factors (3) and (4) merge when the defendant is the government. *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

**ARGUMENT**

**I.    This Case Falls Squarely Within The Heartland Of *Humphrey's Executor* And Its Progeny.**

Since the Founding, the Supreme Court has recognized Congress's authority to regulate the removal of federal employees and officers. In 1887, Congress established the first multimember board whose members are entitled to for-cause removal protection. *See* Interstate Commerce Act, Pub. L. No. 49-104, 24 Stat. 379, 383 (1887). Starting with *Humphrey's Executor* in 1935, the Supreme Court has consistently blessed these "traditional" "multimember board[s] or commission[s]," *Seila Law*, 591 U.S. at 207, which "exercise predominantly quasi judicial and quasi legislative" functions, *Humphrey's Executor*, 295 U.S. at 624; *see, e.g.*, *Wiener*, 357 U.S. at 356. In a pair of recent cases, *Collins* and *Seila Law*, the Court struck down for-cause removal provisions for two novel independent agencies created in the wake of the 2008 financial crisis. Both were headed by a single director who wielded significant executive authority and were funded outside the normal appropriations process. *See Collins v. Yellen*, 594 U.S. 220, 220, 253 (2021); *Seila Law*, 591 U.S. at 218; *see also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 495 (2010). The Court in both cases was careful to distinguish and preserve *Humphrey's Executor*.

The Board looks nothing like the novel entities at issue in *Collins* and *Seila Law*. Instead, as the United States all but acknowledges, *see* Defs' TRO Resp. at 8 n.1, and as this Court already

11

held, this case is "on all fours with *Humphrey's Executor*" and its progeny, TRO Op. at 8.  Indeed,

if the Merit Systems Protection Board's members may not be limited to for-cause removal, it is

difficult to imagine that *any* member of any commission could ever receive that protection.  This

Court should decline the government's effort to evade binding precedent, and rule for Harris on

the merits.

### A.    The Board Does Not Wield Substantial Executive Power.

The for-cause removal protection at issue in this case is constitutional because the Merit

Systems Protection Board does "not wield substantial executive power," or "interfere

impermissibly with" the President's "constitutional obligation to ensure the faithful execution of

the laws," *Seila Law*, 591 U.S. at 218; *Morrison*, 487 U.S. at 693.  Rather, the Board is the kind of

"quasi judicial," "adjudicatory body" that Congress may determine requires a measure of "freedom

from Executive interference" to function.  *Humphrey's Executor*, 295 U.S. at 629; *Collins*, 594

U.S. at 250 n.18 (quoting *Wiener*, 357 U.S. at 353).  If Congress cannot provide the members of

the Board for-cause removal protection, it is not clear that Congress may provide anyone that

protection, including potentially even ordinary civil servants.  *See Morrison*, 487 U.S. at 690 n.20.

As this Court outlined in its TRO opinion, the Board's authority is circumscribed.  The

Board does not regulate private parties, let alone "dictate and enforce policy for a vital segment of

the economy affecting millions of Americans."  *Seila Law*, 591 U.S. at 225.  The Board "lacks its

own rulemaking authority" except in furtherance of its adjudicatory functions, and aside from

submitting reports to Congress, its role is essentially adjudicative.  TRO Op. at 9.  Like Article III

courts, the Board cannot initiate cases itself, it must passively wait for them to be brought.[10]  *See*

---

[10] The only instance where the Board can initiate any type of proceeding on its own is when it may conduct a limited review of regulations promulgated by the Office of Personnel Management.  *See* 5 U.S.C. § 1204(f)(1)(A).

5 U.S.C. § 7701(a); *cf.* Alexander Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar of Politics* (1962). The Board, moreover, is focused entirely inward on the treatment of federal workers who allege they have been subject to unlawful employment actions, including discrimination and retaliation. *See supra* pp. 4-5. The Board's case-specific adjudicatory role is vastly different from entities that exercise considerable policymaking discretion to fill out vague standards (for example, to prohibit unfair practices), whose members could theoretically stymie the President's lawful goals in office.

There are strong reasons to defer to Congress's judgment that, of all the boards and commissions across the federal government, the members of the Merit Systems Protection Board require a modest degree of protection. As the Supreme Court has long recognized, Congress possesses constitutional "authority to limit, restrict, and regulate the removal" of federal employees and inferior officers. *Perkins*, 116 U.S. at 485; *see* U.S. Const. art. II, § 2 ("[T]he Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."); *Humphrey's Executor* 295 U.S. at 631 ("In *Marbury v. Madison*, it is made clear that Chief Justice Marshall was of opinion that a justice of the peace for the District of Columbia was not removable at the will of the President.") (internal citation omitted); *Myers v. United States*, 272 U.S. 52, 161 (1926) ("The court also has recognized in the Perkins Case that Congress, in committing the appointment of such inferior officers to the heads of departments, may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal.").

The Merit Systems Protection Board's central purpose is to further Congress's lawful regulation of the civil service, and to protect federal employees against unlawful discrimination and retaliation from within the executive branch itself. Congress has determined that the Board

cannot perform that mission if the Board's members themselves are subject to similar retaliation. As this Court aptly explained, "[d]enying independence to the Board would undermine" "constitutionally sound limitations on the removal of civil servants."  TRO Op. at 10 n.2.  It would "neuter" the "Civil Service Reform Act's" statutory scheme if "high-ranking government officials" could "engage in prohibited practices," such as "discrimination, loyalty oaths, coercion to engage in political activity, and retaliation against whistleblowers," "and then pressure the" Board "into inaction."  *Id.* at 10.

At the same time, Congress has tailored the Board's structure to avoid encroaching on the President's core prerogatives to manage the executive branch, within the laws Congress passed and the President signed.  As an initial matter, by making an internal board that specializes in federal employment issues the first port of call for employee grievances—rather than, for example, an Article III court—Congress reduced the potential for interbranch friction.  It would be more concerning from a separation of powers perspective—not less—if Congress had required an Article III entity to resolve every federal employment dispute.  In this respect, the government's arguments at the TRO stage rebound on them.  If the government thinks that having an Article III court issue relief in this case far too intrusive, *see* Defs. TRO Resp. at 12, surely the government would not wish for an Article III court to be the initial and exclusive option for federal employees in every case.  By contrast, housing a specialized Merit Systems Protection Board within the executive branch ensures that the Board will have expertise in executive branch equities, including the particular ways in which agencies manage their staff.  Moreover, as compared to generalist Article III judges, the specialized Board can more effectively mediate cases and reach informal resolutions that reduce the impact on agencies and the need for the executive to engage in full blown litigation in a trial court.  *See Mediation Appeals Program (MAP)*, U.S. MERIT SYSTEMS

PROTECTION BOARD, https://www.mspb.gov/appeals/mediationappeals.htm (explaining that the Board's mediation program settles "50% of all cases mediated" in the program and more "will later settle after returning to the traditional adjudication track"). At the same time, the fact that Congress could have "given jurisdiction over employment" claims "to the District Courts or to the Court of Claims" confirms that the Board is truly the kind of adjudicatory body that does not wield substantial executive power. *Wiener*, 357 U.S. at 355.

To further protect the President's core removal powers, Congress has also limited the Board's jurisdiction. The Board can only hear adverse action appeals regarding civil servants and cannot adjudicate cases regarding political appointees. *See* 5 U.S.C. § 7511. Even for civil servants, the Board's powers are circumscribed. For example, when a federal employee in the Senior Executive Service is removed from a position "for less than fully successful executive performance," she may receive only an informal hearing, and removal from the Senior Executive Service can occur before that informal meeting. 5 U.S.C. § 3592(a)(2). Similarly, to protect the President's powers as Commander in Chief, the Board cannot "review the merits" of "national security determinations concerning eligibility of an employee to occupy a sensitive position that implicates national security." *Kaplan v. Conyers*, 733 F.3d 1148, 1166 (Fed. Cir. 2013) (en banc); *see Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). In short, Congress ensured the Board does not trample on the President's core policymaking authority or wield significant executive power.

Nor does the Board have the final say in the most significant matters. As this Court explained, the Board effectively conducts a "*preliminary* adjudication of federal employees' claims." TRO Op. at 9 (emphasis added). An employee may appeal the Board's adverse determination to the Article III courts, which is usually but not always the Federal Circuit. 5 U.S.C. § 7703(a); *see Perry*, 582 U.S. 420 at 425 (outlining appeals to regional circuits for

certain cases).[11]  The government through the Director of the Office of Personnel Management may similarly petition the relevant Court of Appeals to hear cases that the Director determines "will have a substantial impact on a civil service law, rule, regulation, or policy directive." *See id*. § 7703(d)(1)-(2).[12]  This structure ensures that, where the President disagrees with the Board over a meaningful question of executive power, the President can nevertheless advance his preferred approach.

The Board's circumscribed adjudicatory authority contrasts sharply with the recent cases in which the Supreme Court has concluded that an unaccountable, independent agency wielded "substantial executive power." *Seila Law*, 591 U.S. at 218.  For example, in *Seila Law*, the Supreme Court struck down for-cause removal protections for the director of the Consumer Financial Protection Bureau (CFPB).  The Court explained that the director was "insulated from Presidential control" and could "dictate and enforce policy for a vital segment of the economy affecting millions of Americans." *Seila Law*, 591 U.S. at 204, 218, 225.  Far from case-by-case adjudication based on settled legal principles, the Bureau possesses extremely broad rulemaking authority to prevent "any unfair, deceptive, or abusive act or practice" by certain participants in the consumer-finance sector. *Id*. at 206.  The Bureau, moreover, may engage in enforcement actions against private parties, pursuing "restitution, disgorgement, and injunctive relief, as well as" staggering "civil penalties of up to $1,000,000 (inflation adjusted) for each day that a violation occurs." *Id*.

---

[11] Typically, judicial review of Board cases lies in the Federal Circuit.  So called "mixed cases" including claims under employment discrimination laws like Title VII proceed to district courts in the first instance.  Regional courts of appeal may review whistleblower cases.

[12] This provision permits the Director to seek review, for example, of a decision reinstating a terminated employee or reassigning one. *See, e.g.*, *Archuleta v. Miller*, 562 F. App'x 978 (Fed. Cir. 2014) (granting Director's request for review).

16

Meanwhile, in *Collins*, the Supreme Court struck down a similar for-cause removal protection for the director of the Federal Housing Finance Agency (FHFA). That agency regulates mortgage lenders Fannie Mae and Freddie Mac, which in 2007 "had a combined value of approximately $5 trillion," and supervises "nearly every aspect of the companies' management and operations." *Collins*, 594 U.S. at 228-230. Like the Consumer Financial Protection Bureau, the agency can "impose penalties ranging from $2,000 to $2 million per day;" "must approve any new products that the companies would like to offer;" and "may order the companies to dispose of or acquire any asset"—to name just a few powers. *Id*. at 230. Given the centrality of home mortgages to the American economy, the agency's actions "could have an immediate impact on millions of private individuals and the economy at large." *Collins*, 594 U.S. at 253.

It should go without saying, but we say it anyway: The Merit Systems Protection Board is nothing like those agencies by a country mile, and it does not wield the kind of "substantial executive power" that raises a profound constitutional concern. *Seila Law*, 591 U.S. at 218. Instead, it is the kind of adjudicatory body that the Supreme Court has long blessed.

**B.      The Board Is A Traditional Multimember Body.**

The Merit Systems Protection Board also falls within the heartland of the *Humphrey's Executor* framework for a second critical reason: It is "a traditional independent agency" "run by a multimember board." *Seila Law*, 591 U.S. at 206.

When the Supreme Court has faced a traditional, multimember board or commission, the Court has easily rejected the constitutional challenge to a for-cause removal provision. *See Mistretta v. United States*, 488 U.S. 361, 410 (1989) (upholding for-cause removal protections for the Sentencing Commission); *Wiener*, 357 U.S. at 356 (War Claims Commission); *Humphrey's Executor*, 295 U.S. at 632 (Federal Trade Commission). By contrast, when the Supreme Court

struck down for-cause removal provisions in *Seila Law* and *Collins*, the Court emphasized that the independent agencies in question had a novel and non-traditional structure, *i.e.*, they were led by a single director.  *See Seila Law*, 591 U.S. at 207; *Collins*, 594 U.S. at 251; *see also Free Enter. Fund*, 561 U.S. at 496 ("This novel structure . . ."); *cf. Humphrey's Executor*, 295 U.S at 626 (explaining that *Myers v. United States*, 272 U.S. 52 (1926), stands for "the narrow point" "that the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress").

In those latter cases—and in particular, *Seila Law*—the Supreme Court contrasted the novel, unconstitutional agencies in question with the traditional and permissible multimember structure.  *See Seila Law*, 591 U.S. at 207 ("Rather than create a traditional independent agency headed by a multimember board or commission . . . ."); *id*. at 216 ("*Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts."); *id*. at 218 (noting Congress may choose to provide "multimember expert agencies" for-cause protection); *id*. at 237 (noting that Congress could convert "the CFPB into a multimember agency" via legislation, but the Court could not do so unilaterally); *see also Collins*, 594 U.S. at 253 n.19 (contrasting the structure of the Federal Housing Finance Agency with "a multi-member Commission."); *Free Enter. Fund*, 561 U.S. at 501 ("The point is not to take issue with for-cause limitations in general; we do not do that.").

As this Court's TRO decision recognizes (at 8-9), the distinction between multimember boards and single-director agencies is constitutionally significant.  By their nature, multimember entities do not concentrate "power in the hands of any single individual," consistent with the Framers' design of divided government.  *Seila Law*, 591 U.S. at 223.  Meanwhile, the traditional requirement that a multimember board contain members from both parties ensures that its

18

adjudicatory decisions are respected as "nonpartisan" and "impartial[]." *Humphrey's Executor*, 295 U.S. at 624. The assurance of impartiality is particularly critical for the Merit Systems Protection Board, which hears claims regarding unlawful retaliation, and is already receiving ten times the number of cases as it normally would. *See supra* p.6.

Because members of traditional multimember bodies serve staggered terms, moreover, a President is assured of appointing at least some members to the board, ensuring that the multimember body reflects the results of nationwide presidential elections. *See Seila Law*, 591 U.S. at 225 ("[T]he agency's single-Director structure means the President will not have the opportunity to appoint any other leaders—such as a chair or fellow members of a Commission or Board—who can serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies."). "[S]taggered" "terms" additionally ensure that the Board can "accumulate technical expertise" in a unique area—federal employment law—over time. *Id.* at 216; *accord Humphrey's Executor*, 295 U.S. at 624 ("It is manifestly desirable that the terms of the commissioners shall be long enough to give them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience."). Meanwhile, the President may typically replace the chairperson of the board or commission, providing him a further measure of control.[13]

The Merit Systems Protection Board also notably lacks the unique permanent funding features that insulated the CFPB and the FHFA from the constitutional "appropriations process," and further "aggravate[d] the" "threat to Presidential control" in *Seila* and *Collins*. *Id.* at 226. The

---

[13] As noted *supra* p. 8 n.8, Plaintiff does not contest the President's authority to demote her from her position as Chairman and assign her as a member of the Board. Defendants have not raised this issue, perhaps because they realize it undercuts their position regarding the President's ability to exercise control over the Board.

"President normally has the opportunity to recommend or veto spending bills that affect the operation of administrative agencies" and to submit "a proposed budget to Congress for approval." *Id.* But both the CFPB and the FHFA received funding outside of that process, which made it "even more likely that the agency" would "slip from the Executive's control, and thus from that of the people." *Id.* (quotation marks omitted); *see Collins*, 594 U.S. at 231 ("[T]he FHFA is not funded through the ordinary appropriations process."). That the Board is subject to the appropriations process confirms that the Board is a traditional and permissible multimember body.

### C.    Ruling For Defendants Would Upend Constitutional Law.

Adopting the cramped interpretation of *Humphrey's Executor* advanced by the government in this case—which the government essentially acknowledges requires overturning it, TRO Op. at 8 n.1—would represent a sharp departure from the nation's history and tradition and would herald an unprecedented revolution in the structure of the federal government that could potentially impact every federal employee. That is yet another reason to reject Defendants' arguments.

Since *Marbury v. Madison*, the Supreme Court has consistently recognized that Congress has the constitutional authority to "regulate" "removal" of employees and inferior officers—the precise goal the Board's independent members further. *Perkins*, 116 U.S. at 485; *see Humphrey's Executor* 295 U.S. at 631; *see supra* p. 13. Even in *Myers*, the brief high-water mark for the maximalist interpretation of the President's removal power, the Supreme Court recognized that Congress could to some degree limit "the exercise of the power of removal." *Myers*, 272 U.S. at 161. The result of that historical process is a fully merit-based civil service, in which a Republican federal employee can rest assured that a Democratic President cannot fire him for his political beliefs and vice versa. The Merit Systems Protection Board is integral to that goal. *See supra* pp. 3-4.

Multimember boards with a degree of for-cause protection have existed since the Nineteenth Century. Congress established the Interstate Commerce Commission in 1887.[14] *See* Interstate Commerce Act, Pub. L. No. 49-104, 24 Stat. 379, 383 (1887) (members removable for "inefficiency, neglect of duty, or malfeasance in office"). The Federal Reserve followed in 1913, and the Federal Trade Commission a year later. *See* Federal Reserve Act, Pub. L. No. 63-48, 38 Stat. 251, 260 (1913) (providing members are removable "for cause"); Federal Trade Commission Act, Pub. L. No. 63-203, 38 Stat. 717, 718 (1914) (providing commissioners are removable "for inefficiency, neglect of duty or malfeasance in office"). Today, the multimember bodies whose members are entitled to for-cause removal protection include, to name just a few: the National Labor Relations Board; the Mine Safety and Health Review Commission; the Nuclear Regulatory Commission; the Federal Energy Regulation Commission; the Chemical Safety and Hazard Investigation Board; the Postal Regulatory Commission; the Occupational Safety and Health Review Commission; and the Federal Maritime Commission.[15]

This long and unbroken history is constitutionally significant, particularly in a separation of powers case like this one in which the constitutional text is indeterminate. As Justice Kagan—joined by Justices Sotomayor, Barrett, and Kavanaugh—recently explained "[l]ong settled and established practice" carries "great weight" "in interpreting constitutional provisions about the

---

[14] Bipartisan multimember boards without for-cause protection are even older. *See, e.g.*, An Act to Amend Section Fifty-Three Hundred and Fifty-Two of the Revised Statutes of the United States, in Reference to Bigamy, and for Other Purposes, 47 Cong. Ch. 47, 22 Stat. 30, 32 (1882) (creating a bipartisan, five-member board to govern the Territory of Utah).

[15] *See* 29 U.S.C. § 153(a) (National Labor Relations Board); 30 U.S.C. § 823(b) (Mine Safety and Health Review Commission); 42 U.S.C. § 5841(e) (Nuclear Regulatory Commission); 42 U.S.C. § 7171(b) (Federal Energy Regulation Commission); 42 U.S.C § 7412(r)(6) (Chemical Safety and Hazard Investigation Board); 39 U.S.C. § 502(a) (Postal Regulatory Commission); 29 U.S.C. § 661(b) (Occupational Safety and Health Review Commission); 46 U.S.C. § 46101(b) (Federal Maritime Commission).

operation of government." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 442 (2024) (Kagan, J., concurring) (quotation marks omitted); *see also, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 683 (1981) (Rehnquist, J.) (practice of Congressional acquiescence to President settling claims against foreign nations by executive agreement supported President's power to do so); *Stuart v. Laird*, 5 U.S. 299, 309 (1803) (upholding the assignment of Supreme Court Justices to sit as circuit judges because "practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction").

In contrast, ruling for Defendants in this case would have sweeping practical ramifications. Invalidating Harris's tenure protections would mean invalidating tenure protections for *every* multimember board. *Stare decisis* principles strongly counsel against this extraordinary upheaval. Indeed, even the government recognizes that it would be catastrophic for the American economy to strip at least one board—the Federal Reserve Board—of its independence. Earlier this week, the President issued an executive order requiring all "independent agencies" to submit "significant regulatory actions" for the President's approval. *See* Exec. Order No. 14,215 (2025) (Ensuring Accountability for All Agencies). That order is predicated on the same argument Defendants have advanced here, *i.e.*, that all executive branch personnel must be subject to "the President's ongoing supervision and control." *Id*. But with no explication whatsoever, the executive order specifically carves out an exception for "the Board of Governors of the Federal Reserve System" and "the Federal Open Market Committee in its conduct of monetary policy." *Id*. In short, the government knows it would be catastrophic to adopt the logical extensions of its own legal position.

The potential upheaval would not stop there. In its opposition to the temporary restraining order, the government paid lip service to the long historical tradition of Congress regulating the

22

removal of inferior officers and federal employees.  *See, e.g.*, Defs. TRO Resp. at 6.  It is difficult to square that longstanding practice, however, with Defendants' ahistoric and inflexible notion of the President's removal power.  If it is unconstitutional for Congress to ever protect from removal a board member who exercises "*any* executive power" to any degree, there is no plausible basis to distinguish the whole gamut of federal employees who exercise varying degrees of executive power.  Defs. TRO Resp. at 7 (emphasis original, quotation marks omitted).

Finally, there is an important, additional separation of powers concern if a court were to pull the rug from Congress and invalidate tenure provisions.  For a century, Congress passed laws establishing boards and appropriating funds to hire millions of federal employees on the assurance that the President would not be a king, and that the merits based civil service could not become a spoils system.  Congress may have—indeed, likely would have—chosen to not pass a significant portion of that legislation had it known a single person could so dramatically reshape the landscape of federal employment and aggrandize huge amounts of power.  Instead, Congress may have lodged certain entities (like the Merit Systems Protection Board) in another branch, *see Wiener*, 357 U.S. at 355; may have passed far more rigorous (and from the executive's perspective, more intrusive) laws regarding civil servants' rights; and may have radically scaled back the executive's authority altogether.  If the judiciary changes the rules on Congress now, and overturns *Humphrey's Executor*, it will radically upset the balance of power in a single, undemocratic stroke.[16]

### D.    The Government's Arguments On The Merits Are Wrong.

At the TRO stage, the government advanced a handful of arguments to distinguish this case from *Humphrey's Executor* on the merits.  None hold water.

---

[16] Because the Constitution makes legislation difficult to pass, including because it is subject to Presidential veto, it is no answer to suggest that Congress could *now* pass legislation to pare back the President's sudden accumulation of power.

*First*, the government formalistically argued that if a multimember board exercises any degree of executive authority, the Board falls outside of the *Humphrey's Executor* framework. According to the government, *Humphrey's Executor* mischaracterized the Federal Trade Commission as exercising quasi-legislative and quasi-judicial power in an Article I and III sense; modern courts understand that entities like the Merit Systems Protection Board actually exercise a degree of Article II executive authority; and so this case is distinguishable from *Humphrey's Executor* on that technical basis.

The Supreme Court has already rejected that reading of *Humphrey's Executor* and the argument that if someone exercises a mere scintilla of executive power, she must be removable at will by the President.  In *Morrison*, the Court acknowledged that under modern precedent, "the powers of the" Federal Trade Commission "at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree."  487 U.S. at 689 n.28.  But the Court explained its use of the terms quasi-legislative and quasi-judicial in *Humphrey's Executor* was not meant "to define rigid categories of those officials who may or may not be removed at will by the President."  *Id*. at 689.  Instead, the terms quasi-legislative and quasi-judicial help

> describe the circumstances in which Congress might be more inclined to find that a degree of independence from the Executive, such as that afforded by a "good cause" removal standard, is necessary to the proper functioning of the agency or official.  It is not difficult to imagine situations in which Congress might desire that an official performing "quasi-judicial" functions, for example, would be free of executive or political control.

*Id*. at 691 n.30.

The government's invocation of *Seila Law* on this point (at 9) is particularly off base.  Far from describing *Humphrey's Executor* as holding that a "multimember body" cannot "exercise *any* executive power," Defs. TRO Resp. at 9 (quoting *Seila Law*, 591 U.S. at 198, but emphasis added by the government), *Seila Law* explained that "multimember expert agencies that do not wield

*substantial* executive power" may receive for-cause removal protections under the *Humphrey's Executor* framework, *Seila Law*, 591 U.S. at 218 (emphasis added).  And because the Merit Systems Protection Board does not exercise *substantial* executive power, the for-cause removal provision at issue in this case is constitutional.

*Second*, the government attempted to distinguish the Merit Systems Protection Board "from a purely adjudicative body" like the War Claims Commission in *Wiener* based on several factors.  Defs. TRO Op. at 7.  Its arguments only underscore why the Board does not wield substantial executive authority and why the Board is a true adjudicatory body like the War Claims Commission.

For example, the government complained that the Board "hears" and "adjudicates" matters and, subject to the appeals process, takes "final action."  *Id.* (brackets omitted, quoting 5 U.S.C. § 1204(a)(1)).  But the whole point of an adjudicatory body is to hear and adjudicate matters. Moreover, the War Claims Commission, which the government appears to acknowledge was constitutional, could exercise far more authority than the Board.  As the Supreme Court explained in *Wiener*, the Commission's "finality of determination" was

> not subject to review *by any other official of the United States or by any court by mandamus or otherwise.*  Awards were to be paid out of a War Claims Fund in the hands of the Secretary of the Treasury, whereby such claims were given even more assured collectability than adheres to judgments rendered in the Court of Claims.

*Wiener*, 357 U.S. at 354-355 (internal citation omitted, emphasis added).  In contrast, the Board's decisions are subject to appellate review in Article III courts.

The government likewise complains the Board has the authority to review Office of Personnel Management rules to ensure they do not violate prohibitions against certain employment practices, such as coercing employees into engaging in political activity.  *See* 5 U.S.C. §§ 1204(f), 2302(b)(3).  That too is hardly the exercise of "substantial executive power," *Seila Law*, 591 U.S.

at 218, particularly because the Director of Office of Personnel Management may seek an Article III court's intervention where the President disagrees with the Board.  *See* 5 U.S.C. § 7703(d). Finally, the government points to the fact that the Board is "the named respondent" in some cases and can litigate the matter in the Courts of Appeals.  This happens when the Board resolves a matter on procedural grounds, or if the government contests a Board decision.  Defs. TRO Op. at 7.  That is not "*substantial* executive power," either.  *Seila Law*, 591 U.S. at 218 (emphasis added). It is a minor aspect of the Board's function that ensures the Board may (1) have its experts handle complex procedural appeals, and (2) inform the Court of its views when the Director petitions a Court of Appeals for review.[17]

*Third*, the government argued (at 9) that, under *Collins*, a court may not ever weigh the substantiality of the executive power a multimember body possesses when determining whether a for-cause removal provision is constitutional.  But that is not what the Court said in *Collins*. Instead, the Court stressed that *Collins* was a "straightforward application of" the Court's "reasoning in *Seila Law*," and that its holding is limited to "an agency led by a single Director." *Collins*, 594 U.S. at 251.  In fact, *Collins* reiterated that *Seila Law* had not "revisit[ed]" "prior decisions allowing certain limitations on the President's removal power," but instead declined to extend *Humphrey's Executor* in a "novel context" involving a single director.  *Id.* (quoting *Seila Law*, 591 U.S. at 204).  And *Seila Law* is crystal clear:  For "multimember expert agencies," the question is whether they "wield substantial executive power."  *Seila Law*, 591 U.S. at 218.

---

[17] Even if the Court thinks Congress crossed over the line and granted the Board some authority that counts as substantial executive power (it did not), the appropriate remedy would not be to invalidate the tenure provision.  Instead, in an appropriate case challenging a specific authority as beyond what a multimember body may exercise, should one ever arise, a court could invalidate that offending exercise of authority.

II.    **This Court Should Provide The Full Relief Harris Seeks.**

Moving from merits to remedy, this Court should award the full measure of relief Plaintiff seeks, as well as any other remedy the Court deems appropriate.  The open-and-shut nature of the merits case underscores why meaningful and effective relief is so critical.

**A.**  Plaintiff is entitled to declaratory relief.  There are " 'no dispositive factors' " for when declaratory judgment should issue, but courts typically rely on "two criteria" when determining whether to issue declaratory relief: (1) whether the judgment will "clarify[] the legal relations at issue" and (2) whether it will "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016)).

Both factors warrant declaratory relief here.  There is no question that a judgment would settle a "substantial controversy" as to the parties' relations—namely whether Plaintiff remains a duly appointed member of the Merit Systems Protection Board.  *See Glenn*, 222 F. Supp. 3d at 36. Declaratory relief would similarly remove the uncertainty at the heart of this case:  Whether Harris can be removed from her position on the Board absent "inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. § 1202(d).

Nor would any of the typical concerns that might weigh against declaratory relief apply. There are no questions about the "equity" of Harris's conduct; the "state of the record" is fully developed as to all facts relevant to the legal issue before this Court; the parties are plainly "adverse[]"; and, as this Court has already recognized, the "question to be decided" is one of substantial "public importance."  *POM Wonderful LLC v. F.T.C.*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012) (noting several "useful considerations" found by the D.C. Circuit); TRO Op. at 20 (discussing the "substantial public interest" in this case).

**B.** Plaintiff also satisfies the requirements for a permanent injunction.[18] Plaintiff (1) will suffer irreparable injury if an injunction is denied; (2) remedies "available at law" cannot remedy that injury; and (3) the balance of hardships and public interest favor Plaintiff. *See eBay Inc.*, 547 U.S. at 391. Where, as here, the "enforce[ment] of federal law" hangs in the balance, courts "must not hesitate in awarding necessary relief." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021) (quoting *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017)). All the reasons this Court presented why this case is a "genuinely extraordinary situation" warranting such relief apply with even greater force at this stage. *See* TRO Op. at 12-14.

*First*, the harms at issue here are irreparable and "sufficient in kind and degree" to override the factors typically weighing against relief in "personnel cases." *See Sampson v. Murray*, 415 U.S. 61, 84 (1974).

Most importantly, Defendants' actions cause irreparable harm to the Board itself.[19] Defendants seek to deprive Plaintiff "of the ability to do what Congress specifically directed," *i.e.*, to serve as an independent member of the Board. TRO Op. at 15 (quoting *Dellinger v. Bessent*, No. 25-0385, 2025 WL 471022, at *11 (D.D.C. Feb. 12, 2025)). Plaintiff's "statutory mission" is core to the Board's independence. Denying a merits-stage injunction would not just "threaten[] the independence" of the Board, it would destroy its independence entirely by suggesting that the co-equal branches lack any ability to counteract the plainly illegal removal of Board members for cause. *Humphrey's Executor*, 295 U.S. at 630; *see also Berry v. Reagan*, No. 83-3182, 1983 WL

---

[18] For the same reasons discussed here and for the reasons outlined in the Court's TRO opinion, Plaintiff also satisfies the standard for a preliminary injunction. Should the Court not issue its merits decision before the TRO dissolves, Plaintiff requests a preliminary injunction on or before the dissolution of the TRO.

[19] This Court correctly observed (TRO Op. at 15) that the "interests of [a plaintiff's agency]" is a permissible factor to consider in awarding equitable relief.

538, at *5 (D.D.C. Nov. 14, 1983) (explaining that irreparable injury is "evident by the obviously disruptive effect the *denial* of preliminary relief will likely have on [an independent] Commission's final activities"). More narrowly, Plaintiff would also be deprived of her " 'statutory right to function' " as a board member, which is a separate harm based on Plaintiff's inability to fulfill her seven-year term. *See* TRO Op. at 17. These are the quintessential types of harm that "cannot be remedied with anything other than equitable relief." *Id.*; *accord* TRO Op. at 15.[20]

*Second*, the nature of the irreparable harm makes plain why legal remedies are inadequate. Plaintiff's "loss of the ability" to perform her congressionally directed, presidentially appointed, and Senate confirmed mission transcends the "loss of income" or "embarrassment" involved in the typical employment action; and it cannot be restored by an award of damages. *Dellinger*, 2025 WL 471022, at *10-11; TRO Op. at 18. The government's argument in its TRO briefing that backpay is the only appropriate remedy, Defs' TRO Resp. at 10, is unavailing. As an initial matter, the mere availability of other *equitable* relief does not render injunctive relief improper. *See Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1184 (11th Cir. 2010) (explaining that back pay "is considered equitable relief"). In any event, no amount of money paid to Plaintiff will reanimate the Board's independence once it is eviscerated or replace her lost time in office.

*Third*, as at the TRO stage, the balance of the equities and public interest favor Plaintiff. There is an extremely strong interest in the executive branch "abid[ing] by the federal laws that govern [its] existence and operations." TRO Op. at 20 (quoting *League of Women Voters of United*

---

[20] In addition, member Raymond Limon's term will expire on March 1, 2025. Declining to issue injunctive relief would potentially deprive the Board of a quorum and prevent it from deciding cases. The government may suggest that this harm is lessened by the possibility that Limon chooses to hold over for an additional year. But it is entirely speculative that Limon will choose to extend his term by a year, or that the President will not attempt to fire him if Limon does extend. Regardless, what is a fact is that Limon's term expires on March 1, 2025, and absent some further development, the Board will lack a quorum if Harris is not acting as a member.

*States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  In its stay papers, the government asserted a countervailing harm based on the purported "intrusion" of an injunction on the President's Article II prerogative.  Stay Mot. at 2, ECF No. 16.  But that is just an attempt by the government to "tie their argument to the merits."  *Dellinger*, 2024 WL 471022 at *13.  This Court should reject that sleight of hand.  If Congress could permissibly grant for-cause removal protections to members of the Merit Systems Protection Board, then there has been no intrusion on the President's Article II powers.  The Government has no interest in doing what the law forbids.  *League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").  Permanent injunctive relief is therefore proper.[21]

**C.**  In its TRO filings and in *Dellinger*, the Government has suggested that it would be inappropriate to provide injunctive relief in this case due to separation of powers concerns.  But those arguments are all wrong.

1.  The government relies on a separation-of-powers argument grounded in the norm against "enjoin[ing] the President in the performance of his official duties."  *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality) (quoting *Mississippi v. Johnson*, 4 Wall. 475, 501 (1867)); Defs' TRO Resp. at 10; Gov't Stay App. ("*Dellinger* App.") at 21-22, *Bessent v. Dellinger*, No. 24A790 (U.S. Feb. 16, 2025).  But the government fundamentally misreads precedent.  The norm against issuing injunctive relief against the President as an individual reflects a unique concern that injunctive relief that runs "against the President personally" would "distract him from his constitutional responsibilit[ies]."  *Id*. at 828 (Scalia, J. concurring in part and

---

[21] For the additional reasons discussed below, to the extent permanent injunctive relief is not available, Plaintiff is also entitled to mandamus.  *See* Compl., ECF No. 1 at 16 (requesting mandamus relief in Count Five).

concurring in the judgment).[22] That norm has never been held to prevent suits against lesser executive officials, which do not "invoke separation-of-powers considerations to the same extent," and which ensure relief to the plaintiff. *Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982). As to those executive officials, "injunctive relief" is firmly "within the courts' power," *Franklin*, 505 U.S. at 802, and consistent with "a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 327 (2015). Nor is it uncommon for plaintiffs to include the President as a named party, but for the relief to run against his subordinates. *See Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (maintaining the President as a defendant but tailoring "injunctive relief" to the other "remaining Defendants"), *vacated on other grounds*, 583 U.S. 941 (2017).[23]

Indeed, the D.C. Circuit has rejected this precise argument. As the Court explained, the fact that challenged action "is essentially that of the President does not insulate the entire executive branch from judicial review." *Chamber of Com. Of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). Rather, it is "well established" that plaintiffs can obtain full review by "seeking to enjoin the officers who attempt to enforce the President's directive" "[e]ven if [they] were acting at the behest of the President." *Id*. (quoting *Franklin*, 505 U.S. at 815 (Scalia, J. concurring)). The D.C.

---

[22] Even *Franklin* "did not absolutely slam the door shut on presidential injunctions"—rather, both the plurality and Justice Scalia left open the possibility that the President "might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *McCray v. Biden*, 574 F. Supp. 3d 1, 9 (D.D.C. 2021) (quoting *Franklin*, 505 U.S. at 802; *id*. at 827 n.2 (Scalia, J. concurring)).

[23] To avoid any doubt, the Court may wish to make clear that all injunctive relief (temporary, preliminary, or permanent) applies only "to the other defendants acting on [the President's] behalf." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025). The D.C. Circuit has held that courts "may utilize the tool of declaratory relief" against the President as a defendant. *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974). But to similarly avoid the government recycling its argument about whether the President is a proper defendant for declaratory relief, the Court may wish to issue declaratory relief solely against the other Defendants.

Circuit recently reaffirmed this point in *Dellinger*, explaining that such relief is "unquestionably" available in removal cases. *Dellinger*, 2025 WL 559669, at *6 n.1.

The government's position also proves too much. Taken to its logical conclusion, the government would prohibit relief against any official that can be said to exercise Article II power, including any time the President orders someone to act under his prerogative to "take Care that the Laws be faithfully executed." *Dellinger* App. at 12. Indeed, if the government is correct, the President could always avoid judicial review by asserting that the acts of his officials constitute the use of "executive power on his behalf." *Id*. That cannot be right. Our federal system of checks and balances relies on the ability of the judiciary to "determine if the executive branch is abiding by the terms of legislative enactments," *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996), and "to say what the law is," *Marbury*, 5 U.S. at 177. That core aspect of the separation of powers— and indeed the "rule of law"—could effectively be "bypassed" were courts unable to issue "injunctive relief against subordinate officials" in those circumstances. *Swan*, 100 F.3d at 978.

2. The government also argued that injunctive relief would amount to improper "judicial reinstatement." Defs' TRO Resp. at 10. This argument conflates the merits and remedies analysis. Whether Plaintiff must be *reinstated*, or whether she currently *is* a legally appointed Board member, "is the very merits issue" that must be "adjudicated by [this] [C]ourt." *Dellinger*, 2025 WL 559669, at *6. To entertain the government's argument, this Court would have to presume that the for-cause removal protection itself is unconstitutional—"the opposite of what courts normally do." *Id*. If this Court follows the normal course and concludes that "the statute is constitutional and binding," *see id.*, only one conclusion is available: that Plaintiff is and always has been a duly appointed member of the Merit Systems Protection Board. *See also Wilkinson v.*

*Legal Servs. Corp.*, 27 F. Supp. 2d 32, 64 (D.D.C. 1998) (explaining that courts only "reach the question of . . . remedy" if a plaintiff "prevail[s]" on her claim).

Injunctive relief, therefore, would simply prevent Cathy Harris from being "removed from her office" or "in any way be[ing] treated as having been removed."  Compl. at 11-12.  It would not require "reinstatement" or otherwise coerce executive officials in a way different from the mine run of cases enjoining *ultra vires* executive acts.  *See, e.g.*, *Reich*, 74 F.3d at 67 (explaining that "courts are normally available" when the executive "acts *ultra vires*").  In short, the Government's objection only makes sense if Plaintiff's removal was lawful in the first place—the very inquiry on the merits.  The Court should reject this end run around the typical permanent injunction inquiry.

3.  The government in *Dellinger* also advanced a highly technical argument that only *legal* relief is available in these circumstances, citing a statement from an 1898 case that that courts of equity traditionally lacked jurisdiction over "the appointment and removal of public officers." *Dellinger* App. at 24 (quoting, inter alia, *White v. Berry* 171 U.S. 366, 377 (1898)).  But the Supreme Court has explained that "[m]uch water has flowed under the dam since 1898," *Sampson*, 415 U.S. at 71, including the merger of law and equity in 1938.  Since 1898, the Supreme Court has expressly recognized that Article III courts are not "without authority to grant interim injunctive relief to a discharged government employee," *despite* the "historical denial" of such relief "in cases such as *White*."  *Id.* at 71, 83; *see also id.* at 92 n.68 ("[W]e do not wish to be understood as foreclosing [such] relief.").  Indeed, other plaintiffs have received equitable relief in analogous contexts.  *See, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 540 (1959) (holding that Department of Interior official was illegally dismissed in violation of binding regulations and stating official was therefore "entitled to the reinstatement which he seeks"); *Service v. Dulles*, 354 U.S. 363, 370 (1957) (considering similar claim for declaratory and injunctive relief by illegally

discharged foreign service employee); *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) (granting preliminary injunction); *cf. Wiener*, 357 U.S. at 351 & n.* (noting that member of War Claims Commission had initially filed suit to retain his office, but then switched to seeking back pay after "the Commission was abolished").[24]

Regardless, even if the government were correct that the Court may not issue equitable relief here (to be clear: the government is wrong), the Court should at minimum grant other relief Plaintiff seeks. For one, the technical constraints that may apply to injunctive relief need not apply to declaratory judgments, which "are neither legal nor equitable," *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988), and need not "fit into one of the existing equitable patterns." *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 223 (3d Cir. 2009). In addition, cases the government cited in its application before the Supreme Court in *Dellinger* confirm that courts have jurisdiction "to determine the title to a public office" by "*certiorari*, error, or appeal, or by *mandamus*, prohibition, [or] *quo warranto*." *In re Sawyer*, 124 U.S. 200, 212 (1888) (cited at *Dellinger* App. 23-24). To be clear, the fact that so many remedies have long been available in personnel cases proves that no grave separation-of-powers concerns arise from issuing an injunction. But in this particular case, the Complaint includes a request for mandamus relief. Compl. ¶¶ 42-44. If the Court concludes *other* relief is unavailable, a writ of mandamus should issue. "[N]o other adequate means to attain relief" would exist; Plaintiff's entitlement to relief is "clear and indisputable"; and mandamus would be "appropriate under the circumstances." *See In*

---

[24] The District Court in *Service* later entered an order declaring the Secretary of State's action "purporting to terminate" the plaintiff to be "invalid and without legal effect" and ordering the plaintiff's "restoration . . . as a foreign service officer." *Service*, B-134614 Comp. Gen., 1958 WL 1888 (Mar. 3, 1958).

34

*re Al Baluchi*, 952 F.3d 363, 368 (D.C. Cir. 2020) (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004)).[25]

4. Finally, as a variant of its argument that an officer may not seek equitable relief, the government has relatedly suggested that Harris's potential relief is limited to backpay. Defs' TRO Resp. at 10. This, too, misreads precedent. *Sampson* expressly left open the possibility of injunctive relief in the "extraordinary situation" where there is no other proper equitable remedy. TRO Op. at 11 n.3 (citing *Sampson*, 415 U.S. at 92 n. 68). Plaintiff is aware of no court—and the government cites none—establishing a "*per se*" backpay-only rule. *Robinson v. D.C. Gov't*, No. 97-CV-787, 1997 WL 607450, at *7 (D.D.C. July 17, 1997) (collecting cases). As Judge Jackson explained in *Dellinger*, the considerations that have led courts to deny injunctive relief in other contexts have "little utility" as applied to officials removable only for cause. *Dellinger*, 2025 WL 471022, at *10.

At bottom, it makes no sense to limit relief to backpay: The President has "naked[ly]" claimed that he may "remove a member of an adjudicatory body" "merely because he wanted his own appointees." *Wiener*, 357 U.S. at 256. But "no such power is given to the President directly by the Constitution." *Id.* It cannot be that the President may unlawfully terminate a protected adjudicatory official like Cathy Harris, and the only minor consequence of violating the law is that the Treasury must write her a check each pay period, a negligible expense from the President's perspective. Congress did not provide for-cause protection to Board members to ensure they

---

[25] To facilitate appellate review, if the Court were to grant a permanent injunction, the Court may still wish to additionally note that it would alternatively grant mandamus were the option of a permanent injunction not available.

receive pay upon removal.  Congress protected members from arbitrary dismissal to ensure they remain in office and exercise their duties, free from fear or favor.[26]

* * *

Let's be clear: Defendants purport to champion the separation of powers.  But at the end of the day, their position that this Article III Court is powerless to award meaningful relief to Cathy Harris and enforce landmark precedent takes direct aim at the very notion of judicial review core to the separation of powers.  "The government of the United States has been emphatically termed a government of laws, and not of men.  It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."  *Marbury*, 5 U.S. at 163; *see id*. ("[W]here there is a legal right, there is also a legal remedy" (quotation marks omitted)).  This Court can and should say "no."

---

[26] Indeed, under the logical extent of the government's backpay-only framework, if the President purported to terminate Article III judges and ordered executive branch officials to bar them from their chambers, the harmed judge would have no meaningful recourse.  That cannot be right.

36

## CONCLUSION

For the foregoing reasons, Plaintiff Cathy A. Harris's motion should be granted, the Court should enter declaratory relief for Plaintiff, the Court should order the proposed permanent injunction submitted by Plaintiff, and the Court should issue a writ of mandamus. Plaintiff also respectfully requests that the Court extend the operative TRO if it does not resolve the merits within 14 days of the TRO's entry. *See* Fed. R. Civ. P. 65(b)(2). Plaintiff similarly respectfully requests a preliminary injunction if the TRO dissolves under Federal Rule of Civil Procedure 65 and the Court has not yet issued a decision on the merits.[27]

---

[27] For analytic simplicity, Plaintiff's complaint was divided into six overlapping counts. She deserves to prevail on the merits of counts one and four because, as we just explained in Part I, the alleged "termination of Ms. Harris is *ultra vires*," and violates the "reasonable limitations on the removal of the heads of independent agencies" established by Congress pursuant to its powers under the Constitution. Compl. ECF No. 1 at 15, 16. She deserves to prevail on count two, under the Administrative Procedure Act, because, as we explained in Part I, any action taken by the defendants toward her or the Board with respect to her alleged termination is not "in accordance with law." *Id*. at 16 (quotation marks omitted). She deserves to prevail on count three (declaratory relief), count five (mandamus), and count six (injunction) for the reasons described above in Part II.

Respectfully submitted,

Dated: February 23, 2025          /s/ Jeremy D. Wright
      Washington, D.C.          MICHAEL J. KATOR, D.C. Bar No. 366936
                                   JEREMY D. WRIGHT, D.C. Bar No. 483297
                                   KERRIE D. RIGGS, D.C. Bar No. 995784
                                   KATOR, PARKS, WEISER & WRIGHT,
                                     P.L.L.C.
                                   1150 Connecticut Ave., NW, Suite 705
                                   Washington, DC 20036
                                   (202) 898-4800
                                   (202) 289-1389 (fax)
                                   mkator@katorparks.com
                                   jwright@katorparks.com
                                   kriggs@katorparks.com

                                   LINDA M. CORREIA, D.C. Bar No. 435027
                                   CORREIA & PUTH, PLLC
                                   1400 16th Street, NW, Suite 450
                                   Washington, D.C. 20036
                                   (202) 602-6500
                                   lcorreia@correiaputh.com

                                   NEAL KUMAR KATYAL, D.C. Bar No. 462071
                                    *pro hac vice application pending*
                                   NATHANIEL A.G. ZELINSKY, D.C. Bar No. 1724093
                                    *pro hac vice application pending*
                                   EZRA P. LOUVIS, D.C. Bar No. 90005185
                                    *pro hac vice application pending*
                                   MILBANK LLP
                                   1850 K St., NW
                                   Suite 1100
                                   Washington, DC 20006
                                   (202) 835-7505
                                   nkatyal@milbank.com
                                   nzelinsky@milbank.com
                                   elouvis@milbank.com

                                   *Attorneys for Plaintiff Cathy A. Harris*

38

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of February, 2025, I filed the foregoing document

with the Court via ECF, which will automatically serve all counsel of record, including:

MADELINE M. MCMAHON
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Email: madeline.m.mcmahon@usdoj.gov

/s/ Jeremy D. Wright_____
Jeremy D. Wright