# DECLARATION OF CATHY A. HARRIS

I, Cathy A. Harris, hereby declare:

1. I have served as a member of the Merit Systems Protection Board (MSPB or Board) since June 1, 2022.

2. On or about June 24, 2021, President Biden nominated me to be a member and Chairman of the MSPB. I was renominated by President Biden to be a member of the MSPB on January 4, 2022. The Senate confirmed my nomination as a member to the MSPB on May 25, 2022. I was sworn in as a member of the Board on June 1, 2022. My term as a member of the MSPB expires on March 1, 2028.

3. President Biden designated me as Vice Chairman of the MSPB on June 6, 2022, and I served as Acting Chairman of the MSPB until March 6, 2024. The Senate confirmed me as Chairman of the MSPB on March 6, 2024, and I was sworn in as Chairman of the MSPB on March 14, 2024.

4. Early in the morning on February 11, 2025, I saw an email from Trent Morse from the White House Office of Presidential Personnel. The email indicated that it was sent on February 10, 2025, at 10:49 PM. The email stated, "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately." A true and correct copy of the email that I received is attached as Exhibit 2.

5. I did not perform any Board work after I received the email until the Court issued its TRO order on February 18, 2025. On February 19, 2025, I resumed deliberating and voting on cases.

6. In my role as a member of the Board since June 1, 2022, I deliberate and vote on cases at the Board's appellate level, which are mostly on "petitions for review." Since June 1, 2022, through the date I was terminated (February 10, 2025), I participated in approximately 4,472 decisions. As of the date of my termination, there were approximately 70 additional cases that have been

voted by the three Board members and pending issuance by the Board's staff.

7. When the Board lost its quorum between January 7, 2017, and March 3, 2022, the Board could not vote on any petitions for review. At the time the quorum was restored on March 4, 2022, the new Board, consisting of Tristan Leavitt and Raymond Limon, inherited a caseload of 3,793 cases. We have referred to this as the "inherited inventory."

8. I joined the Board on June 1, 2022. Between March 4 and June 1, 2022, the other Board members began issuing decisions. They issued about 225 decisions before my arrival.

9. When I arrived at the Board in June 2022, I was informed that it was predicted that it would take 5-6 years to clear the remaining inherited inventory. I determined that we needed to try to clear the inherited inventory much sooner. I set a target that we would clear the inherited inventory by the end of 2025, if not sooner.

10. The Board provides statistics at the end of each month to show the progress with the inherited inventory. *See* https://www.mspb.gov/foia/files/HQ_Case_Processing_Data.pdf.

11. Between the restoration of the quorum and the end of the 2022 fiscal year, the Board decided 528 cases, which included both inherited inventory headquarters (HQ) cases as well as HQ cases docketed after the restoration of the quorum. At that point, there was 87% of the inherited inventory remaining.

12. By the end of the FY 2023, we had decided a total of 2,027 cases since the quorum was restored. At that point, there was 50% of the inherited inventory remaining. We were well ahead of the goal to clear the inherited inventory by the end of 2025.

13. By the end of FY 2024, we had decided 4,368 cases since the quorum was restored. This left us with only 6% of the inherited inventory.

14. By the end of January 2025, we had decided 4620 cases. This left us with only 56 inherited inventory cases, representing only 1% of the inherited inventory.

15. As of Friday, February 7, 2025, the Board had 44 inherited inventory cases remaining. As of Friday, February 21, 2025, the Board had 32 inherited inventory cases remaining.

16. In addition to deciding the inherited inventory cases, the Board has also worked to decide newly-filed appellate-level cases. Historically, about 400-600 cases are filed each year at the appellate level. We decided that, in addition to deciding the oldest cases pending before the Board, we would decide newly-incoming cases so that a perpetual backlog would not be created. This proved to be quite efficient.

17. Between February 11, 2025, and February 18, 2025, the Board did not issue any Board-level decisions. The Board resumed issuance of such decisions on February 19, 2025. Generally, the issued cases are available on the Board's website the next business day. *See, e.g.*, https://www.mspb.gov/decisions/nonprecdec.htm (non-precedential decisions); https://www.mspb.gov/decisions/precdec.htm (precedential decisions).

18. After I was appointed and confirmed as a member, and once I became acclimated to the job, I sought to consider, deliberate, and vote on approximately 35 cases per week. Some weeks were higher, some lower. Some cases were more complex or required more extensive deliberations. I encouraged my fellow Board members to have the same goal of 35 cases per week, if possible.

19. To reach a decision on a case, the attorneys in the Board's Office of Appeals Counsel (OAC), prepare a draft decision for consideration by the Board members. I typically review materials prepared by OAC counsel as well as relevant portions of the hearing-level record from the initial appeal stage of the case. The hearing-level record can be quite voluminous. At times, I adopt the draft decision from OAC. At other times, I revise the draft decision,

write an entirely new decision, or recommend to my fellow Board members that we send the case back to OAC for a rewrite. At times, multiple alternative decisions are exchanged until consensus is reached by the Board members.

20. To maximize the efficiency of our decisions, we deployed a Case Review Update team to review and revise the draft decisions that had been drafted by the OAC attorneys during the lack of quorum. Because of changes in the law that had occurred during the lack of quorum, many of the previously drafted decisions had to be updated.

21. We also determined that it would be most efficient for us to focus on the cases that would likely be precedential decisions, so that other cases that might rely on such precedent could flow afterward and be more efficiently processed. Therefore, before my arrival, the other Board members issued 15 precedential decisions. Between June 1, 2022 and September 30, 2022, we issued an additional 18 precedential decisions. In FY 2023, we issued 37 precedential decisions. In FY 2024, we issued 13 precedential decisions. So far, in FY 2025, we have issued 9 precedential decisions.

22. In terms of the volume of overall decisions, both precedential and non-precedential, before the loss of quorum, the Board issued 207 cases at the appellate-level in FY 2017 before it lost its quorum; 1,180 cases in FY 2016; 3,120 cases in FY 2015, an unusual year in which mass furloughs were conducted in the federal government; 1,101 cases in FY 2014; and 952 cases in FY 2013. *See* https://www.mspb.gov/about/annual_reports/MSPB_FY_2017_Annual_Report_1481375.pdf at 13; https://www.mspb.gov/about/annual_reports/MSPB_FY_2016_Annual_Report_1374269.pdf at 15; https://www.mspb.gov/about/annual_reports/MSPB_FY_2015_Annual_Report_1275851.pdf at 15; https://www.mspb.gov/about/annual_reports/MSPB_FY_2014_Annual_Report_1179694.pdf at 15;

https://www.mspb.gov/about/annual_reports/MSPB_FY_2013_Annual_Report_1038222.pdf.

23. The Board does not establish policy other than policies regarding its own staff and operations and has no rulemaking authority.

24. The Board is also neither an investigative nor prosecutorial agency. The Board performs no investigations of external parties and does not prosecute cases. The Board does not investigate allegations of wrongdoing brought by federal employees in the first instance; rather, it adjudicates appeals brought by federal employees who have been subject to an adverse action, or who bring an individual right of action alleging whistleblower retaliation after first bringing such allegations for investigation to the Office of Special Counsel (OSC). Rarely, the Board also adjudicates appeals brought to it by agencies, such as in the case of discipline sought against administrative law judges, or in Hatch Act cases brought by OSC. The Board does not initiate disciplinary actions against federal employees (with the exception of disciplinary actions against Board employees, when appropriate). The Board has no enforcement units, such as a Hatch Act unit or a USERRA unit, like OSC has. Rather, the Board adjudicates cases brought before the Board under the Hatch Act and USERRA. The Board does not order other agencies to conduct investigations or to produce written reports.

25. The Board is a multi-member, bi-partisan tribunal, consisting of three members. The President may nominate a Chairman, who must be confirmed by the Senate. The President may also appoint a Vice Chairman, who is not subject to Senate confirmation. In the absence of a confirmed Chairman, the Vice Chairman may serve as Acting Chairman.

26. As a member of the Board, I cannot issue adjudication decisions unilaterally. Rather, there must be a quorum, consisting of at least two Board members, to issue a decision. The decisions are voted on by all of the Board members. There may be dissents, split decisions, concurrences, and recusals. However, during my tenure, over 95% of the decisions (not including any recusals) have been unanimous.

27. During my tenure with the Board, I estimate that over 95% of the time spent working by a Board member is devoted to adjudicating cases before the Board. The Chairman, who is the "chief executive and administrative officer of the Board," 5 U.S.C. § 1203(a), acts on behalf of the Board with respect to most administrative and operational matters, and spends additional time on internal administrative matters such as Board personnel matters, labor-management relations, hiring, IT (including the Board's new e-Appeal system), security, strategic planning, and MSPB budgetary issues. The Chairman supervises the Executive Director and the EEO Director. The agency's Performance Improvement Officer is housed within the Chairman's office. The Chairman also selects and hires the General Counsel of the agency. The Chairman is the official who responds on behalf of the agency to FOIA and Privacy Act appeals made by external parties.

28. The Board does not dictate or enforce policies regarding the federal workforce. That power is entrusted to the Office of Personnel Management.

29. 5 U.S.C. § 1204(a)(2) provides that the Board shall "order any Federal agency or employee to comply with any order or decision issued by the Board under the authority granted under paragraph (1) of this subsection and enforce compliance with any such order." This is similar to the powers of a court to issue orders and is in no way a prosecutorial function.

30. 5 U.S.C. § 1204(a)(3) provides that the Board shall "conduct, from time to time, special studies relating to the civil service and to other merit systems in the executive branch, and report to the President and to the Congress as to whether the public interest in a civil service free of prohibited personnel practices is being adequately protected." These studies are prepared by the Board's Office of Policy and Evaluations, and are recommendations provided to Congress and the President and are similar to the studies conducted by the legislative Congressional Research Service. The Board's studies have no authoritative force of law and are not enforced by the Board. All of the Board members vote on whether the studies are released to Congress and the President, and are not subject to any unilateral action by

any one Board member. This is a very limited duty and has taken up less than 1% of my time.

31. 5 U.S.C. § 1204(a)(4) provides that the Board shall "review, as provided in subsection (f), rules and regulations of the Office of Personnel Management." Subsection (f) provides that the Board may review such rules and regulations "on its own motion," "on the granting by the Board . . . of any petition for review filed with the Board by any interested person," or "on the filing of a written complaint by the Special Counsel seeking such review." Thus, these reviews are done through an adjudicative review process. The Board may declare such rules or regulations invalid on its face only under very limited circumstances, i.e. if the rule or regulation "on its face" requires any employee to violate 5 U.S.C. § 2302(b). The Board may declare a rule or regulation "invalidly implemented by any agency" if it its implementation required any employee to violate section 2302(b). I cannot recall any such instances occurring during my tenure, and my understanding is that this is an exceedingly rare occurrence.

32. The Board's decisions are subject to judicial review. Pursuant to 5 U.S.C. § 7703(a), an employee may appeal to an Article III court, which is generally but not always the Federal Circuit. Pursuant to 5 U.S.C. § 7703(d), the Director of the Office of Personnel Management may also petition a federal court, which is generally but not always the Federal Circuit, to review decisions by the Board.

33. By statute, the Board may be a named defendant before a court in two circumstances. First, if the Board issues a decision on a procedural or jurisdictional basis, the Board will be a defendant, and the Board's attorneys will appear in court (with the exception that the Solicitor General represents the Board before the Supreme Court). This ensures the Board's expert attorneys can provide their specialized knowledge in procedurally and jurisdictionally complex cases. Second, if the Director of the Office of Personnel Management petitions for review, the Board will be a named defendant. This ensures the Board's attorneys can provide the court the Board's perspective on the matter. Finally, the Board will also be a plaintiff

before a court when it requests that court to enforce a subpoena issued by the Board. However, that is a very rare occurrence, and I am aware of no instances in which this has occurred during my tenure. The Board is otherwise generally not a party in court and does not litigate before courts.

34. The Board has seen an increase in new filings this year. While ordinarily the MSPB will receive about 400 new appeals per month at the regional level, during the time period from February 9-20, 2025, the MSPB received more than 1,600 new appeals.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____          _2/23/2025_____
Cathy A. Harris                                                    Date