# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS, in her personal capacity
and in her official capacity as Member of the
Merit Systems Protection Board,

               Plaintiff,

     v.

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury, et al.,

               Defendants.

Case No. 1:25-cv-00412-RC

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
Margaret Hassel (DC Bar No. 90029057)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iii

INTEREST OF *AMICUS CURIAE* ..................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

ARGUMENT ....................................................................................................... 4

    I.    Binding Precedent Affirms the Legitimacy of Multimember Independent Agencies Like the MSPB ......................................................................... 4

    II.   Established Practice Confirms the Validity of Multimember Independent Agencies ................................................................................................ 11

    III.   Constitutional Text and History Further Underscore the Legitimacy of Multimember Independent Agencies ..................................................... 15

CONCLUSION .................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ............................................................................ 13

*Collins v. Yellen*,
    594 U.S. 220 (2021) ............................................................................ 5

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
    91 F.4th 342 (5th Cir. 2024) ............................................................... 4, 8

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ....................................................... 3, 5, 14, 18

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935) ............................................................................ 13, 18

*In re Hennen*,
    38 U.S. 230 (1839) ............................................................................. 3, 15, 16

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) ............................................................................ 3, 11

*Marbury v. Madison*,
    5 U.S. 137 (1803) ............................................................................... 17

*McAllister v. United States*,
    141 U.S. 174 (1891) ............................................................................ 18

*McPherson v. Blacker*,
    146 U.S. 1 (1892) ............................................................................... 13

*Meta Platforms, Inc. v. FTC*,
    No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024) ................... 10

*Mistretta v. United States*,
    488 U.S. 361 (1989) ............................................................................ 11, 15

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................................ 13

*Myers v. United States*,
    272 U.S. 52 (1926) ............................................................................. 16, 18

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ................................................................................. 6

*Nat'l Sec. Archive v. Cent. Intel. Agency,*
104 F.4th 267 (D.C. Cir. 2024) ................................................................ 3

*NLRB v. Noel Canning,*
573 U.S. 513 (2014) ............................................................................. 2, 11

*Parsons v. United States,*
167 U.S. 324 (1897) ............................................................................... 18

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995) ................................................................................. 6

*The Pocket Veto Case,*
279 U.S. 655 (1929) ............................................................................... 11

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020) ................................................... 1-11, 13, 14, 18

*Shurtleff v. United States,*
189 U.S. 311 (1903) ............................................................................... 18

*Stuart v. Laird,*
5 U.S. 299 (1803) ................................................................................... 14

*United States v. Curtiss-Wright Exp. Corp.,*
299 U.S. 304 (1936) ............................................................................... 13

*United States v. Midwest Oil Co.,*
236 U.S. 459 (1915) ............................................................................... 11

*Va. Off. for Prot. & Advoc. v. Stewart,*
563 U.S. 247 (2011) ................................................................................. 6

*Wiener v. United States,*
357 U.S. 349 (1958) ............................................................................... 13

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) .......................................................................... 11, 15

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ...................................................................................    2, 11

Constitutional Provisions, Statutes, and Legislative Materials

Act of July 27, 1789, ch. 4, 1 Stat. 28...................................................    17

Act of Feb. 25, 1863, ch. 58, 12 Stat. 665 ...........................................    17

Act of Mar. 2, 1889, ch. 382, 25 Stat. 855............................................    12

Act of June 29, 1906, ch. 3591, 34 Stat. 584 ........................................    12

An Act to Create a Federal Trade Commission, ch. 311, 38 Stat. 717 (1914) .............    13

An Act to Regulate Commerce, Pub. L. No. 49-104, ch. 104, 24 Stat. 379 (1887) ......    1, 6, 7, 12

1 Annals of Cong. (1789)........................................................................    17

Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 903, 92 Stat. 1111 .............    8

S. Rep. No. 95-969 (1978) ....................................................................    9, 10

5 U.S.C. § 1201 ...................................................................................    7, 8, 10

5 U.S.C. § 1202 ...................................................................................    7

5 U.S.C. § 1202(a) ...............................................................................    8

5 U.S.C. § 1204(a) ...............................................................................    8

5 U.S.C. § 1204(b)(2)(A).......................................................................    7

5 U.S.C. § 1204(c) ...............................................................................    7

5 U.S.C. § 1204(e)(2)(A) .......................................................................    8

U.S. Const. art. I, § 8, cl. 18...................................................................    16

U.S. Const. art. II, § 2 ..........................................................................    16

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

U.S. Const. art. II, § 4 ...................................................................................... 15

*Violations and Abuses of Merit Principles in Federal Employment: Hearings Before the Subcomm. on Manpower & Civil Serv. of the H. Comm. on Post Office & Civil Serv.*, 94th Cong. (1975)........................................................................................... 9

<u>Books, Articles, and Other Authorities</u>

Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175 (2021) .......................................................................................... 15

Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111 (2000) ........................ 12

Br. for Court-Appointed *Amicus Curiae*, *Seila Law LLC v. CFPB*, 591 U.S. 197 (No. 19-7) ................................................................................................... 7

Jimmy Carter, Federal Service Reform Message to the Congress (Mar. 2, 1978) ........ 10

Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353 (1927).................................................................... 17

David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161 (1995) ........................ 16

*The Federalist No. 39* (Clinton Rossiter ed., 1961)...................................... 16

*The Federalist No. 77* (Clinton Rossiter ed., 1961)...................................... 15

Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725 (1996) ............. 15

Chester A. Newland, *Politics of Transition from the Administrative to the Facilitative State*, *in* The Future of Merit 200 (James P. Pfiffner & Douglas A. Brook eds., 2000).......................................................................................... 9

Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021 (2006) ........................................................................................ 17

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911).......................... 15

Joseph Story, *Commentaries on the Constitution of the United States* (1833).............. 15

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

White House Historical Association, *When Was Electricity First Installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house ........................................................................................ 1

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works to improve understanding of the Constitution and accordingly has an interest in this case.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

Congress has been creating multimember independent agencies for most of the nation's history—they have existed for as long as the light bulb.[2]  Nearly a century of Supreme Court precedent affirms their constitutionality.  Relying on that precedent, Congress has established dozens of multimember agencies whose leaders are removable only for cause, including the Merit Systems Protection Board (MSPB).  President Trump's attempt to remove Cathy Harris from the Board without cause, in defiance of the Civil Service Reform Act (CSRA), contravenes binding Supreme Court precedent, established practice, and the Constitution's text and history.

In claiming that the President has the authority to ignore MSPB Members' statutory tenure protections, Defendants rely primarily on *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020).  But that decision addressed "a new situation" involving the "almost wholly unprecedented" creation of an independent agency "wield[ing] significant executive power" while led "by a single individual."  *Id.* at 238, 220, 204, 213.  Making clear that it was not "revisit[ing] [its] prior

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission.  All parties have consented to the filing of this brief.

[2] *Compare* An Act to Regulate Commerce, Pub. L. No. 49-104, ch. 104, § 11, 24 Stat. 379, 383 (1887) (establishing Interstate Commerce Commission), *with* White House Historical Association, *When Was Electricity First Installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house (electricity installed at White House and at State, War, and Navy Building in 1891).

decisions," the Court found "compelling reasons not to *extend* those precedents to the novel context of an independent agency led by a single Director." *Id.* at 204 (emphasis added).

*Seila Law* distinguished single-director independent agencies from "a traditional independent agency, run by a multimember board," *id.* at 205-06, in three respects. First, the Court wrote, such agencies are "an innovation with no foothold in history or tradition." *Id.* at 222. Second, the Court concluded that a single-director structure is a greater imposition on presidential oversight, "foreclos[ing] certain indirect methods of Presidential control." *Id.* at 225. Third, the Court concluded that empowering a single director with "no colleagues to persuade" impermissibly "clashes with constitutional structure by concentrating power in a unilateral actor." *Id.* at 225, 204 (quotation marks omitted).

None of those features describes the MSPB—a multimember body that resembles agencies dating back 150 years in every constitutionally significant way. Bearing the hallmarks of a traditional independent agency, the MSPB has multiple members with staggered terms, avoiding the concentration of power that so troubled the Court in *Seila Law* while allowing every President to influence the Board's composition. And unlike the Consumer Financial Protection Bureau (CFPB), the MSPB primarily adjudicates disputes internal to the federal government.

Even if *Seila Law* were not so definitive about what made the CFPB Director's removal protection unconstitutional, established practice has long settled the constitutional legitimacy of multimember independent agencies like the MSPB. In separation-of-powers cases, the judiciary places "significant weight upon historical practice," *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quotation marks omitted), including practice that "began after the founding era," because it embodies "the compromises and working arrangements that the elected branches of Government themselves have reached," *NLRB v. Noel Canning*, 573 U.S. 513, 525-26 (2014).

2

Multimember independent agencies have wielded substantial executive power and undertaken adjudications for generations. And the Supreme Court has consistently affirmed their constitutionality—right up to its recognition in *Seila Law* that Congress could amend the constitutional defects of the CFPB, "an independent agency that wields significant executive power," by "converting the CFPB into a multimember agency." 591 U.S. at 204, 237.

Multimember independent agencies like the MSPB are also fully consonant with the Constitution's original meaning. The constitutional text, which "is silent with respect to the power of removal," *In re Hennen*, 38 U.S. 230, 258 (1839), does not specify the exact boundary between the President's authority to supervise subordinates and Congress's authority to shape the federal government. The acceptance of presidential removal authority in the early Republic did not resolve whether Congress could limit that authority with respect to certain officers, a practice Congress began in the nineteenth century. And as the Supreme Court has consistently acknowledged, conditioning removal on good cause is a permissible limit for multimember expert bodies.

In *Seila Law*, as in *Free Enterprise Fund*, the Supreme Court confronted a "new situation," *Free Enter. Fund*, 561 U.S. at 483, and prohibited "*additional* restrictions on the President's removal authority" that have "no foothold in history or tradition," *Seila Law*, 591 U.S. at 228, 222 (emphasis added). It did not license lower courts to strike down a time-honored structure the Supreme Court has consistently upheld—that of a "traditional independent agency headed by a multimember board or commission." *Id.* at 207. Instead, this Court must abide by the "directly control[ling]" precedent of *Humphrey's Executor*. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quotation marks omitted); *Nat'l Sec. Archive v. Cent. Intel. Agency*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024); *see also Consumers' Rsch. v. Consumer Prod. Safety*

*Comm'n*, 91 F.4th 342 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414 (2024) (declining to read *Seila Law* as overruling *Humphrey's Executor*).

**ARGUMENT**

**I.      Binding Precedent Affirms the Legitimacy of Multimember Independent Agencies Like the MSPB.**

**A.      *Seila Law* Addressed Only the Innovation of an Independent Agency Led by a Single Director.**

In claiming authority to remove Ms. Harris without cause, in violation of the CSRA, President Trump relies on *Seila Law*.  *See* TRO Opp. 6.  But *Seila Law* was clear about its limited scope: "We hold that the CFPB's leadership *by a single individual* removable only for inefficiency, neglect, or malfeasance violates the separation of powers."  591 U.S. at 213 (emphasis added).  "Instead of placing the agency under the leadership of a board with multiple members," Congress "deviated from the structure of nearly every other independent administrative agency in our history."  *Id.* at 203.  "The question before us," the Court said, "is whether *this arrangement* violates the Constitution's separation of powers."  *Id.* (emphasis added).

As the Court explained, *Humphrey's Executor* recognized the longstanding exception to the President's removal authority that Congress may "create expert agencies led by a *group* of principal officers removable by the President only for good cause."  *Id.* at 204 (emphasis in original).  In *Seila Law*, the Court was "asked to extend these precedents to a new configuration: an independent agency that wields significant executive power *and is run by a single individual*."  *Id.* (emphasis added).

In refusing to broaden its precedent, the Court was clear that "we need not and do not revisit our prior decisions allowing certain limitations on the President's removal power."  *Id.*

4

Rather, the Court declined "to extend those precedents to the 'new situation' before [it]," *id.* at 220 (quoting *Free Enter. Fund*, 561 U.S. at 483), which introduced a "novel impediment" to presidential authority, *id.* at 215; *accord Free Enter. Fund*, 561 U.S. at 483-84 (striking down "new situation" of "multilevel protection from removal," but declining "to reexamine any . . . precedents"). In short, *Seila Law* was clear that it reached only the new phenomenon of removal protections for "principal officers who, *acting alone*, wield significant executive power." 591 U.S. at 238 (emphasis added).

The Court's subsequent decision in *Collins v. Yellen* confirmed the narrow scope of *Seila Law*'s holding. In that challenge to the single-director Federal Housing Finance Agency (FHFA), the Court concluded that "[a] straightforward application of our reasoning in *Seila Law* dictates the result." 594 U.S. 220, 251 (2021). That straightforward application was simple: "The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd Frank Act) restricts the President's removal power." *Id.* And the Court reiterated that in *Seila Law*, "[w]e did not revisit our prior decisions allowing certain limitations on the President's removal power, but we found compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* at 250-51 (quotation marks omitted).

**B.    *Seila Law* Rested on Three Features Unique to Single-Director Independent Agencies, None of Which Characterize the MSPB.**

After concluding that precedent did not resolve the legitimacy of removal protection for agency leaders serving alone, *Seila Law* discussed three aspects of single-director leadership that the Court concluded made removal limits untenable in that context: it was a historical anomaly, 591 U.S. at 220-23; it introduced new barriers to presidential oversight, *id.* at 204; and it concentrated power in the hands of one person, *id.* None of those concerns applies to the MSPB.

### 1. *Historical Anomaly*

*Seila Law* stressed that "[t]he CFPB's single-Director structure is an innovation with no foothold in history or tradition" that was "almost wholly unprecedented." *Id.* at 220-22. In "only a handful of isolated incidents" had Congress elsewhere "provided good-cause tenure to principal officers who wield power alone rather than as members of a board or commission." *Id.* at 220 (quotation marks omitted). And nearly all of those "isolated examples" were also "comparatively recent and controversial." *Id.* at 221. This "lack of historical precedent" for the Bureau's single-director structure suggested a "constitutional problem." *Id.* at 220 (quotation marks omitted).

*Seila Law* was not the first time the Court articulated a suspicion of novelty. "Lack of historical precedent can indicate a constitutional infirmity," the Court has written, because novelty "is often the consequence of past constitutional doubts." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 260 (2011). The modern Court has applied this skepticism toward "novel governmental structures," *Seila Law*, 591 U.S. at 231, across multiple contexts. *See NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (while "not necessarily fatal . . . sometimes the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent" (quotation marks omitted)); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) (Congress's "prolonged reticence" to assert authority creates an "inference" that it is "constitutionally proscribed").

But multimember independent agencies are not novel. Members of expert boards have enjoyed removal protection since the establishment of the Interstate Commerce Commission in 1887. *See* Act to Regulate Commerce, § 11, 24 Stat. at 383. And the MSPB bears the hallmarks of these traditional agencies. *Compare id.* (establishing the ICC with five Commissioners,

serving six-year terms, removable for cause), *with* 5 U.S.C. §§ 1201-1202 (establishing the

MSPB with three Members, serving seven-year terms, removable for cause). Indeed, the

MSPB's powers to which Defendants most object—such as the power to enforce subpoenas in

court—have close analogs in the powers of that first independent agency. *Compare* Act to

Regulate Commerce, § 12, 24 Stat. at 383 ("the Commission shall have power to require the

attendance and testimony of witnesses and . . . may invoke the aid of any court of the United

States in requiring [the same]"), *with* 5 U.S.C. § 1204(b)(2)(A), (c) (the Board may "issue

subpenas requiring the attendance and presentation of testimony of any such individual," and

"[i]n the case of contumacy or failure to obey a subpoena . . . the United States district court . . .

may issue an order requiring such person to appear"). The MSPB's structure and powers are not

"novel" or "innovative" at all. *Seila Law*, 591 U.S. at 215, 228.

### 2.  *Greater Encroachment on Presidential Oversight*

*Seila Law* also concluded that removal protections for agency heads who serve alone

intrude on presidential authority more than protections for members of boards or commissions.

This rendered the CFPB's structure a "novel impediment to the President's oversight of the

Executive Branch." *Id.* at 215. Although the CFPB's defenders argued that a single-director

independent agency is just as accountable to the President as a multimember agency, *see, e.g.*,

Br. for Court-Appointed *Amicus Curiae* 44-46, *Seila Law*, 591 U.S. 197 (No. 19-7), the Court

disagreed, holding that a single-director structure "forecloses certain indirect methods of

Presidential control" available to influence multimember bodies. *Seila Law*, 591 U.S. at 225.

"Because the CFPB is headed by a single Director with a five-year term," a President

could spend much of their term unable to remove a director holding diametrically opposed

views. *Id.* And "the agency's single-Director structure means the President will not have the

opportunity to appoint any other leaders [of the agency] . . . who can serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id.* Indeed, "some Presidents may not have any opportunity to shape its leadership and thereby influence its activities," because they will "*never*" be able to appoint a director. *Id.*

None of these concerns apply to the MSPB. Because there are three Board Members serving staggered terms, and because the President also appoints the Board's chairperson, every President will have at least some ability to shape the agency's leadership and agenda. *See* 5 U.S.C. §§ 1201, 1202(a). The MSPB receives funding through the annual appropriations process, Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 903, 92 Stat. 1111, 1224, allowing Presidents to exercise control through their involvement in that process as well.

And the MSPB's powers are limited compared to those wielded by other independent agencies whose constitutionality have been upheld, *see, e.g.*, *Consumers' Rsch.* 91 F.4th at 346 (Consumer Product Safety Commission). Rather than promulgate detailed regulations, the MSPB enforces civil service protections almost exclusively through adjudication and limited review of Office of Personnel Management regulations. 5 U.S.C. § 1204(a). And after it adjudicates, it does not enforce its orders in court, as Defendants imply, TRO Opp. 7; instead, it can only withhold non-appointed government employees' pay if they refuse to comply with the Board's order, 5 U.S.C. § 1204(e)(2)(A).

In short, the MSPB's structure involves no "novel impediment to the President's oversight of the Executive Branch." *Seila Law*, 591 U.S. at 215.

### 3. Concentration of Power in a Single Person

The third feature of the CFPB's structure on which *Seila Law* rested was its consolidation of power in "a unilateral actor insulated from Presidential control." 591 U.S. at 204. According

to the Court, this configuration has "no place in our constitutional structure." *Id.* at 220. With "the sole exception of the Presidency, that structure scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 222-23. "The CFPB's single-Director structure," however, "contravene[d] this carefully calibrated system by vesting significant governmental power in the hands of a single individual." *Id.* "With no colleagues to persuade," this individual could "unilaterally" wield a range of enforcement, adjudicative, and rulemaking authorities. *Id.* at 225.

The Court found this arrangement a far cry from the "multimember body of experts" it previously had approved. *Id.* at 216. But the MSPB matches that traditional profile. In response to evidence that the Nixon administration sought to circumvent the nation's laws establishing merit principles for federal hiring and firing, *Violations and Abuses of Merit Principles in Federal Employment: Hearings Before the Subcomm. on Manpower & Civil Serv. of the H. Comm. on Post Office & Civil Serv.*, 94th Cong. 8-9 (1975) (statement of Robert E. Hampton, Chairman, U.S. Civil Serv. Comm'n) (discussing the "arrogant view" that "civil servants could not be trusted" and that therefore "higher goals justified the breaking of laws and regulations" governing the civil service), Congress concluded that there was "little doubt" that a "strong and independent agency" was needed to adjudicate personnel disputes in line with merit principles, S. Rep. No. 95-969, at 7-8 (1978); *see id.* (calling the merit board "'the cornerstone' of civil service reform" (quoting Dwight Ink, Exec. Dir., President's Pers. Mgmt. Stud.)); Chester A. Newland, *Politics of Transition from the Administrative to the Facilitative State*, *in* The Future of Merit 200, 206-08 (James P. Pfiffner & Douglas A. Brook eds., 2000).

Modeled on the independent agencies that preceded it, the MSPB was structured with power divided among multiple Board Members, who would serve "non-renewable overlapping

terms" and be "removable only for cause."  Jimmy Carter, Federal Service Reform Message to the Congress (Mar. 2, 1978).  That structure was thought to "guarantee independent and impartial protection to employees."  *Id.*

The final law also demanded that each Member be appointed based on "ability, background, training, or experience," 5 U.S.C. § 1201, and shown to be "affirmatively qualified for their positions"—a requirement that Congress recognized as being "consistent with recent actions by Congress with respect to independent agencies" and would ensure that the MSPB would develop "expertise" in the meaning and application of civil service principles.  S. Rep. No. 95-969, at 27-28, 60.  The Board was to "act in most respects as a quasi-judicial body, empowered to determine when abuses or violations of law have occurred, and to order corrective action."  *Id.* at 24.  The high qualification standards for Board Members, the length and staggered nature of their terms, and the safeguards put in place to protect their impartiality were all designed to ensure a balanced, expert body that would uphold merit standards.

In contrast, the CFPB Director had no "peers" to share his authority or to temper his decisions, and the Court held that "*this arrangement* violates the Constitution's separation of powers."  *Seila Law*, 591 U.S. at 203 (emphasis added).  The Director could "*unilaterally* . . . issue final regulations, . . . initiate prosecutions, and determine what penalties to impose on private parties."  *Id.* at 225 (emphasis in original).  No such concentration of power exists in the MSPB.

\* \* \*

In sum, *Seila Law* held that the CFPB's unique structure could not find support in *Humphrey's Executor*.  But the Supreme Court was explicit that "we do not revisit *Humphrey's Executor* or any other precedent."  *Id.* at 228; *see Meta Platforms, Inc. v. FTC*, No. 24-5054,

10

2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (per curiam) ("[t]he Supreme Court has not

disturbed" *Humphrey's Executor*).  And lower courts must "follow the case which directly

controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."

*Mallory*, 600 U.S. at 136 (quotation marks omitted).

## II.    Established Practice Confirms the Validity of Multimember Independent Agencies.

The flip side of the Supreme Court's suspicion of "novel governmental structures," *Seila*

*Law*, 591 U.S. at 231, is that "'traditional ways of conducting government . . . give meaning' to

the Constitution," *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown*

*Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).  For that

reason, the Court "put[s] significant weight upon historical practice" in separation-of-powers

cases.  *Zivotofsky*, 576 U.S. at 23 (quotation marks omitted); *see The Pocket Veto Case*, 279 U.S.

655, 689 (1929) ("established practice is a consideration of great weight" for such constitutional

provisions).  When construing the Constitution's broadly phrased divisions among the branches,

judges "must hesitate to upset the compromises and working arrangements that the elected

branches of Government themselves have reached."  *Noel Canning*, 573 U.S. at 526.

Established practice is crucial "even when the nature or longevity of that practice is

subject to dispute, and even when that practice began after the founding era."  *Id.* at 525; *see id.*

at 528-29 (relying on history of intra-session recess appointments that began after the Civil War);

*United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915) ("[I]n determining . . . the existence

of a power, weight shall be given to the usage itself, even when the validity of the practice is the

subject of investigation.").

Congress has been assigning regulatory authority to independent, multimember agencies

for most of the nation's history, beginning nearly 150 years ago with the Interstate Commerce

Commission (ICC).  *See* Act to Regulate Commerce, § 11, 24 Stat. at 383.  The ICC had investigative and enforcement authority over the monumentally important railroad industry, including the power to issue cease-and-desist orders, to require payment of reparations, and to enforce its orders in court.  *See id.* §§ 12-16, 20; *cf.* TRO Opp. 7 (asserting vaguely that the MSPB possesses "independent litigating authority").

Although the Interior Secretary initially had some authority over the ICC, *see* Act to Regulate Commerce, §§ 18, 21, 24 Stat. at 386-87, Congress eliminated it two years later, *see* Act of Mar. 2, 1889, ch. 382, §§ 7-8, 25 Stat. 855, 861-62.  And in 1906, Congress empowered the ICC to prescribe "fair" and "reasonable" practices, as well as maximum railroad rates, *see* Act of June 29, 1906, ch. 3591, § 4, 34 Stat. 584, 589, cementing its status as "a very powerful agency," Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1130 (2000); *cf.* TRO Opp. 7 (noting that the MSPB "can review rules of the Office of Personnel Management").

In the early twentieth century, "a multitude of new agencies were established using the ICC as their prototype," including "the Federal Reserve Board (1913), Federal Trade Commission (1914), Federal Radio Commission (1927), Federal Power Commission (1930), Securities and Exchange Commission (1934), Federal Communications Commission (1934), National Labor Relations Board (1935), Bituminous Coal Commission (1935), and Federal Maritime Commission (1936)."  Breger & Edles, *supra*, at 1116 & n.14.  And the "critical element of independence" for these agencies is "protection . . . against removal except 'for cause.'"  *Id.* at 1138.

The long pedigree of multimember independent agencies is all but dispositive of their legitimacy.  "A legislative practice . . . marked by the movement of a steady stream for a century

and a half of time" indicates "the presence of unassailable ground for the constitutionality of the practice." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 327-28 (1936); *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("where there is ambiguity or doubt" in constitutional interpretation, "subsequent practical construction is entitled to the greatest weight").

For generations, these agencies have wielded substantial executive power. Although the Supreme Court initially conceived of their powers as "quasi-legislative or quasi-judicial," rather than as executive, *Seila Law*, 591 U.S. at 216 & n.2 (quotation marks omitted), it now recognizes that the functions which independent agencies have long carried out—enforcement, rulemaking, adjudications—are "exercises of . . . the 'executive Power'" under the Constitution, *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). And at the time of *Humphrey's Executor*, the FTC wielded considerable authority by any measure. To accomplish its mission of preventing "unfair methods of competition," the agency could charge private parties with statutory violations, adjudicate those charges in administrative hearings, issue cease-and-desist orders, and enforce those orders in court. *See Humphrey's Ex'r*, 295 U.S. at 620; *see also* An Act to Create a Federal Trade Commission, ch. 311, § 5, 38 Stat. 717, 719-20 (1914).

Beginning with *Humphrey's Executor*, therefore, the Court has consistently upheld removal protections for multimember agencies with powers that "at the present time" are "considered executive." *Morrison v. Olson*, 487 U.S. 654, 699 n.28 (1988) (quotation marks omitted). In *Wiener v. United States*, the Court confronted "a variant of the constitutional issue decided in *Humphrey's Executor*" and reached the same result. 357 U.S. at 351. By the time of *Morrison*, it had been established for half a century that "the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." 487 U.S. at 687 (quoting *Humphrey's Ex'r*, 295 U.S. at 630).

13

Two decades later, the Court again confirmed the validity of removal protections for multimember bodies wielding significant executive power. Article II was satisfied when the members of the Public Company Accounting Oversight Board were shielded from removal by "a single level of good-cause tenure" making them adequately "subject . . . to Presidential oversight." *Free Enter. Fund*, 561 U.S. at 509.

*Seila Law* again reinforced these principles. Not only did the Court emphatically base its holding on the "new situation" of an independent officer wielding power "alone," but it explained that Congress could cure the constitutional defect while preserving removal limits by "converting the CFPB into a multimember agency." 591 U.S. at 237.

Thus, for nearly a century, an unbroken line of decisions has approved a governmental structure pioneered another half-century earlier. Over the generations, Congress has relied on this precedent to create "some two-dozen multimember independent agencies" with for-cause removal protections. *Id.* at 230. This "practical exposition" of the Constitution is, by now, "too strong and obstinate to be shaken." *Stuart v. Laird*, 5 U.S. 299, 309 (1803).

For half a century, the MSPB has undertaken its primarily adjudicative role, while occasionally enforcing its subpoenas in court and reviewing OPM rules for statutory compliance. Its exercise of these modest powers fits well within a long history of American governance. It is not the CFPB (created in 2010; removal protection struck down ten years later based on its novel single-director structure) or the Public Company Accounting Oversight Board (created in 2002; removal protection struck down eight years later based on its novel dual layers of protection). Striking down the MSPB's removal protections would discard nearly a century and a half of history and interfere with what is now firmly established as a "traditional way[] of conducting

government." *Mistretta*, 488 U.S. at 401 (quoting *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring)).

### III.    Constitutional Text and History Further Underscore the Legitimacy of Multimember Independent Agencies.

In addition to being validated by precedent and established practice, multimember independent agencies like the MSPB are fully consonant with the Constitution's original meaning, which supports Congress's authority to temper the President's exercise of removal authority.

At the Founding, there was no consensus that "executive" power entailed removal authority. *See* Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725, 1790 (1996). Removal authority was not "an inherent attribute of the 'executive power' as it was understood in England," where Parliament "exercised significant control over the tenure of officers appointed to execute the laws, including officers appointed by the King." Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175, 182, 220 (2021).

The Constitution itself "is silent with respect to the power of removal," *Hennen*, 38 U.S. at 258; *see* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531 (1833) ("the Constitution makes no mention of any power of removal by the executive of any officers whatsoever"), apart from Congress's power to impeach, U.S. Const. art. II, § 4. Presidential removal authority was not discussed at the Constitutional Convention, and Alexander Hamilton soon after asserted that the Senate's consent would be required. *See The Federalist No. 77*, at 459 (Clinton Rossiter ed., 1961).

Notably, the Framers rejected a plan to delineate in the Constitution the duties of specific department heads who would serve "during pleasure." 2 *Records of the Federal Convention of*

15

*1787*, at 335-36 (Max Farrand ed., 1911). Instead, the text broadly empowers Congress to shape the federal government. It anticipates that Congress would "by Law" create "Departments" and "Officers," U.S. Const. art. II, § 2, while specifying little about their relationship to the President. *Cf. id*. art. II, § 2, cl. 1 (authorizing the President to require the opinions of principal officers). The Constitution also empowers Congress to enact laws necessary and proper "for carrying into Execution . . . *all . . . Powers* vested by this Constitution in the Government of the United States." U.S. Const. art. I, § 8, cl. 18 (emphasis added). James Madison explained that "[t]he tenure of the ministerial offices generally will be a subject of legal regulation." *The Federalist No. 39*, at 242 (Clinton Rossiter ed., 1961).

Because of the Constitution's silence on removal, the question came to the fore when Congress created the federal government's first departments. But the ensuing "Decision of 1789" addressed only who, if anyone, possesses inherent removal power—not the extent to which Congress may condition that power.

The "real point which was considered and decided" in 1789 was whether the Senate's role in approving appointments also gave it "part of the removing power." *Myers v. United States,* 272 U.S. 52, 118 (1926); *see Hennen*, 38 U.S. at 259. As Congress considered legislation establishing a Foreign Affairs Secretary, disagreement arose about whether to declare that the President could remove the Secretary from office. *See* David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161, 196-201 (1995). Reflecting the absence of authoritative constitutional text, views differed about whether the Constitution gave inherent removal power to the President, the Senate, both jointly, or neither. *Id.*; *see Hennen*, 38 U.S. at 233. The final legislation obliquely

16

signaled that the President could remove the Secretary, without specifying whether this power was statutory or constitutional.  *See* Act of July 27, 1789, ch. 4, § 2, 1 Stat. 28, 29.

Despite its ambiguities, the Decision of 1789 was taken as establishing that "the constitution vested the power of removal in the President alone," rather than jointly with the Senate.  1 Annals of Cong. 398 (Rep. Vining) (1789).  But the degree to which Congress could limit the President's inherent removal authority was not addressed, because the debate focused on where the removal power was lodged, not on Congress's authority to modify or abridge it.  Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1072 (2006).  Accordingly, when Congress later established a Comptroller within the Treasury Department, Madison noted "strong reasons why an officer of this kind should not hold his office at the pleasure of the executive," given that the Comptroller's duties partook "of a judiciary quality as well as executive."  1 Annals of Cong. 636 (1789).  The "nature of this office" meant that "a modification might take place."  *Id.* at 638.

In the following decades, inherent presidential removal authority was viewed as compatible with legislative modification.  *Marbury v. Madison* concluded that Congress could make certain officers "not removable at the will of the executive," in which case "the appointment is not revocable, and cannot be annulled."  5 U.S. 137, 162 (1803).  Removal authority "was not regarded . . . as embracing officers with fixed term[s]," except perhaps for certain officers who implemented inherent presidential authority.  Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353, 379 (1927).

In the second half of the nineteenth century, Congress began imposing limits on presidential removal, ranging from good-cause tenure to a requirement of Senate concurrence in the removal.  *E.g.*, Act of Feb. 25, 1863, ch. 58, § 1, 12 Stat. 665, 665-66.  When disputes arose

about these provisions, the Supreme Court resolved them as statutory matters, *e.g.*, *McAllister v. United States*, 141 U.S. 174 (1891); *Shurtleff v. United States*, 189 U.S. 311 (1903), declining to resolve "the constitutional power of the president in his discretion to remove officials during the[ir] term[s]," *Parsons v. United States*, 167 U.S. 324, 334 (1897).

Not until *Myers* did the Court establish the President's constitutional power of removal. But that decision rejected a requirement of Senate approval that could inhibit removals entirely—making it "impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed." 272 U.S. at 164. In contrast, a requirement of good cause to remove the leaders of multimember expert agencies was soon upheld as consistent with the President's constitutional authority. *Humphrey's Ex'r*, 295 U.S. at 626. That rule has prevailed ever since. *See Free Enter. Fund*, 561 U.S. at 509 (curing constitutional defect by subjecting multimember body to "a single level of good-cause tenure"); *Seila Law*, 591 U.S. at 237 (inviting Congress to preserve removal limits by "converting the CFPB into a multimember agency"). Constitutional text and history, therefore, do not support Defendants' assertion that good-cause tenure for MSPB Members violates President Trump's Article II authority.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's motion for preliminary injunction and uphold the constitutionality of the Civil Service Reform Act's removal protections for members of the Merit Standards Protection Board.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
Margaret Hassel (DC Bar No. 90029057)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: February 24, 2025

19