IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS,

　　　　*Plaintiff,*

　　v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury, et al.,

　　　　*Defendants.*

Case No. 1:25-cv-00412-RC

**BRIEF OF THE STATE OF FLORIDA, 19 STATES, AND THE ARIZONA LEGISLATURE AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND JUDGMENT ON THE MERITS**

JAMES UTHMEIER
　*Attorney General of Florida*

JEFFREY PAUL DESOUSA
　*Acting Solicitor General*
NATHAN A. FORRESTER
DAVID M. COSTELLO
　*Chief Deputy Solicitors General*
DARRICK W. MONSON
　*Assistant Solicitor General*
FOSTER H. SWARTZ
　*Solicitor General Fellow*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*

*Counsel for* Amicus *State of Florida*

February 28, 2025

[Additional counsel listed inside]

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

TREG TAYLOR
Attorney General
State of Alaska

STEVE MONTENEGRO
Speaker of the Arizona
  House of Representatives

WARREN PETERSON
President of the Arizona Senate

TIM GRIFFIN
Attorney General
State of Arkansas

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

JOHN MCCUSKEY
Attorney General
State of West Virginia

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae*, the State of Florida, 19 States, and the Arizona Legislature, verify that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

ADDITIONAL COUNSEL ................................................................................. i

CORPORATE DISCLOSURE STATEMENT .................................................. ii

TABLE OF AUTHORITIES ............................................................................ iv

INTEREST OF *AMICI CURIAE* ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT .................................................................................................... 3

I.      The President has absolute authority to remove members of the
        Merit Systems Protection Board. ........................................................ 3

II.     By threatening the separation of powers, "independent" executive
        officers and agencies in turn threaten state sovereignty. ................... 8

III.    Federal courts lack equitable authority to reinstate public
        officials. ............................................................................................. 11

CONCLUSION ............................................................................................... 18

CERTIFICATE OF COMPLIANCE .............................................................. 19

CERTIFICATE OF SERVICE ....................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Thetford*, 529 F.2d 695 (5th Cir. 1976) ........................................................ 16

*Abbott v. Thetford*, 534 F.2d 1101 (5th Cir. 1976) ...................................................... 16

*Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341 (1951) ...................................... 17

*Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979) ........................................... 10

*Att'y Gen. v. Earl of Clarendon*, 17 Ves. Jr. 491, 34 Eng. Rep. 190 (Ch. 1810) ............................................................................................................................ 12

*Baker v. Carr*, 369 U.S. 186 (1962) ............................................................................ 15

*Beebe v. Robinson*, 52 Ala. 66 (1875) ........................................................................ 14

*Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ...................... 15

*Bessent v. Dellinger*, No. 24A790 (U.S.) ............................................................ 11, 12

*Bond v. Floyd*, 385 U.S. 116 (1966) ........................................................................... 15

*Bond v. United States*, 564 U.S. 211 (2011) ............................................................ 1, 9

*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793) ........................................................ 8

*Cochran v. McCleary*, 22 Iowa 75 (1867) .................................................................. 13

*Collins v. Yellen*, 594 U.S. 220 (2021) ......................................................................... 7

*Delahanty v. Warner*, 75 Ill. 185 (1874) .................................................................... 13

*Dellinger v. Bessent*, No. 1:25-cv-385, 2025 WL 471022 (D.D.C. Feb. 12, 2025) ........................................................................................................................... 15

*Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020) (mem.) ........................ 17

*Edmond v. United States*, 520 U.S. 651 (1997) ........................................................... 5

*Fineran v. Bailey*, 2 F.2d 363 (5th Cir. 1924) ........................................................... 15

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) ............................................................................................................................ 7

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) .................................... 8

*Georgia v. Stanton*, 73 U.S. (6 Wall.) 50 (1867) ........................................................ 12

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .................................................................. 16

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308
    (1999) .......................................................................................................... 11, 16

*Hagner v. Heyberger*, 7 Watts & Serg. 104 (Penn. 1844) .......................................... 13

*Harris v. Bessent*, No. 1:25-cv-00412 (D.D.C.) .......................................................... 11

*Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) ..................................... passim

*In re Sawyer*, 124 U.S. 200 (1888) ..................................................................... passim

*Littlefield v. Perry*, 88 U.S. 205 (1874) ..................................................................... 11

*Morrison v. Olson*, 487 U.S. 654 (1988) ............................................................. 4, 6, 7

*Myers v. United States*, 272 U.S. 52 (1926) ............................................................... 12

*Nixon v. United States*, 506 U.S. 224 (1993) ............................................................. 16

*Props. of the Vills., Inc. v. FTC*, No. 5:24-cv-316, 2024 WL 3870380 (M.D.
    Fla. Aug. 15, 2024), *appeal docketed*, No. 24-13102 (11th Cir. Sept.
    24, 2024) .......................................................................................................... 10

*Republica v. Cobbett*, 3 U.S. 467 (Pa. 1798) ............................................................... 8

*Ryan, LLC v. FTC*, No. 3:24-cv-986, 2024 WL 3879954 (N.D. Tex. Aug.
    20, 2024), *appeal docketed*, No. 24-10951 (5th Cir. Oct. 18, 2024) ....................... 10

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) .............. passim

*Sheridan v. Colvin*, 78 Ill. 237 (1875) ....................................................................... 13

*State ex rel. McCaffery v. Aloe*, 54 S.W. 494 (Mo. 1899) ........................................... 14

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ...................................... 16

*Stern v. Marshall*, 564 U.S. 462 (2011) ....................................................................... 6

*Tappan v. Gray*, 9 Paige Ch. 507 (Ch. Ct. N.Y. 1842) .............................................. 13

*Taylor v. Kercheval*, 82 F. 497 (C.C.D. Ind. 1897) ................................................... 14

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ................................................... 5, 9

*United States v. Perkins*, 116 U.S. 483 (1886) ............................................................. 4

*Walton v. House of Representatives of Okla.*, 265 U.S. 487 (1924)...................... 11, 15

*Warren v. DeSantis*, No. 4:22-cv-302 (N.D. Fla.) ........................................................ 17

*Webster v. Fall*, 266 U.S. 507 (1925) ............................................................................ 16

*White v. Berry*, 171 U.S. 366 (1898) ............................................................................. 14

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) ..................................... 6

*Wiener v. United States*, 357 U.S. 349 (1958) ............................................................. 5

**Statutes**

42 U.S.C. § 2000e-5........................................................................................................ 11

5 U.S.C. § 1204 ............................................................................................................... 5

5 U.S.C. § 7703................................................................................................................ 5

Judiciary Act of 1789, 1 Stat. 73 ................................................................................... 16

**Constitutional Provisions**

U.S. Const. art. I, § 7 ..................................................................................................... 6

U.S. Const. art. II, § 1..................................................................................................... 3

U.S. Const. art. II, § 3................................................................................................. 3, 4, 6

**Rules**

Local Civil Rule 7(o)(1) .................................................................................................. 1

**Regulations**

Fed. Trade Comm'n, *Dissenting Statement of Commissioner Andrew N. Ferguson* (June 28, 2024) ....................................................................................... 10

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024)................................. 10

**Other Sources**

1 Annals of Cong. 463 (1789) (J. Madison) ................................................................... 3

Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* (1911) ............................................................................ 14

Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* (1909) ............................................................................ 14

James L. High, *Treatise on the Law of Injunctions* (2d ed. 1880)............................ 14

John Norton Pomeroy, *A Treatise on Equity Jurisprudence* (4th ed. 1918) ................................................................................ 14

Joseph Story, *Commentaries on Equity Pleadings and the Incidents Thereof* (2d ed. 1840) ............................................................. 12

Letter from John Adams to the Inhabitants of the Colony of Massachusetts-Bay, April 1775 ................................................. 13

Nikolas Bowie, *Why the Constitution Was Written Down*, 71 Stan. L. Rev. 1397 (2018) ............................................................ 13

Seth Davis, *Empire in Equity*, 97 Notre Dame L. Rev. 1985 (2022)........................ 12

*The Federalist* No. 48 (Madison) (Jacob E. Cooke, ed., 1961) ...................................... 4

*The Federalist* No. 70 (Hamilton) (Jacob E. Cooke, ed., 1961) ............................... 4, 9

W.S. Holdsworth, *English Corporation Law in the 16th and 17th Centuries*, 31 Yale L.J. 382 (1922) ......................................... 13

## INTEREST OF *AMICI CURIAE*

The Attorney General of Florida, on behalf of the State of Florida, 19 States, and the Arizona Legislature, respectfully submits this amicus brief pursuant to Local Civil Rule 7(o)(1) in opposition to plaintiff's motion for preliminary injunction and judgment on the merits. President Trump lawfully removed plaintiff from her post.

The States ceded sovereign authority to the federal government when they joined the union on the understanding that the power of the federal government was limited, that this power would be divided among multiple branches of government, and that the States and their citizens would be able to hold federal officials democratically accountable for their exercise of that power. Yet when it comes to independent agencies, none of that is true. Federal power is instead consolidated in a select few accountable to no one. And that naturally leads to the expansion of that power.

*Amici* have an interest in ensuring that federal officials exercise their power— power that flows from the States themselves—within constitutional limits. After all, "[s]eparation-of-powers principles" do not just "protect each branch of government from incursion by the others"; they "protect the individual" and state sovereignty as well. *Bond v. United States*, 564 U.S. 211, 222 (2011). The issue here—and the separation-of-powers principles involved in resolving it—go to the heart of the federalist bargain struck by the Framers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Cathy A. Harris challenges President Trump's authority to remove her from her presidentially appointed position as a member of the Merit Systems

Protection Board ("MSPB"). But as a member of that Board, she exercises substantial executive power—namely, the power to enforce compliance with the Board's decisions regarding the employment of individuals in the federal civil service—and is answerable to no one except the President. Because she is a principal officer exercising executive power on behalf of the President, the Constitution requires that she be removable at the President's will. The provision of 5 U.S.C. § 1202(d) purporting to allow her removal "only for inefficiency, neglect of duty, or malfeasance in office" is therefore unconstitutional.

That bedrock principle safeguards state sovereignty. When the States surrendered some of their sovereign power to the federal government upon joining the union, they never would have imagined unaccountable officials wielding that power independent of anyone who must answer to the people or the States for its exercise. That was not what the Constitution promised them. Yet when it comes to independent agencies and tenure-protected executive officers, that is precisely what the States get. When independent agencies and tenure-protected officers wield executive power outside the purview of a democratically elected President, it not only usurps the President's authority, it strikes at the core of the compact the States agreed to at the Founding. And state sovereignty and individual liberty suffer.

Nor can this Court grant the relief that plaintiff seeks in substance: an injunction ordering her reinstatement. Just as Congress may not restrain the President's removal power over executive officials, courts may not order an executive officer's reinstatement. That limit on equity dates to the Founding and runs throughout the

precedents of the Supreme Court. The rule ensures effective governance, respects state sovereignty, and yields reasoned jurisprudence. This Court should heed what the Supreme Court held over a century ago: "a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888).

## ARGUMENT

The Court should deny plaintiff's motion for preliminary injunctive relief and judgment on the merits. Core separation-of-powers principles, bolstered by long historical understanding, require that the President have the authority to remove executive branch officials. That limitation on Congress's power indirectly preserves state sovereignty by ensuring that "independent agencies" are politically accountable should they attempt to intrude in state affairs. And a federal court would in any event lack the authority to reinstate plaintiff to her post.

## I. The President has absolute authority to remove members of the Merit Systems Protection Board.

"'[T]he 'executive Power'—all of it—is 'vested in a President, who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). And "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Cong. 463 (1789) (J. Madison). That necessarily includes the authority to remove executive officers. Indeed, "lesser officers must remain accountable to the President," for it is his "authority they wield." *Seila Law*, 591 U.S. at 213. Without the power to remove, the

President lacks the ability to compel compliance with his directives, *id.* at 213–14, and thus to fulfill his oath to execute the law, U.S. Const. art. II, § 3.

Given the "necessity of an energetic executive," *The Federalist* No. 70, at 472 (Hamilton) (Jacob E. Cooke, ed., 1961), and the legislative branch's historic tendency to "draw[] all power into its impetuous vortex," *The Federalist* No. 48, at 333 (Madison) (Jacob E. Cooke, ed., 1961), it is critical that the President's authority to direct and supervise the executive branch in the performance of its functions be protected from legislative encroachment. As a result, the Supreme Court has recognized only two exceptions to the President's otherwise "exclusive and illimitable power of removal." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935); *see also Seila Law*, 591 U.S. at 215 (referring to the President's "unrestricted removal power"). Neither exception covers a member of the MSPB.

The first exception is for certain inferior officers, and it has been applied to only two: a naval cadet-engineer, *United States v. Perkins*, 116 U.S. 483 (1886), and the so-called independent counsel, *Morrison v. Olson*, 487 U.S. 654 (1988). Whatever its continuing vitality, that inferior-officer exception is inapplicable to members of the MSPB. Members of the MSPB, who are appointed by the President and confirmed by the Senate, 5 U.S.C. § 1201, do not have a superior other than the President. *See, e.g.*, *id.* §1204(a)(3) (Board reports directly to the President). They thus qualify as principal officers under the chief criterion the Supreme Court has recognized for determining whether an Officer of the United States is principal or inferior. *See United*

*States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021); *Edmond v. United States*, 520 U.S. 651, 662–63 (1997).

The second exception, recognized in *Humphrey's Executor* and later in *Wiener v. United States*, 357 U.S. 349 (1958), is for "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [i]s said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. That exception does not apply here either, because the MSPB exercises substantial executive power. First, the Board resolves disputes about employment within the executive branch and may "take final action on any such matter." 5 U.S.C. § 1204(a)(1). The Board may "order any Federal agency or employee to comply with" its decision, after which the Board "shall . . . enforce compliance with any such order." *Id.* § 1204(a)(2). If compliance is not forthcoming, the Board may appoint attorneys to represent it in civil litigation relating to its orders, *id.* §1204(i), where the Board is often the "named respondent." *Id.* § 7703(a)(2). On top of this quintessentially executive enforcement authority, the Board also regularly evaluates "whether the public interest in a civil service free of prohibited personnel practices is being adequately protected" and reports its findings directly to Congress and the President. *Id.* § 1204(a)(3). The MSPB, in sum, exercises a significant "part of the executive power vested by the Constitution in the President" and should be considered a part of the executive department. *Humphrey's Ex'r*, 295 U.S. at 628. The members of the MSPB must be fully accountable to the President, just like any other executive officers, and cannot be shielded from presidential supervision by a statute restricting the grounds on which they may be removed.

If there were any question about that analysis, the *Humphrey's Executor* exception should be interpreted as narrowly as possible. *Humphrey's Executor* indulged the fiction that a so-called "independent" agency "exercises no part of the executive power vested by the Constitution in the President." 295 U.S. at 628. It went so far as to propose the existence of a new class of officers—"a *de facto* fourth branch of Government," *Seila Law*, 591 U.S. at 240 (Thomas, J., concurring)—that acted "in part quasi-legislatively and in part quasi-judicially." *Humphrey's Ex'r*, 295 U.S. at 628. *Humphrey's Executor* did so based on reasoning "devoid of textual or historical precedent for the novel principle it set forth." *Morrison*, 487 U.S. at 726 (Scalia, J., dissenting). If an officer exercises "quasi-legislative" power, that officer belongs in the legislative branch. If, on the other hand, an officer exercises "quasi-adjudicative" power, that officer belongs in the judicial branch. It could hardly be otherwise, since Congress "lacks the authority to delegate its legislative power." *Seila Law*, 591 U.S. at 247 (Thomas, J., concurring) (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001)). Congress also "cannot authorize the use of judicial power by officers acting outside of the bounds of Article III." *Id.* (citing *Stern v. Marshall*, 564 U.S. 462, 484 (2011)).[1] In suggesting to the contrary, *Humphrey's Executor* defied one

---

[1] There are exceptions, of course, as part of the checks and balances of government. For example, the Constitution gives the President a limited role in the legislative process (e.g., to "recommend to [Congress] such Measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3; and to decide whether to "approve" an act of Congress upon presentment, U.S. Const. art. I, § 7, cl. 2). An executive officer might assist the President in performing these duties. But these explicit textual exceptions merely prove the rule that no implicit exceptions for "quasi-legislative" or "quasi-adjudicative" functions exist.

of the most basic principles of the separation of powers embodied in the American experiment.

Not surprisingly, *Humphrey's Executor* has seen its already shaky foundations eroded over the years. In *Morrison*, the Supreme Court sidestepped *Humphrey's Executor*'s troublesome reliance "on the terms 'quasi-legislative' and 'quasi-judicial,'" instead grounding its endorsement of tenure protection for the independent counsel on the conclusion that tenure protection did not "unduly trammel[] on executive authority." 487 U.S. at 689, 691. The decision similarly avoided scrutiny in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, in part because the parties there "agree[d] that the Commissioners [of the Securities and Exchange Commission] cannot themselves be removed by the President except under the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office.'" 561 U.S. 477, 487 (2010) (quoting *Humphrey's Ex'r*, 295 U.S. at 620). But the majority opinion in *Free Enterprise Fund* is replete with reminders that allowing officers to "execute the laws" without plenary presidential supervision "is contrary to Article II's vesting of the executive power in the President"—a principle squarely in conflict with *Humphrey's Executor*. 561 U.S. at 496. And most recently, in *Seila Law* and again in *Collins v. Yellen*, 594 U.S. 220 (2021), the Supreme Court took particular care not to widen the application of *Humphrey's Executor* beyond its essential facts. This history counsels in favor of treating the exception for politically balanced, multi-member commissions "said not to exercise any executive power" narrowly. *Seila Law*, 591 U.S. at 216.

And because that exception does not fit the MSPB, the members of the Board are not entitled to the removal protections set forth in 5 U.S.C. § 1202(d).

## II. By threatening the separation of powers, "independent" executive officers and agencies in turn threaten state sovereignty.

Whether Congress may shield executive officials from presidential oversight has grave ramifications for *amici* States. Before joining the union, "the several States had absolute and unlimited sovereignty within their respective boundaries." *Republica v. Cobbett*, 3 U.S. 467, 473 (Pa. 1798). By entering a compact under the Constitution, the States "surrendered" some of that sovereignty to the United States. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 435 (1793) (Iredell, J., dissenting). But "in every instance where [their] sovereignty ha[d] not been delegated to the United States, [the States remained] completely sovereign." *Id.* The result was a "system of government" that "differ[ed], in form and spirit, from all other governments, that ha[d] [t]heretofore existed in the world"—a carefully calibrated balance of power between States and the federal government. *Republica*, 3 U.S. at 473. "[T]he United States ha[s] no claim to any authority but such as the States have surrendered to [it]." *Chisholm*, 2 U.S. at 435 (Iredell, J., dissenting).

When ceding that sovereign power, the States ensured that it would be divided among distinct branches of the federal government. They "viewed the principle of the separation of powers as the central guarantee of a just government." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 870 (1991). To protect their sovereignty and preserve individual liberty, the founding States "scrupulously avoid[ed] concentrating power in the hands of any single individual." *Seila Law*, 591 U.S. at 223. The

one exception was the executive branch. Because an "energetic executive" is "essential" to perform that branch's "unique responsibilities," the Framers decided to "fortif[y]" that power in "one man." *Id.* at 223–24. To mitigate their concerns over power consolidation, they made the executive branch "the most democratic and politically accountable" in the federal government. *Id.* at 224. Only the President and Vice President are "elected by the entire Nation." *Id.* And because of the nature of the electoral college, they are elected not just by the People, but also by the States. This carefully calibrated "allocation of powers"—essential to the compact the States agreed to upon joining the union—protects "libert[y]" and state "sovereignty." *Bond*, 564 U.S. at 221.

Independent agencies threaten that compact. *See, e.g.*, *Seila Law*, 591 U.S. at 246 (Thomas, J., concurring) (observing that cases like *Humphrey's Executor* "laid the foundation for a fundamental departure from our constitutional structure"). They represent one of the founding States' worst fears: the consolidation of power in one or a few democratically unaccountable officials. *See* 591 U.S. at 222–24. Without "a politically accountable officer [to] take responsibility" for the exercise of executive power, "the public [and the States] can only wonder 'on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Arthrex*, 594 U.S at 16 (quoting *The Federalist* No. 70, at 476 (A. Hamilton) (Jacob E. Cooke, ed., 1961)). By eviscerating the "clear and effective chain of command down from the President, on whom all people vote," the actions of independent agencies are deprived of "legitimacy and accountability to the public" and the States. *Id.* at 11 (internal quotation marks omitted).

9

One need not search long for an egregious example. Just last year, the Federal Trade Commission ("FTC") banned noncompete clauses in employment contracts nationwide. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024). In "the most extraordinary assertion of authority in the Commission's history," a few unaccountable commissioners "prohibit[ed] a business practice that has been lawful for centuries" and "invalidate[d] thirty million existing contracts." Fed. Trade Comm'n, *Dissenting Statement of Commissioner Andrew N. Ferguson* 1 (June 28, 2024), https://tinyurl.com/3j8dxrtx. And they did so even though "[c]ommercial agreements traditionally are the domain of state law." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979). Nor did the FTC care that 46 states had exercised their sovereign authority to permit noncompete agreements in some form. *See* Ferguson Dissent at 14. But because of the FTC's independence, the States have no one to hold to account for that dramatic intrusion on their sovereignty.[2]

Government actors who exercise significant authority must ultimately account in the chain of command to the States and their citizens. Anything else is not the sovereign authority the States ceded the federal government when they joined the union.

---

[2] The FTC's authority to promulgate the non-compete rule is being tested in several pending cases. *See Ryan, LLC v. FTC*, No. 3:24-cv-986, 2024 WL 3879954 (N.D. Tex. Aug. 20, 2024), *appeal docketed*, No. 24-10951 (5th Cir. Oct. 18, 2024); *Props. of the Vills., Inc. v. FTC*, No. 5:24-cv-316, 2024 WL 3870380 (M.D. Fla. Aug. 15, 2024), *appeal docketed*, No. 24-13102 (11th Cir. Sept. 24, 2024).

### III.   Federal courts lack equitable authority to reinstate public officials.

Not only is plaintiff wrong on the merits, she is wrong on the remedy. Federal courts may not reinstate public officers absent an act of Congress. *See, e.g.*, 42 U.S.C. § 2000e-5(g) (authorizing courts to "reinstate[]" employees who suffer discrimination). Plaintiff has cited no such act. Nor is Congress's silence surprising—orders reinstating public officials hamper effective governance, invade state sovereignty, and beget rushed jurisprudence.

A. Plaintiff seeks relief the courts cannot grant. She conspicuously avoids using the word "reinstatement," instead framing her requested remedy as an "[o]rder" that she "not . . . in any way be treated as having been removed" from office "or otherwise be obstructed from her ability to carry out her duties." DE1 at 11, *Harris v. Bessent*, No. 1:25-cv-00412 (D.D.C.). But as plaintiff has already been removed from office, it is inescapable that the equitable remedy of reinstatement is what she seeks. *See Littlefield v. Perry*, 88 U.S. 205, 223 (1874) (Waite, C.J.) ("A court of equity looks to substance rather than form."). The only equitable remedies that a federal court may grant are those "traditionally accorded by courts of equity." *Bessent v. Dellinger*, No. 24A790, slip op. at 3 (U.S. Feb. 21, 2025) (Gorsuch, J., joined by Alito, J., dissenting) (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999)). And history teaches that "[a] court of equity has no jurisdiction over the appointment and removal of public officers." *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 490 (1924); *Dellinger*, No. 24A790, slip op. at 4 (Gorsuch, J., dissenting) (finding it "well settled that a court of equity has no jurisdiction over the

11

appointment and removal of public officers" (quoting *Sawyer*, 124 U.S. at 212)). "To be sure, throughout the Nation's history, various presidentially appointed officials . . . have contested their removal—and courts have heard and passed on their claims. But those officials have generally sought remedies like backpay, not injunctive relief like reinstatement." *Dellinger*, No. 24A790, slip op. at 4 (Gorsuch, J., dissenting) (citing, e.g., *Myers v. United States*, 272 U.S. 52 (1926); *Humphrey's Ex'r*).

That rule flows from English common law. Recognizing the critical "distinction between judicial and political power," English courts historically would not wield equity to vindicate a litigant's "political right[]" to office. *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 71, 76 & n.20 (1867) (collecting cases); *see Sawyer*, 124 U.S. at 212 (collecting cases, including *Attorney General v. Earl of Clarendon*, 17 Ves. Jr. 491, 498, 34 Eng. Rep. 190, 193 (Ch. 1810)). In *Earl of Clarendon*, for instance, the English Court of Chancery declined to remove public-school officers on the ground that they lacked necessary legal qualifications. 17 Ves. Jr. at 493, 34 Eng. Rep. at 191. According to that court, a court of equity "has no jurisdiction with regard either to the election or the [removal] of" officers. *Id.* at 498, 34 Eng. Rep. at 193. Contemporary English cases tracked that reasoning. *See also* Joseph Story, *Commentaries on Equity Pleadings and the Incidents Thereof* §§ 467–70 (2d ed. 1840) (explaining that traditional equity courts would not adjudicate rights of a "political nature" and citing examples); Seth Davis, *Empire in Equity*, 97 Notre Dame L. Rev. 1985, 2011–12 (2022).[3]

---

[3] Although *Earl of Clarendon* and some other cases cited in *Sawyer* involved corporate officers, those legal entities were historically treated more like

American courts imported that principle after the Framing. In the early 19th century, courts nationwide denied that equity chancellors could afford a removed official relief, even when the official's ouster was illegal and unauthorized. *Tappan v. Gray*, 9 Paige Ch. 506, 508–09 (Ch. Ct. N.Y. 1842); *see also Hagner*, 7 Watts & Serg. at 105; *Sawyer*, 124 U.S. at 212 (collecting cases). *Hagner* is emblematic. In that case, the Supreme Court of Pennsylvania declined to enjoin a defendant from unlawfully acting as a school director because it possessed no more power than "an English court of chancery." *Hagner*, 7 Watts & Serg. at 106–07. Because chancery courts traditionally "would not sustain the injunction proceeding to try the election or [removal] of corporators of any description," Pennsylvania's high court held that it could not either. *Id.* Other courts took a similar tack throughout Reconstruction.[4]

---

governments and public entities. Colonial governments, for instance, were created through corporate charters, with "shareholders" acting like modern-day voters and voting for corporate boards that looked like modern-day state and local governments. Nikolas Bowie, *Why the Constitution Was Written Down*, 71 Stan. L. Rev. 1397, 1416–21 (2018); *see also* Letter from John Adams to the Inhabitants of the Colony of Massachusetts-Bay, April 1775, https://founders.archives.gov/documents/Adams/06-02-02-0072-0015. And as the Pennsylvania Supreme Court noted in *Hagner v. Heyberger*, limits on equitable jurisdiction that applied to "private corporations" apply "*à fortiori*" to "the case of a public officer of a municipal character." 7 Watts & Serg. 104, 105 (Penn. 1844); *see also* W.S. Holdsworth, *English Corporation Law in the 16th and 17th Centuries*, 31 Yale L.J. 382, 383–84 (1922) (noting that for both public and private corporations, "creation by and subordination to the state are the only terms upon which the existence of large associations of men can be safely allowed to lead an active life").

[4] *See, e.g.*, *Cochran v. McCleary*, 22 Iowa 75, 91 (1867) ("The right to a public office or franchise cannot, as the authorities above cited show, be determined in equity."); *Sheridan v. Colvin*, 78 Ill. 237, 247 (1875) ("A court of equity is not a proper tribunal for determining disputed questions concerning the appointment of public officers, or their right to hold office[.]"); *Delahanty v. Warner*, 75 Ill. 185, 186 (1874) (court of chancery had no power to restrain local officials from removing the

The Supreme Court later confirmed that historical equitable constraint in *Sawyer*. There, a locally elected officer sought an injunction from a federal court barring local officials from removing him. 124 U.S. at 201. After the local officials were held in contempt of that injunction, the Court issued a writ of habeas corpus to vacate their convictions because the injunction was issued without jurisdiction. The Court explained that a federal court in equity "has no jurisdiction . . . over the appointment and removal of public officials." *Id.* at 210. And a wall of contemporary treatises echoed that understanding.[5] As one 19th-century commentator put it, "[n]o principle of the law of injunctions, and perhaps no doctrine of equity jurisprudence, is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers or their title to office." 2 High, *Law of Injunctions* § 1312.

The Supreme Court has doubled down on that rule. A decade after *Sawyer*, the Court reiterated that equity courts may "not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." *White v. Berry*, 171 U.S. 366, 377 (1898). The Court restated the point in *Walton*: While federal courts are "*particularly* . . . without jurisdiction

---

superintendent of streets from his post); *Beebe v. Robinson*, 52 Ala. 66, 73 (1875) (similar); *Taylor v. Kercheval*, 82 F. 497, 499 (C.C.D. Ind. 1897) (similar); *State ex rel. McCaffery v. Aloe*, 54 S.W. 494, 496 (Mo. 1899) (similar).

[5] *See* 2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909); 4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1760 (4th ed. 1918); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 (1911).

over the appointment and removal of state officers," they no more possess "jurisdiction over the appointment and removal of [other] public officers." 265 U.S. at 490 (emphasis added). And it repeated the principle in *Baker v. Carr*—"federal equity power [may] not be exercised to enjoin a state proceeding to remove a public officer." 369 U.S. 186, 231 (1962); *see also Fineran v. Bailey*, 2 F.2d 363, 363 (5th Cir. 1924) ("It is well settled by the decisions of the Supreme Court that a District Court of the United States has no jurisdiction over the appointment and removal of public officers.").

Similarly, there is no established historical tradition of equity courts reinstalling officials, at least not without express statutory authorization. "No English case has been found of a bill for an injunction to restrain the appointment or removal of a municipal officer." *Sawyer*, 124 U.S. at 212. Aside from the outlier case discussed in this Court's order granting the temporary restraining order in this case[6] and the very recent order in *Dellinger v. Bessent*, No. 1:25-cv-385, 2025 WL 471022 (D.D.C. Feb. 12, 2025), we know of no case in which a federal court has ordered the reinstatement plaintiff seeks.[7] The lack of historical pedigree for reinstatement suggests that

---

[6] *See* DE9 at 13–14, *Harris v. Bessent*, No. 1:25-cv-412 (D.D.C.) (discussing *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) (per curiam)).

[7] The only other arguable candidate we have found is *Bond v. Floyd*, in which the Supreme Court held that the Georgia legislature violated the First Amendment in refusing to seat a newly elected member for engaging in anti-Vietnam War speech while the member-elect was a private citizen. 385 U.S. 116, 137 (1966). But *Bond v. Floyd* did not grapple with the limits on the federal courts' remedial authority discussed by *Walton* or *Sawyer*. *See id.* At most, *Bond v. Floyd* represents an implicit "drive-by" ruling that carries "no precedential effect." *Steel Co. v. Citizens for a Better*

it "was unknown to traditional equity practice," *Grupo Mexicano*, 527 U.S. at 327, and divorced from the "jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)," *id.* at 318–19.

B. Tradition is often grounded in common sense. Here, there are at least three reasons why courts should not wade into the messy business of reinstatement.

*First*, reinstatement hampers effective governance. Like a grain of sand in a gear, forcing the sovereign to retain an official it believes is unfit threatens to halt the levers of government and risks intra-office "chaos." *Nixon v. United States*, 506 U.S. 224, 236 (1993) (questioning what relief a federal court could grant a judge who had been impeached and removed from office); *Abbott v. Thetford*, 529 F.2d 695, 708 (5th Cir. 1976) (Gewin, J., dissenting) (arguing that reinstating a state judicial employee would impair the court's judicial functions), *majority vacated and dissent adopted upon reh'g en banc*, 534 F.2d 1101 (5th Cir. 1976).

*Second*, when extended to state officers, reinstatement invades state sovereignty. "The authority of the people of the States to determine" their state officers "goes beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a sovereign entity" that lies at "the heart of representative government." *Gregory v. Ashcroft*, 501 U.S. 452, 460, 463 (1991). The historical limit on

---

*Env't*, 523 U.S. 83, 91 (1998). The issue of the equitable authority of the federal courts "merely lurk[ed] in the record," so the holding of *Bond v. Floyd* cannot "be considered as having . . . constitute[d] precedent[]" on the question. *Webster v. Fall*, 266 U.S. 507, 511 (1925).

federal reinstatement power preserves "the scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts." *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 349 (1951).

*Finally*, reinstatement encourages rushed jurisprudence. When officials believe that reinstatement lies just behind the courthouse door, they will often seek emergency injunctive relief. *See, e.g.*, *Warren v. DeSantis*, No. 4:22-cv-302 (N.D. Fla.) (in which a district judge ordered an extraordinarily compressed trial schedule of just over three months in a case posing many complex issues of constitutional significance). Those fast-paced proceedings "tend to force judges into making rushed, high-stakes, low-information decisions" on constitutional issues of immense importance. *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring).

## CONCLUSION

The Court should deny plaintiff's motion for preliminary injunctive relief and judgment on the merits. The Court should also deny plaintiff's request for a declaratory judgment, a permanent injunction, and a writ of mandamus.

February 28, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
NATHAN A. FORRESTER
DAVID M. COSTELLO
  *Chief Deputy Solicitors General*
DARRICK W. MONSON
  *Assistant Solicitor General*
FOSTER H. SWARTZ
  *Solicitor General Fellow*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*

*Counsel for* Amicus *State of Florida*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and page-length require-ments of Local Civil Rules 5.1(d) and 7(o)(4).

*/s/ Jeffrey Paul DeSousa*
Acting Solicitor General

**CERTIFICATE OF SERVICE**

I certify that on February 28, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Jeffrey Paul DeSousa*
Acting Solicitor General