# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHY A. HARRIS, | ) |
|    *Plaintiff*, | ) <br> ) <br> )   Civil Action No. 1:25-CV-412 |
| v. | )   Judge Rudolph Contreras <br> ) |
| SCOTT BESSENT, in his official capacity, et al., | ) <br> ) <br> ) |
|    *Defendants*. | ) |

**BRIEF OF TENNESSEE AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND
MOTION FOR JUDGMENT ON THE MERITS**

## **CORPORATE DISCLOSURE STATEMENT**

Amicus curiae the State of Tennessee verifies that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

**TABLE OF CONTENTS**

INTERESTS OF AMICUS CURIAE ................................................................................................ 1

INTRODUCTION ......................................................................................................................... 2

ARGUMENT ................................................................................................................................. 3

   I.    Article II's vesting of the "executive Power" in a single, elected president requires plenary supervision of subordinate executive officials. ...................................................... 3

   II.   For-cause removal protections for the Board and like agencies violate Article II. ............ 6

   III.  Granting the Board for-cause protection creates independent constitutional problems. .. 10

CONCLUSION ............................................................................................................................ 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bond v. United States*,
    564 U.S. 211 (2011) ............................................................................................................. 1

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ............................................................................................................. 1

*City of Arlington v. FCC*,
    569 U.S. 290 ......................................................................................................... 1, 4, 7, 8

*Collins v. Yellen*,
    594 U.S. 220 (2021) ..................................................................................................... 2, 8, 9

*Fleming v. USDA*,
    987 F.3d 1093 (D.C. Cir. 2021) ..................................................................................... 10, 11

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ..................................................................................................... 5, 6, 8

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935) ................................................................................................... 2, 6, 7, 8

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ................................................................................................. 9

*Lucia v. SEC*,
    585 U.S. 237 (2018) ........................................................................................................... 10

*Morrison v. Olson*,
    487 U.S. 654 (1988) .......................................................................................................... 3, 7

*Myers v. United States*,
    272 U.S. 52 (1926) ............................................................................................................ 4, 6

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ......................................................................................... 4, 5, 6, 7, 8, 9

*Trump v. United States*,
    603 U.S. 593 (2024) .......................................................................................................... 5, 8

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) ................................................................................................................. 4

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
   No. 1:24-cv-02577 (TNM), 2024 WL 5056358 ...................................................................5

*Whitman v. Am. Trucking Assocs.*,
   531 U.S. 457 (2001)............................................................................................................4

**Constitutions, Statutes, and Regulations**

U.S. Const.
   art. I, § 1 ........................................................................................................................3, 4
   art. II ..........................................................................................................2, 3, 4, 6, 8, 9
   art. II, § 1 ........................................................................................................................3, 4
   art. II, § 3 ...........................................................................................................................4
   art. III, § 1 .........................................................................................................................3
   art. III, § 3 ......................................................................................................................4, 5

5 U.S.C.
   § 1202(d) ............................................................................................................................9
   § 1204(a)(1) .......................................................................................................................9
   § 1204(a)(2) .......................................................................................................................9
   § 1204(h) ............................................................................................................................9
   § 1204(i) .............................................................................................................................9

29 U.S.C. § 153(a) .......................................................................................................................4

26 Stat. 826-30 (1891) .................................................................................................................4

**Other Authorities**

Local Rule 7(o)(1)........................................................................................................................1

*The Federalist* (Clinton Rossiter ed., 1961)
   No. 70........................................................................................................................2, 3, 4
   No. 78........................................................................................................................3, 5, 7

2 Henry de Bracton, *On the Laws and Customs of England*
   (Samuel E. Thorne trans., 1977) ........................................................................................5

Michael W. McConnell, *The President Who Would Not Be King* (2020) .......................................5

Saikrishna Prakash, *New Light on the Decision of 1789*,
   91 Cornell L. Rev. 1021 (2006) .........................................................................................5

Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive* (2008) ....................................5

**INTERESTS OF AMICUS CURIAE**

The State of Tennessee files this amicus curiae brief under Local Rule 7(o)(1) in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction and Motion for Judgment on the Merits.

The balance of powers between the States and the Federal Government "preserves the integrity, dignity, and residual sovereignty of the States," allowing States to "function as political entities in their own right." *Bond v. United States*, 564 U.S. 211, 221 (2011). And "[t]he declared purpose of separating and dividing the powers of government, of course, was to 'diffus[e] power the better to secure liberty.'" *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). Allowing Congress to thwart presidential supervision of high-level Executive Branch officers presents an especially grave danger to the States and their citizens by vesting executive power in those lacking the political accountability and responsiveness Article II contemplates.

Tennessee and other States have already suffered harm at the hands of putatively independent Executive Branch officials. In at least one case, Tennessee is caught between a live dispute between President Trump—who has ordered an executive agency enforcement document rescinded—and Executive Branch officials who claim power to buck direct presidential instructions. *See* Pls.' Resp. to Notice of Executive Order and Unopposed Mot. to Vacate Hr'g, *Tennessee v. EEOC*, No. 3:24-cv-224-CEA-DCP (E.D. Tenn. Jan. 22, 2025). Tennessee thus has an interest in pushing against positions that further enable a "headless fourth branch of government" to pursue executive actions no democratically elected actor has endorsed. *City of Arlington v. FCC*, 569 U.S. 290, 314 (2013) (Roberts, C.J., dissenting) (citation omitted).

**INTRODUCTION**

Article II vests the "executive Power" in a single, nationally elected president able to act with "energy" and "dispatch." *The Federalist* No. 70, at 424 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Part and parcel of the President's law-execution duty is the power to supervise those carrying out Article II's chain-of-command. When Congress restricts the President's ability to dismiss agency heads, it thwarts the vesting of "executive Power" in the President alone.

Yet for some time now, the 1935 decision in *Humphrey's Executor* has carved out an aberrant exception from the constitutional rule of presidential supervision. Whatever *Humphrey's* reasoning used to be worth, subsequent Supreme Court cases have repudiated it. Instead, the requirement of at-will removal applies "*whenever* an agency does important work" of the Executive Branch, regardless of its "size or role." *Collins v. Yellen*, 594 U.S. 220, 252 (2021) (emphasis added). That describes the Board to a T: It claims power to regulate "Federal personnel management" including "Federal agenc[ies]" and "employee[s]." D.E. 1 ¶ 18. So whether because *Humphrey's* is wrong or just inapplicable, the Board's for-cause removal restrictions violate Article II. Plaintiff's motion for preliminary and permanent relief thus should fail.

Plaintiff's counters back her into a second constitutional corner. As several have noted, the Board's removal insulation creates an independent problem under *Free Enterprise Fund*'s rule against "two layers of for-cause protection," since the Board in turn may remove certain Administrative Law Judges (ALJs) only for cause. *Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)), *aff'd on other grounds*, 603 U.S. 109. So at the very least, either the Board's or ALJs' removal restrictions cannot stand. Given Board members' role as principal officers, and their Board's adjudicatory

duties, their restrictions are invalid under Plaintiff's favored cases and in light of the Board's status as a more modern innovation in the Executive Branch.

## ARGUMENT

**I.    Article II's vesting of the "executive Power" in a single, elected president requires plenary supervision of subordinate executive officials.**

A.    The Framers' genius lies in their choice to separate the legislative, executive, and judicial powers and vest each in its own branch. The legislative power "prescribes the rules" of the community. *The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The executive power is the "sword of the community." *Id.* And the judicial power, "declare[s] the sense of the law." *Id.* at 469. The Framers "viewed the principle of separation of" those powers as "the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

With that principle in mind, the Framers proposed, and "the People of the United States … ordain[ed] and establish[ed]," the U.S. Constitution's separation-of-powers framework. U.S. Const. pmbl. Article I vests "legislative Powers" in "a Congress of the United States." U.S. Const. art. I, § 1. Article III vests the "[t]he judicial Power" in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. And finally, Article II: "The executive Power shall be vested in a President of the United States." U.S. Const. art. II, § 1.

The Framers understood that "[e]nergy in the executive is a leading character in the definition of good government," while a "feeble executive" leads to "bad government." *The Federalist* No. 70, at 423 (Alexander Hamilton) (Clinton Rossiter ed., 1961). To satisfy the "necessity of an energetic executive," Article II blends "ingredients which constitute energy in the executive," namely, "unity; duration; an adequate provision for its support; and competent

3

powers." *Id.* at 423-24.  And the Constitution commands the President to "take Care that the Laws be faithfully executed" to promote accountability for executive action.  U.S. Const. art. II, § 3.

    B.  While the executive power is vested in "a President," U.S. Const. art. II, § 1, as a practical matter "the President alone and unaided could not execute the laws."  *Myers v. United States*, 272 U.S. 52, 117 (1926).  So the Constitution contemplates that the President will enjoy "the assistance of subordinates" selected through required appointment processes.  *Id.*  Such subordinate officials include the heads of administrative agencies, which, having no superior other than the President, are principal officers.  *See United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021).

    The history of the executive power, the text of Article II, and the structure of the Constitution dictate the President's power to remove executive agency heads.  To start, agencies exercise executive power.  That follows from a process of elimination.  Agencies cannot exercise legislative powers because those powers are vested in Congress, U.S. Const. art. I, § 1, and Congress may not delegate those powers, *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001).  Agencies cannot exercise judicial power because they are not the Supreme Court or inferior courts.  *Compare*, *e.g.*, 29 U.S.C. § 153(a) (establishing the National Labor Relations Board "as an agency of the United States") *with, e.g.*, 26 Stat. 826-30 (1891) (establishing "circuit courts of appeals").  Therefore, agency "activities" are "exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'"  *City of Arlington*, 569 U.S. at 304 n.4 (quoting U.S. Const. art. II, § 1).  So agencies exercise executive power when they "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties."  *Seila Law LLC v. CFPB*, 591 U.S. 197, 225 (2020)

For centuries of Anglo-American legal history, the executive power has included plenary authority to remove subordinate executive officials. *See generally VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 1:24-cv-02577, 2024 WL 5056358, at *3-4 (D.D.C. Dec. 10, 2024) (collecting historical examples). Henry of Bracton, writing in 13th century England, noted that the king wielded "the sword" of the community. 2 Henry de Bracton, *On the Laws and Customs of England* 32 (Samuel E. Thorne trans., 1977), https://tinyurl.com/yc2xa8sy; *cf. The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The executive … holds the sword of the community."). While "powerful persons" were a part of "the sword" and helped the "defence of the realm and the country," they were "under the king," and they could neither "question" nor "contravene" his "acts." *Id.* at 32-33. The English king's power over subordinates continued up to the American founding: "The king had the prerogative power to remove" executive officers "at will." Michael W. McConnell, *The President Who Would Not Be King* 162 (2020).

That English tradition carried into the United States. During the much-discussed Decision of 1789, the First Congress concluded the President enjoys a "preexisting removal power." Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1026 (2006); *see Free Enter. Fund*, 561 U.S. at 492. And that power was not academic for the Founders, as President George Washington "plainly and willingly employed" the "removal power" to "administer the executive branch … in an orderly fashion." Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive* 42 (2008).

Historical practice surrounding presidential removal power aligns with Article II's plain language, which guarantees the "President's power to remove—and thus supervise—those who wield executive power on his behalf." *Seila Law*, 591 U.S. at 204; *see also Trump v. United States*, 603 U.S. 593, 620 (2024) ("[T]he Constitution vests the entirety of the executive power in the

5

President."). And plenary removal also addresses functional concerns. After all, Executive Branch subordinates "act for [the President] under his direction in the execution of the laws." *Myers*, 272 U.S. at 117. By "implication," the President's "power of removing" his subordinates "is essential to the execution of the laws." *Id.* Otherwise, swaths of critical enforcement authority would operate insulated from "a clear and effective chain of command" headed by the President, on whom the public can "pass judgment." *Free Enter. Fund*, 561 U.S. at 498.

Surveying all this, the Supreme Court in *Myers* held that Article II "grants to the President" the power of "removal of executive officers." 272 U.S. at 163-64. *Myers*'s approximately six-dozen pages of analysis included "an exhaustive examination of the First Congress's determination in 1789, the views of the Framers and their contemporaries, historical practice, and [Supreme Court] precedents up until that point." *Seila Law*, 591 U.S. at 214. Writing for the Court, Chief Justice Taft reinforced the President's removal power as a pillar in our constitutional framework—to impede that power "might make impossible that unity and co-ordination in executive administration essential to effective action." *Myers*, 272 U.S. at 134.

## II. For-cause removal protections for the Board and like agencies violate Article II.

*Myers*'s detailed analysis of the President's power to remove executive officials soon met motivated opposition in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). But that case was wrongly decided. And its reasoning does not extend to the Board regardless.

A. *Humphrey's* examined the Federal Trade Commission Act, which limited the President's removal of FTC commissioners to cases of "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 619. The *Humphrey's* Court considered a claim for back-pay from the estate of an FTC commissioner dismissed by President Franklin Roosevelt without indicating a statutory cause for the dismissal. *Id.* at 612-19. In about a dozen pages, the Supreme Court upheld the FTC's removal restrictions against a constitutional challenge.

6

The decision in *Humphrey's*—"considered by many at the time the product of an activist, anti-New Deal Court bent on reducing the power of President Franklin Roosevelt," *Morrison*, 487 U.S. at 724 (Scalia, J., dissenting)—has since been read to "permit[] Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines." *Seila Law*, 591 U.S. at 216. *Humphrey's* did not square that holding with Article II's Vesting or Take Care Clauses. Instead, it rested its reasoning on a belief that "the duties" of the commission at issue were "neither political nor executive, but predominantly quasi judicial and quasi legislative." *Humphrey's Ex'r*, 295 U.S. at 624. In so holding, the Court described the FTC as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute and in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 628.

*Humphrey's* reasoning was wrong the day it was rendered. To "carry into effect legislative policies" and "perform other specified duties" is, by definition, to *execute* a law. As discussed above (*supra* Section I.A.) government power is either legislative, executive, or judicial. *See The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The legislative power is to prescribe rules; the executive power is to effectuate those rules. *See id.* And the Constitution exclusively vests each of those powers in Congress and the President, respectively. For the Court to state that the FTC's "duties" were not "executive" was to contradict our constitutional design. Executive agency officials wield the executive power, even when doing things that look like legislating and adjudicating. *See City of Arlington*, 569 U.S. at 304 n.4.

Given its flaws, it is no surprise that subsequent cases have narrowed *Humphrey's* nearly out of existence:

- *Free Enterprise Fund* exhaustively detailed Article II's design to permit agencies to be "fully accountable" to the President for their conduct. Applying that rule, the Court

7

held that the Public Company Accounting Oversight Board's "dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers." 561 U.S. at 492.

- *City of Arlington* acknowledged that *all* agency activities are exercises of the executive power—contra *Humphrey's* quasi-legislative, quasi-judicial conception of FTC. 569 U.S. at 304 n.4.

- *Seila Law* cabined *Humphrey's Executor* to allowing "for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and [are] said not to exercise any executive power." 591 U.S. at 216. *Seila Law* noted that, even under *Humphrey's Executor*, a multimember agency that "wield[s] substantial executive power" violates Article II. *Seila Law*, 591 U.S. at 218.

- In *Collins v. Yellen*, the Court held that the "Recovery Act's for-cause restriction on the President's removal authority violates the separation of powers." 594 U.S. at 250. The Recovery Act created the Federal Housing Finance Agency, "led by a single Director" removable "by the President 'for cause.'" *Id.* at 229 (citation omitted). The "FHFA clearly exercises executive power," so even "'modest restrictions' on the President's power to remove the head of an agency with a single top officer" violates the Constitution. *Id.* at 254, 256 (citation omitted). And that rule of at-will removal applies "whenever an agency does important work." *Id.* at 252.

Most recently, in last term's *Trump v. United States* decision, the Court noted that the "removal" of certain federal officers "implicates 'conclusive and preclusive' Presidential authority." 603 U.S. at 620-21. A President's exclusive power that "stem[s] … from the Constitution itself" is "conclusive and preclusive." *See id.* at 607 (quoting *Youngstown Sheet & Tube Co.*, 343 U.S. at 585; *id.* at 638 (Jackson, J., concurring)). That includes "the President's 'unrestricted power of removal' with respect to 'executive officers of the United States whom he has appointed.'" *Id.* at 609 (quoting *Myers*, 272 U.S. at 106). "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609. Therefore, *Trump* determined that Congress cannot regulate a President's removal of those officers by way of criminal sanction. *Id.* at 621.

Putting all this together, the Supreme Court's recent instruction leaves at most a 1930s-FTC-specific exception to the general rule of at-will presidential removal. For those modern-day agencies exercising executive power, Article II prohibits statutes that purport to limit the President's ability to dismiss an agency head. *See, e.g.*, *Jarkesy*, 34 F.4th at 464 n.19 (discussing the interaction between *City of Arlington* and *Seila Law*).

B.  The Board is "composed of 3 members appointed by the President, by and with the advice and consent of the Senate, not more than 2 of whom may be adherents of the same political party." 5 U.S.C. § 1201. If the Board exercises significant executive authority, then the Constitution requires its heads to be removable by the President at will.

There can be no serious debate that the Board exercises "quintessentially executive power." *Seila Law*, 591 U.S. at 219; *see also Collins*, 594 U.S. at 252-53. The Board "adjudicate[s] … all matters within the jurisdiction of the Board," "order[s] any Federal agency or employee to comply with" its orders and decisions, and "enforce[s] compliance with" those orders and decisions. 5 U.S.C. § 1204(a)(1), (2). And it may "designate[]" attorneys to "appear for the Board" in "civil action[s]" to enforce its orders and decisions. *Id.* § 1204(i). Finally, it may "prescribe such regulations as may be necessary for the performance of its functions." *Id.* § 1204(h).

Yet despite those immense executive powers, the Board's governing statute provides that "[a]ny member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 1202(d). The Board's removal restrictions are plainly unconstitutional under *Seila Law* and *Collins*. So Article II empowered President Trump to terminate Plaintiff Harris without cause or recourse in the form she requests—*i.e.*, a court order supervising presidential personnel decisions.

9

### III. Granting the Board for-cause protection creates independent constitutional problems.

Plaintiff's defense of the Board's for-cause-insulated structure only tees up an independent constitutional problem other courts have recognized. Specifically, the MSPB's suite of powers includes the exclusive authority to assess and remove many Executive Branch ALJs, who are themselves "Officers of the United States." *See Lucia v. SEC*, 585 U.S. 237, 241 (2018). But, importantly, the Board's removal authority is generally limited to removing ALJs "only for good cause established." 5 U.S.C. § 7521(a).

Carrying forward the Board's for-cause removal restrictions thus generates an independent constitutional problem under *Free Enterprise Fund*. That case's Article II-based rule bars Congress from imposing "two levels of protection from removal for those who nonetheless exercise significant executive power." 561 U.S. at 514. But *Lucia* determined that ALJs are indeed Executive Branch officers. And while their functions might be "adjudicative," as Executive Branch officers ALJs "cannot exercise anything but executive power." *Fleming v. USDA*, 987 F.3d 1093, 1115 (D.C. Cir. 2021) (Rao, J., concurring in part and dissenting in part). The upshot: If the Board remains for-cause-removal insulated, then two levels of removal protection (the President to the Board, and the Board to ALJs) operate to insulate ALJs from presidential supervision. That result is contrary to *Free Enterprise Fund*. *See id.* at 1115-23; *see also Jarkesy*, 34 F.4th at 463 (invalidating ALJ removal protections on this basis).

At a minimum, then, either the Board's or ALJs' for-cause removal restrictions are unlawful. And when it comes to remedying that constitutional problem, Plaintiff's arguments cut against her. *First*, Plaintiff contends (at 12-13, 16-17, 25) that Congress has more leeway to insulate executive adjudicators from removal than those who exercise other types of enforcement authority. That framing is suspect under modern removal precedents. *See, e.g.*, *Seila Law*, 591

10

U.S. at 216 n.2 (*Humphrey's* "conclusion that the FTC did not exercise executive power has not withstood the test of time"); *Fleming*, 987 F.3d at 1120 ("ALJ adjudication *is* an enforcement power.") (Rao, J., concurring in part and dissenting in part); *Jarkesy*, 34 F.4th at 465 n.20 (ALJs are "integral pieces within the SEC's powerful enforcement apparatus"). But even accepting it, an adjudicator-protective test would counsel maintaining the removal restrictions of ALJs, who engage exclusively in adjudications, not the removal restrictions of the Board. After all, the Board indisputably exercises additional executive powers—like rulemaking and independent litigation of cases—that are broader than ALJs' adjudicative duty to resolve individual legal claims. *See* U.S. Br. 3-4, 7, 9-10; Pl.'s Mot. 12.

*Second*, Plaintiff appears to posit (at 13, 20, 22-23) that Congress can more readily cabin removal of inferior (versus principal) officers. Others defending removal restrictions have argued similarly. *See, e.g.*, Pls.' Mot. for a TRO & Prelim. Inj. & Mem. in Supp. of Same at 15, *Storch v. Hegseth*, No. 1:25-cv-00415-ACR (D.D.C. Feb. 14, 2025). But the Board, no one disputes, comprises principal officers, while ALJs typically qualify as inferior officers. U.S. Br. 3-4. So if anything Plaintiff's conception of Article II favors solving the Board's *Free Enterprise Fund* problem by enjoining the Board's principal-officer removal protections, not inferior-officer ALJs'.

To be sure, Article II, best read, renders all for-cause restrictions on Executive-Branch officers highly suspect. *See Morrison*, 487 U.S. at 715-27 (Scalia, J., dissenting). But if nothing else, *Free Enterprise Fund* teaches that a novel scheme[1] imposing double for-cause restrictions on

---

[1] Far from reflecting longstanding "history and tradition," Pl.'s Mot. 20, the Board's for-cause scheme is novel. Originally, the "members of the Civil Service Commission"—the Board's predecessor agency—"were removable at will by the President." *Fleming*, 987 F.3d at 1116-17 (Rao, J., concurring in part and dissenting in part). "It was not until 1978 that Congress established the Merit Systems Protection Board" and the attending removal restrictions which have led to ALJs' double-for-cause protection. *Id.* at 1117.

11

the President's ability to remove executive officers like ALJs cannot pass constitutional muster. Maintaining the Board's for-cause removal protections carries forward just such a scheme. Reducing the President to "cajoler-in-chief" twice over defies Article II and the Supreme Court's recent precedents interpreting it. *Free Enter. Fund*, 561 U.S. at 502. Enforcing the President's power to supervise the Board's membership, by contrast, avoids that independent constitutional problem.

## CONCLUSION

The foregoing arguments support denying the Plaintiff's requested relief.

Dated: March 1, 2025

JONATHAN SKRMETTI
Tennessee Attorney General
& Reporter
*/s/ Whitney Hermandorfer*

WHITNEY HERMANDORFER (DC Bar #888314222)
  Director of Strategic Litigation
JOSEPH M. FIORILE*
  Strategic Litigation Unit Honors Fellow
Office of the Tennessee Attorney General
and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-3491
whitney.hermandorfer@ag.tn.gov
joseph.fiorile@ag.tn.gov

*Counsel for Amicus Curiae State of Tennessee*

*Active Government Status

## CERTIFICATE OF SERVICE

     I hereby certify that on March 1, 2025, I electronically filed this brief of Tennessee as amicus curiae with the Clerk of the Court for the U.S. District Court for the District of Columbia by using the CM/ECF system.  Such filing effectuates service under LCvR 5.4(d).

March 1, 2025                                         */s/ Whitney Hermandorfer*
                                                                         WHITNEY HERMANDORFER (DC Bar #888314222)