APPEAL,CLOSED,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–00412–RC</u>
### *Internal Use Only*

| | |
|---|---|
| HARRIS v. BESSENT et al | Date Filed: 02/11/2025 |
| Assigned to: Judge Rudolph Contreras | Date Terminated: 03/04/2025 |
| Case in other court:  USCA, 25–05037 | Jury Demand: None |
| Cause: 28:1331 Fed. Question | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: Federal Question |

**<u>Plaintiff</u>**

**CATHY A. HARRIS**
*in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board*

represented by **Michael J. Kator**
KATOR, PARKS, WEISER & WRIGHT, PLLC
1150 Connecticut Ave., NW
Suite 705
Washington, DC 20036
202–898–4800
Fax: 202–289–1389
Email: mkator@katorparks.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ezra Louvis**
MILBANK LLP
1850 K St. NW
Suite 1100
Washington, DC 20006
202–835–7584
Email: elouvis@milbank.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeremy D. Wright**
KATOR, PARKS, WEISER & WRIGHT PLLC
1150 Connecticut Ave NW
Ste 705
Washington, DC 20036
202–898–4800
Fax: 202–289–1389
Email: jwright@katorparks.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Linda Marie Correia**
CORREIA & PUTH, PLLC

1

1400 16th Street, NW
Suite 450
Washington, DC 20036
(202) 602–6500
Fax: (202) 602–6501
Email: lcorreia@correiaputh.com
*ATTORNEY TO BE NOTICED*

**Nathaniel Avi Gideon Zelinsky**
MILBANK LLP
1850 K St. NW
Suite 1100
Washington, DC 20006
202–835–7523
Email: nzelinsky@milbank.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neal Kumar Katyal**
MILBANK LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
202–835–7505
Email: nkatyal@milbank.com
*ATTORNEY TO BE NOTICED*

**Kerrie Diane Riggs**
KATOR, PARKS, WEISER & HARRIS,
PLLC
1150 Connecticut Ave, N.W.
Suite 705
Washington, DC 20036
202–898–4800
Fax: 202–289–1389
Email: kriggs@katorparks.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SCOTT BESSENT**                    represented by   **Jeremy Samuel Bloch Newman**
*in his official capacity as Secretary of the*       U.S. DEPARTMENT OF JUSTICE
*Treasury*                                           1100 L Street NW
                                                     Washington, DC 20005
                                                     202–532–3114
                                                     Email: jeremy.s.newman@usdoj.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Madeline McMahon**

2

DOJ–CIV
1100 L Street NW
Washington, DC 20005
(202) 451–7722
Fax: (202) 616–8470
Email: madeline.m.mcmahon@usdoj.gov
*TERMINATED: 02/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TRENT MORSE**
*in his official capacity as Deputy*
*Assistant to the President and Deputy*
*Director of the White House Presidential*
*Personnel Office*

represented by **Jeremy Samuel Bloch Newman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Madeline McMahon**
(See above for address)
*TERMINATED: 02/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SERGIO GOR**
*in his official capacity as Director of the*
*White House Presidential Personnel*
*Office*

represented by **Jeremy Samuel Bloch Newman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Madeline McMahon**
(See above for address)
*TERMINATED: 02/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**HENRY J. KERNER**
*in his official capacity as Acting*
*Chairman of the Merit Systems*
*Protection Board*

represented by **Jeremy Samuel Bloch Newman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Madeline McMahon**
(See above for address)
*TERMINATED: 02/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD J. TRUMP**
*in his official capacity as President of the*
*United States of America*

represented by **Jeremy Samuel Bloch Newman**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Madeline McMahon**
(See above for address)
*TERMINATED: 02/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **RUSSELL T. VOUGHT**<br>*in his official capacity as Director of the*<br>*Office of Management and Budget* | represented by | **Jeremy Samuel Bloch Newman**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Madeline McMahon**
(See above for address)
*TERMINATED: 02/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **CONSTITUTIONAL**<br>**ACCOUNTABILITY CENTER** | represented by | **Brianne Jenna Gorod**<br>CONSTITUTIONAL<br>ACCOUNTABILITY CENTER<br>1200 18th Street, NW<br>Suite 501<br>Washington, DC 20036<br>(202) 296–6889 ext. 304<br>Email: brianne@theusconstitution.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **STATE OF FLORIDA** | represented by | **Darrick Monson**<br>FLORIDA ATTORNEY GENERALS<br>OFFICE<br>107 W Gaines Street<br>Tallahassee, FL 32399<br>850–414–3683<br>Email: darrick.monson@myfloridalegal.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**David Costello**
FLORIDA ATTORNEY GENERAL'S
OFFICE
Concourse Center IV
3507 E. Frontage Road
Ste 200
Tampa, FL 33607
908–461–5672

4

Email: david.costello@myfloridalegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Paul DeSousa , I**
OFFICE OF THE ATTORNEY
GENERAL/FL
PL–01, The Capitol
Tallahassee, FL 32399
850–414–3830
Email: jeffrey.desousa@myfloridalegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan Andrew Forrester**
OFFICE OF THE ATTORNEY
GENERAL/FL
PL–01, The Capitol
Tallahassee, FL 32399
703–906–0298
Email: nathan.forrester@myfloridalegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF TENNESSEE**                    represented by    **Whitney D. Hermandorfer**
OFFICE OF TENNESSEE ATTORNEY
GENERAL
P.O. Box 20207
Nashville, TN 37202
615–741–7403
Email: whitney.hermandorfer@ag.tn.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Fiorile**
OFFICE OF THE ATTORNEY
GENERAL & REPORTER– TN
P.O. Box 20207
Nashville, TN 37202
615–741–7404
Email: joseph.fiorile@ag.tn.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11473515) filed by CATHY A. HARRIS. (Attachments: # 1 Exhibit Exhibit A, # 2 Civil Cover Sheet Civil Cover Sheet, # 3 Summons Summons for Attorney General, # 4 Summons Summons for Scott Bessent, # 5 Summons Summons for Sergio Gor, # 6 Summons Summons for Henry Kerner, # 7 Summons Summons for Trent |

| | | Morse, # <u>8</u> Summons Summons for Donald Trump, # <u>9</u> Summons Summons for USAO, # <u>10</u> Summons Summons for Vought)(Kator, Michael) Modified attorney on 2/12/2025 (znmw). (Entered: 02/11/2025) |
|---|---|---|
| 02/11/2025 | 2 | Emergency MOTION for Temporary Restraining Order by CATHY A. HARRIS. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Exhibit Exhibit A, # <u>3</u> Compliance Report, # <u>4</u> Text of Proposed Order)(Riggs, Kerrie) (Entered: 02/11/2025) |
| 02/11/2025 | 3 | NOTICE of Appearance by Linda Marie Correia on behalf of CATHY A. HARRIS (Correia, Linda) (Entered: 02/11/2025) |
| 02/12/2025 | | Case Assigned to Judge Rudolph Contreras. (znmw) (Entered: 02/12/2025) |
| 02/12/2025 | 4 | SUMMONS (8) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # <u>1</u> Notice and Consent)(znmw) (Entered: 02/12/2025) |
| 02/12/2025 | | NOTICE OF ERROR regarding <u>2</u> Emergency MOTION for Temporary Restraining Order , <u>1</u> Complaint. Please note the following error for future filings: Invalid attorney signature− signature on document must match PACER login. Do not refile; future non−compliant documents may be entered in error. (znmw) (Entered: 02/12/2025) |
| 02/12/2025 | | MINUTE ORDER: Upon consideration of <u>2</u> Plaintiff's Motion for Temporary Restraining Order, it is hereby ORDERED that the parties shall appear for a hearing on the matter on February 13, 2025, at 3:00 p.m. in Courtroom 23A. It is FURTHER ORDERED that Plaintiff shall serve Defendants with a copy of this order immediately upon receipt. SO ORDERED. Signed by Judge Rudolph Contreras on 2/12/2025. (lcrc3) (Entered: 02/12/2025) |
| 02/12/2025 | | Set/Reset Hearings: Motion Hearing set for 2/13/2025 at 03:00 PM in Courtroom 23A− In Person before Judge Rudolph Contreras. (tj) (Entered: 02/12/2025) |
| 02/13/2025 | 5 | NOTICE of Appearance by Madeline McMahon on behalf of All Defendants (McMahon, Madeline) (Entered: 02/13/2025) |
| 02/13/2025 | 6 | Memorandum in opposition to re <u>2</u> Motion for TRO filed by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. (McMahon, Madeline) (Entered: 02/13/2025) |
| 02/13/2025 | | NOTICE: The Court will provide public access to the motion hearing in this matter now scheduled for 2/13/2025 at 3:00pm before the Hon. Rudolph Contreras. Members of the public shall adhere to the rules set forth on the Court's website. Toll Free Number: (833) 990−9400; Meeting ID 698780857. (tj) (Entered: 02/13/2025) |
| 02/13/2025 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Motion Hearing held on 2/13/2025 re <u>2</u> Emergency MOTION for Temporary Restraining Order filed by plaintiff CATHY A. HARRIS. Oral argument heard, and plaintiff shall file a reply to the government's opposition by 2/14/2025. The court takes the motion under advisement. (Court Reporter: Tim Miller) (tj) (Entered: 02/13/2025) |
| 02/14/2025 | 7 | REPLY to opposition to motion re <u>2</u> Motion for TRO filed by CATHY A. HARRIS. (Attachments: # <u>1</u> Exhibit Exhibit B)(Riggs, Kerrie) (Entered: 02/14/2025) |
| 02/18/2025 | 8 | ORDER granting <u>2</u> Motion for Temporary Restraining Order. See document for details. Signed by Judge Rudolph Contreras on 2/18/2025. (lcrc3) (Entered: 02/18/2025) |
| 02/18/2025 | 9 | |

| | | |
|---|---|---|
| | | MEMORANDUM OPINION granting 2 Motion for Temporary Restraining Order. See document for details. Signed by Judge Rudolph Contreras on 2/18/2025. (lcrc3) (Entered: 02/18/2025) |
| 02/18/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Jeremy Wright, Filing fee $ 100, receipt number ADCDC–11486595. Fee Status: Fee Paid. by CATHY A. HARRIS. (Attachments: # 1 Declaration Declaration of J.Wright, # 2 Text of Proposed Order Proposed Order)(Riggs, Kerrie) (Entered: 02/18/2025) |
| 02/18/2025 | | NOTICE OF ERROR regarding 10 Motion for Leave to Appear Pro Hac Vice: Attorney Name– Jeremy Wright. The following error(s) need correction: Pro Hac Vice motion must be accompanied by a Certificate of Good Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate as an Errata. (lcrc3) (Entered: 02/18/2025) |
| 02/18/2025 | 11 | ERRATA *Submission of Certificate of Good Standing* by CATHY A. HARRIS re 10 Motion for Leave to Appear Pro Hac Vice,. (Riggs, Kerrie) (Entered: 02/18/2025) |
| 02/19/2025 | | MINUTE ORDER granting 10 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Jeremy D. Wright is admitted to represent Plaintiff Cathy A. Harris *pro hac vice* in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to Local Civil Rule 83.6(a). Click for instructions**. SO ORDERED. Signed by Judge Rudolph Contreras on 2/19/2025. (lcrc3) (Entered: 02/19/2025) |
| 02/19/2025 | 12 | NOTICE of Appearance by Jeremy D. Wright on behalf of All Plaintiffs (Wright, Jeremy) (Entered: 02/19/2025) |
| 02/19/2025 | | Set/Reset Deadlines/Hearings: Motions due by 2/23/2025. Responses due by 2/28/2025 Replies due by 3/2/2025. Status Report due by 2/19/2025 Motion Hearing set for 3/3/2025 at 02:00 PM in Courtroom 23A– In Person before Judge Rudolph Contreras. (tj) (Entered: 02/19/2025) |
| 02/19/2025 | 13 | Joint STATUS REPORT by CATHY A. HARRIS, SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. (Wright, Jeremy) (Entered: 02/19/2025) |
| 02/20/2025 | 14 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to 8 Order on Motion for TRO by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. Fee Status: No Fee Paid. Parties have been notified. (McMahon, Madeline) Modified event on 2/20/2025 (mg). (Entered: 02/20/2025) |
| 02/20/2025 | 15 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 14 Notice of Interlocutory Appeal to DC Circuit Court,. (mg) (Entered: 02/20/2025) |
| 02/20/2025 | 16 | MOTION to Stay re 8 Order on Motion for TRO *Pending Appeal* by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. (McMahon, Madeline) (Entered: 02/20/2025) |
| 02/20/2025 | 17 | RESPONSE re 16 MOTION to Stay re 8 Order on Motion for TRO *Pending Appeal* filed by CATHY A. HARRIS. (Wright, Jeremy) (Entered: 02/20/2025) |
| 02/20/2025 | 18 | |

| | | |
|---|---|---|
| | | ORDER denying 16 Motion to Stay Temporary Restraining Order. See document for details. Signed by Judge Rudolph Contreras on 2/20/2025. (lcrc3) (Entered: 02/20/2025) |
| 02/20/2025 | | USCA Case Number 25−5037 for 14 Notice of Appeal to DC Circuit Court, filed by RUSSELL T. VOUGHT, DONALD J. TRUMP, SERGIO GOR, HENRY J. KERNER, TRENT MORSE, SCOTT BESSENT. (mg) (Entered: 02/21/2025) |
| 02/22/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Neal Kumar Katyal, Filing fee $ 100, receipt number ADCDC−11497771. Fee Status: Fee Paid. by CATHY A. HARRIS. (Attachments: # 1 Declaration Declaration of Neal Kumar Katyal, # 2 Exhibit Katyal Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Riggs, Kerrie) (Entered: 02/22/2025) |
| 02/22/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Nathaniel A.G. Zelinsky, Filing fee $ 100, receipt number ADCDC−11497772. Fee Status: Fee Paid. by CATHY A. HARRIS. (Attachments: # 1 Declaration Declaration of Nathaniel A.G. Zelinsky, # 2 Exhibit Zelinsky Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Riggs, Kerrie) (Entered: 02/22/2025) |
| 02/22/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Ezra Louvis, Filing fee $ 100, receipt number ADCDC−11497773. Fee Status: Fee Paid. by CATHY A. HARRIS. (Attachments: # 1 Declaration Declaration of Ezra Louvis, # 2 Exhibit Louvis Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Riggs, Kerrie) (Entered: 02/22/2025) |
| 02/23/2025 | 22 | MOTION for Preliminary Injunction , MOTION for Judgment , MOTION for Permanent Injunction , MOTION for Summary Judgment , MOTION for Writ of Mandamus , MOTION for Declaratory Judgment by CATHY A. HARRIS. (Attachments: # 1 Text of Proposed Order, # 2 Statement of Facts, # 3 Exhibit Declaration of Cathy A. Harris, # 4 Exhibit Termination Email)(Wright, Jeremy) (Entered: 02/23/2025) |
| 02/24/2025 | | MINUTE ORDER granting 19 , 20 , 21 Motions for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Neal K. Katyal, Nathaniel A.G. Zelinsky, and Ezra P. Louvis are admitted to represent Plaintiff Cathy A. Harris *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civil Rule 83.6(a). <u>Click for instructions</u>**. SO ORDERED. Signed by Judge Rudolph Contreras on 2/24/2025. (lcrc3) (Entered: 02/24/2025) |
| 02/24/2025 | 23 | Consent MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Appendix Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/24/2025) |
| 02/24/2025 | 24 | NOTICE of Appearance by Nathaniel Avi Gideon Zelinsky on behalf of CATHY A. HARRIS (Zelinsky, Nathaniel) (Entered: 02/24/2025) |
| 02/24/2025 | 25 | NOTICE of Appearance by Ezra Louvis on behalf of CATHY A. HARRIS (Louvis, Ezra) (Entered: 02/24/2025) |
| 02/25/2025 | 26 | NOTICE of Appearance by Neal Kumar Katyal on behalf of CATHY A. HARRIS (Katyal, Neal) (Entered: 02/25/2025) |
| 02/26/2025 | 27 | TRANSCRIPT OF TRO HEARING before Judge Rudolph Contreras held on 2−13−25; Page Numbers: 1−19; Date of Issuance: 2−26−25; Court Reporter: Timothy |

| | | R. Miller, Telephone Number (202) 354−3111. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/19/2025. Redacted Transcript Deadline set for 3/29/2025. Release of Transcript Restriction set for 5/27/2025.(Miller, Timothy) (Entered: 02/26/2025) |
|---|---|---|
| 02/27/2025 | <u>28</u> | NOTICE OF SUBSTITUTION OF COUNSEL by Jeremy Samuel Bloch Newman on behalf of All Defendants Substituting for attorney Madeline M. McMahon (Newman, Jeremy) (Entered: 02/27/2025) |
| 02/28/2025 | <u>29</u> | NOTICE of Appearance by Jeffrey Paul DeSousa, I on behalf of STATE OF FLORIDA (DeSousa, Jeffrey) (Entered: 02/28/2025) |
| 02/28/2025 | <u>30</u> | NOTICE of Appearance by Nathan Andrew Forrester on behalf of STATE OF FLORIDA (Forrester, Nathan) (Entered: 02/28/2025) |
| 02/28/2025 | <u>31</u> | NOTICE of Appearance by Darrick Monson on behalf of STATE OF FLORIDA (Monson, Darrick) (Entered: 02/28/2025) |
| 02/28/2025 | <u>32</u> | NOTICE of Appearance by David Costello on behalf of STATE OF FLORIDA (Costello, David) (Entered: 02/28/2025) |
| 02/28/2025 | <u>33</u> | RESPONSE re <u>22</u> MOTION for Preliminary Injunction MOTION for Judgment MOTION for Permanent Injunction MOTION for Summary Judgment MOTION for Writ of Mandamus MOTION for Declaratory Judgment filed by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. (Newman, Jeremy) (Entered: 02/28/2025) |
| 02/28/2025 | <u>34</u> | AMICUS BRIEF by STATE OF FLORIDA. (DeSousa, Jeffrey) (Entered: 02/28/2025) |
| 03/01/2025 | <u>35</u> | NOTICE of Appearance by Whitney D. Hermandorfer on behalf of STATE OF TENNESSEE (Hermandorfer, Whitney) (Entered: 03/01/2025) |
| 03/01/2025 | <u>36</u> | NOTICE of Appearance by Joseph Fiorile on behalf of STATE OF TENNESSEE (Fiorile, Joseph) (Entered: 03/01/2025) |
| 03/01/2025 | <u>37</u> | AMICUS BRIEF by STATE OF TENNESSEE. (Hermandorfer, Whitney) (Entered: 03/01/2025) |
| 03/02/2025 | <u>38</u> | REPLY to opposition to motion re <u>22</u> Motion for Preliminary Injunction,, Motion for Judgment,, Motion for Permanent Injunction,, Motion for Summary Judgment,, Motion for Writ of Mandamus,, Motion for Declaratory Judgment, filed by CATHY A. HARRIS. (Wright, Jeremy) (Entered: 03/02/2025) |

| 03/03/2025 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Hearing on the Motion for Preliminary Injunction <u>22</u> held on 3/3/2025. Oral argument heard, and the court takes the motion under advisement. (Court Reporter: Tim Miller) (tj) (Entered: 03/03/2025) |
|---|---|---|
| 03/04/2025 | | MINUTE ORDER granting <u>23</u> Motion for Leave to File Amicus Brief: It is hereby ORDERED that the motion is GRANTED, and that the brief is DEEMED FILED. SO ORDERED. Signed by Judge Rudolph Contreras on 3/4/2025. (lcrc3) (Entered: 03/04/2025) |
| 03/04/2025 | <u>39</u> | ORDER granting <u>22</u> Plaintiff's Motion for Summary Judgment and granting declaratory and injunctive relief. See document for details. Signed by Judge Rudolph Contreras on 3/4/2025. (lcrc3) (Entered: 03/04/2025) |
| 03/04/2025 | <u>40</u> | MEMORANDUM OPINION granting <u>22</u> Plaintiff's Motion for Summary Judgment and granting declaratory and injunctive relief. See document for details. Signed by Judge Rudolph Contreras on 3/4/2025. (lcrc3) (Entered: 03/04/2025) |
| 03/04/2025 | <u>41</u> | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>39</u> Order on Motion for Declaratory Judgment, Order on Motion for Preliminary Injunction, Order on Motion for Judgment, Order on Motion for Permanent Injunction, Order on Motion for Summary Judgment, Order on Motion for Writ of Mandamus, <u>40</u> Memorandum & Opinion by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. Fee Status: No Fee Paid. Parties have been notified. (Newman, Jeremy) (Entered: 03/04/2025) |
| 03/04/2025 | <u>42</u> | MOTION to Stay *Court's Order Pending Appeal* by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. (Newman, Jeremy) (Entered: 03/04/2025) |
| 03/04/2025 | <u>43</u> | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re <u>41</u> Notice of Appeal to DC Circuit Court,. (zjm) (Entered: 03/04/2025) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CATHY A. HARRIS, | | |
| | *Plaintiff,* | |
| *v.* | | Civil Action No. 1:25-cv-00412-RC |
| SCOTT BESSENT, *et al.*, | | |
| | *Defendants.* | |

## DEFENDANTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's Order Granting Plaintiff's Motion for Summary Judgment and Memorandum Opinion Granting Plaintiff's Motion for Summary Judgment. *See* ECF Nos. 39, 40.

Dated: March 4, 2025

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*
*Civil Division*

CHRISTOPHER R. HALL
*Assistant Branch Director*

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
(DC Bar No. 1024112)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS, *in her personal capacity*  :
*and in her official capacity as Member of the*  :
*Merit Systems Protection Board*,  :
                                 :
       Plaintiff,  :     Civil Action No.:    25-412 (RC)
                                 :
       v.  :     Re Document No.:   22
                                 :
SCOTT BESSENT, *in his official capacity as*  :
*Secretary of the Treasury*, *et al.*,  :
                                 :
       Defendants.  :

## ORDER

### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, Plaintiff Cathy A. Harris's Motion for Summary Judgment (ECF No. 22) is **GRANTED**.  It is hereby:

**DECLARED** that Plaintiff Cathy A. Harris remains a member of the Merit Systems Protection Board, having been confirmed by the Senate on May 25, 2022, and sworn in on June 1, 2022, and that she may be removed by the President prior to the expiration of her term in office only for inefficiency, neglect of duty, or malfeasance in office pursuant to 5 U.S.C. § 1202; and it is

**FURTHER ORDERED** that Plaintiff Cathy A. Harris shall continue to serve as a member of the Merit Systems Protection Board until her term expires pursuant to 5 U.S.C. § 1202, unless she is earlier removed for inefficiency, neglect of duty, or malfeasance in office under that statute.  Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from

removing Harris from her office without cause or in any way treating her as having been removed without cause, denying or obstructing Harris's access to any of the benefits or resources of her office, placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the Merit Systems Protection Board in Harris's position; and it is

**FURTHER ORDERED** that the Court's Temporary Restraining Order (ECF No. 8) is **VACATED**.

**SO ORDERED**.

Dated:  March 4, 2025                                    RUDOLPH CONTRERAS
                                                        United States District Judge

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CATHY A. HARRIS, *in her personal capacity*   :
*and in her official capacity as Member of the*   :
*Merit Systems Protection Board*,   :
  :
       Plaintiff,   :     Civil Action No.:     25-412 (RC)
  :
       v.   :     Re Document No.:     22
  :
SCOTT BESSENT, *in his official capacity as*   :
*Secretary of the Treasury*, *et al.*,   :
  :
       Defendants.   :

## MEMORANDUM OPINION

### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Cathy A. Harris was appointed to the Merit Systems Protection Board ("MSPB") on June 1, 2022, for a term set to expire on March 1, 2028.  Federal law states that members of the MSPB may be removed from office "only for inefficiency, neglect of duty, or malfeasance in office."  On February 10, 2025, President Donald J. Trump informed Harris that her position on the MSPB was "terminated, effective immediately" but provided no reason for Harris's termination.  The following day, Harris filed this lawsuit against President Trump and several other federal officials ("Defendants"), claiming that her termination violated federal law.  She moved for a temporary restraining order enjoining Defendants from treating her as removed from office, which this Court granted.  The parties consolidated preliminary injunction briefing with the merits, and Harris moved for summary judgment.  The Court grants that motion, along with declaratory judgment and a permanent injunction.

## II.  BACKGROUND

### A.  Statutory Background

Congress created the Merit Systems Protection Board as a component of the Civil Service Reform Act of 1978 ("CSRA"), which "establishes a framework for evaluating personnel actions taken against federal employees."  *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012); *see also* CSRA, Pub. L. No. 95-454, § 202, 92 Stat. 1111, 1121–25 (1978) (codified at 5 U.S.C. §§ 1201–05). Congress's Findings and Statement of Purpose indicate that "[i]t is the policy of the United States that . . . to provide the people of the United States with a competent, honest, and productive Federal work force[,] . . . Federal personnel management should be implemented consistent with merit system principles."  CSRA § 3, 92 Stat. at 1112.  Those merit system principles include, among others, "[r]ecruitment . . . from qualified individuals" where "selection and advancement [is] determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity."  *Id.* § 101, 92 Stat. at 1113 (codified at 5 U.S.C. § 2301).  Congress additionally instructed that "[e]mployees should be . . . protected against arbitrary action, personal favoritism, or coercion for partisan political purposes," as well as "against reprisal for the lawful disclosure of information which the employees reasonably believe evidences," among other things, violations of law, gross waste of funds, an abuse of authority, or substantial and specific dangers to public health or safety.  *Id.*, 92 Stat. at 1114 (codified at 5 U.S.C. § 2301).

The CSRA established the MSPB as "an independent agency consisting of three members" and "charged [it] with protecting the merit system principles and adjudicating conflicts between federal workers and their employing agencies."  *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 154 (D.C. Cir. 1982); *see also* CSRA § 101, 92 Stat. at 1114–17 (codified at 5

2

U.S.C. § 2302) (establishing prohibited personnel practices, such as employment discrimination, unlawful political activities, and any other violations of law within the federal civil service).  The Board's primary function is to review federal employee appeals of adverse actions "which [are] appealable to the Board under any law, rule, or regulation," including those related to removal or suspension for periods greater than fourteen days.  5 U.S.C. § 7701(a); *see also id.* § 1204(a)(1). These adjudications consume approximately 95 percent of MSPB members' time.  *See* Pl.'s Statement of Undisputed Material Facts ¶ 54 ("SUMF"), ECF No. 22-2.  The Board may order federal agencies and employees to comply with its decisions, *see* 5 U.S.C. § 1204(a)(2), which are nonetheless subject to judicial review.  *See id.* § 7703.  The MSPB thus acts as a preliminary adjudicator of these employment disputes, with federal courts providing the final say if the parties so desire.

The MSPB carries out other limited tasks in pursuit of its mission.  It conducts studies "relating to the civil service" for the President and Congress, *see* 5 U.S.C. § 1204(a)(3), although this function takes up less than one percent of members' time, *see* SUMF ¶ 62.  The Board may also review "rules and regulations of the Office of Personnel Management," *see id.* § 1204(a)(4), on its own motion, following a complaint from the Special Counsel, or in response to a third party's petition, *see id.* § 1204(f)(1).  The MSPB may invalidate the rule or its implementation if it would require a federal employee to engage in prohibited personnel practices.  *See id.* § 1204(f)(2).[1]

Members of the MSPB are "appointed by the President, by and with the advice and consent of the Senate," and "not more than 2 of [the members] may be adherents of the same

---

[1] Harris explains that invalidation of an Office of Personnel Management rule under this mechanism "is an exceedingly rare occurrence" that has not happened during her tenure.  Harris Decl. ¶ 31, ECF No. 22-3.

political party." CSRA § 202 (codified at 5 U.S.C. § 1201). Members of the MSPB are appointed to seven-year terms that may be extended by up to one year if a successor has not yet been appointed. *Id.* (codified at 5 U.S.C. § 1202(a)–(c)). "Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* (codified at 5 U.S.C. § 1202(d)).

### B. Factual and Procedural Background

President Joseph R. Biden nominated Harris to be a member of the MSPB in January 2022. SUMF ¶ 1. The Senate confirmed her on May 25, 2022, and she was sworn in on June 1, 2022. *Id.* ¶ 2. Her term expires on March 1, 2028. *Id.* ¶ 3. The Senate later confirmed Harris as Chairman, and she was sworn in as Chairman on March 14, 2024. *Id.* ¶¶ 4–5.

Defendants do not dispute that Harris has been efficient and effective in her role at the MSPB. *See id.* ¶ 8. When the MSPB's quorum was restored in March 2022, the agency had a backlog of approximately 3,800 cases that had accrued since 2017, and officials estimated that it would take five or six years for the agency to catch up. *Id.* ¶¶ 12–14. By January 2025, however, the MSPB had cleared nearly 99 percent of its backlog. *Id.* ¶ 20. From June 1, 2022, to February 10, 2025, Harris participated in nearly 4,500 decisions. *Id.* ¶ 10.

On February 10, 2025, Harris received an email from Trent Morse, Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, which stated in its entirety:

> On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately. Thank you for your service[.]

Ex. 4 to Pl.'s Mot. for Prelim. Inj. and J. on the Merits, ECF No. 22-4. The communication did not explain the basis for Harris's termination.

Harris filed this lawsuit on February 11, 2025, claiming that her firing was *ultra vires*, unconstitutional, and a violation of the Administrative Procedure Act ("APA").  *See* Compl. ¶¶ 31–37, 40–41, ECF No. 1.  She seeks relief under the Declaratory Judgment Act, issuance of a writ of mandamus, and equitable relief.  *See id.* ¶¶ 38–39, 42–46.  Harris additionally filed a motion for a temporary restraining order, *see* Pl.'s Mot. for TRO, ECF No. 2, which Defendants opposed, *see* Defs.' Opp'n to Mot. for TRO, ECF No. 6.  The Court held a hearing on the TRO motion on February 13, 2025, and granted the motion on February 18, 2025.  *See* Min. Entry dated Feb. 13, 2025; Order Granting Pl.'s Mot. for TRO, ECF No. 8; Mem. Op. Granting Pl.'s Mot. for TRO ("Mem. Op."), ECF No. 9.  Defendants appealed that order to the D.C. Circuit, and the appeal remains pending.  *See* Notice of Appeal, ECF No. 15.

On February 19, 2025, the parties filed a joint status report indicating that the Court's consideration of the subsequent motion for preliminary injunction should be consolidated with the merits of the case pursuant to Federal Rule of Civil Procedure 65(a)(2).  *See* Joint Status Report, ECF No. 13.  On February 23, 2025, Harris filed a motion for a preliminary injunction and judgment on the merits.  *See* Pl.'s Mot. for Prelim. Inj. and J. on the Merits ("Pl.'s Mot."), ECF No. 22.  Defendants opposed the motion, *see* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. and J. on the Merits ("Defs.' Opp'n"), ECF No. 33, and Harris filed a reply, *see* Defs.' Reply, ECF No. 38.  The parties appeared for a hearing before the Court on March 3, 2025.

### III.  LEGAL STANDARD

"Having granted consolidation under Rule 65(a)(2), the Court 'treats the parties' briefing as cross-motions for summary judgment.'"  *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 226 (D.D.C. 2020) (quoting *Trump v. Comm. on Oversight & Reform of the U.S. House of Representatives*, 380 F. Supp. 3d 76, 90 (D.D.C. 2019)).  "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. On summary judgment, the Court views all evidence "in the light most favorable to the nonmoving party and . . . must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV. ANALYSIS

The Court first considers the constitutionality of the MSPB's structure, concluding that its members' for-cause removal protections are constitutional under *Humphrey's Executor*.

6

Federal law thus prevents the President from removing members of the MSPB without cause, and the President's attempt to terminate Harris was unlawful.  As such, Harris is entitled to summary judgment.  The Court next determines the remedies to which Harris may be entitled, granting her declaratory judgment and a permanent injunction.  To the extent that injunctive relief may be unavailable, the Court would grant mandamus relief in the alternative.

### A.  Constitutionality of the MSPB Members' Removal Protections

Harris claims that her termination was *ultra vires* in violation of statutory authority, violated the separation of powers, and was contrary to law under the APA.  *See* Compl. ¶¶ 31–37, 40–41.  She argues that this case falls squarely within the heartland of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and its progeny, and that the Board is a traditional multimember body that does not wield traditional executive power.  *See* Pl.'s Mot. at 11–20.  MSPB members' removal protections are therefore constitutional, according to Harris.  *See id.* at 11–12.  Defendants respond that the MSPB does not fall within *Humphrey's Executor*, and that the independent agency wields substantial executive power.  *See* Defs.' Opp'n at 5–13.  The Court concludes that MSPB members' removal protections are constitutional under *Humphrey's Executor* and must be upheld here.

In *Humphrey's Executor*, the Supreme Court upheld a statutory provision identical to the one at issue here restricting removal of Federal Trade Commission ("FTC") members.  *See Humphrey's Executor*, 295 U.S. at 619–20 (discussing 15 U.S.C. § 41); 5 U.S.C. § 1202(d).  The FTC comprises five members "appointed by the President[,] by and with the advice and consent of the Senate," and "[n]ot more than three of the commissioners shall be members of the same political party."  *Humphrey's Executor*, 295 U.S. at 619–20 (quoting 15 U.S.C. § 41).  "Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance

7

in office." *Id.* (quoting 15 U.S.C. § 41).  In *Humphrey's Executor*, President Hoover had

appointed William Humphrey as a member of the Federal Trade Commission, which carried a

term of seven years.  295 U.S. at 612.  Less than two years later, President Roosevelt terminated

Humphrey over differences of political opinion, stating, "[e]ffective as of this date you are

hereby removed from the office of Commissioner of the Federal Trade Commission."  *Id.* at 619.

Humphrey died several months later, but his estate sued to recover backpay on the basis that his

removal was unlawful.  *Id.* at 612.

      The Supreme Court confirmed that President Roosevelt's termination of Humphrey was

indeed unlawful.  The Court observed that "[t]he statute fixes a term of office, in accordance

with many precedents."  *Id.* at 623.  The Court further explained that the commission comprised

a "nonpartisan" "body of experts" that was intended to "act with entire impartiality."  *Id.* at 624.

It was "charged with the enforcement of no policy except the policy of the law" and acted in a

manner that was "predominantly quasi judicial and quasi legislative" rather than traditionally

"political []or executive" in nature.  *Id.*  The Court differentiated FTC members from the

postmaster in *Myers v. United States*, 272 U.S. 52 (1926) (evaluating statute stating that

postmasters "shall hold their offices for four years unless sooner removed or suspended

according to law").  "A postmaster is an executive officer restricted to the performance of

executive functions" and is "charged with no duty at all related to either the legislative or judicial

power."  *Id.* at 627.  The FTC, in contrast, "acts in part quasi legislatively and in part quasi

judicially" rather than exercising traditional executive powers.  *Id.* at 628.  "We think it plain

under the Constitution that illimitable power of removal is not possessed by the President in

respect of officers of the character of those just named," the Court concluded.  *Id.* at 629.

Two decades later, the Court considered President Eisenhower's removal of a member of the War Claims Commission, whom President Truman had appointed and the Senate had confirmed. *See Wiener v. United States*, 357 U.S. 349, 350 (1958). Congress charged that commission with processing "claims for compensating internees, prisoners of war, and religious organizations . . . who suffered personal injury or property damage at the hands of the enemy in connection with World War II," and the commissioners' terms were limited by the short duration of the commission's existence. *Id.* The Court reasoned that Congress intended to "preclude[] the President from influencing the Commission in passing on a particular claim," which meant that the President naturally could not "hang . . . the Damocles' sword of removal" over the commissioners. *Id.* at 356. The Court reaffirmed that the President had "no such power" to "remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission." *Id.*[2]

In two more recent cases, however, the Supreme Court ruled that for-cause removal provisions applying to independent agencies with a single director violated the separation of powers. *See Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 218 (2020); *Collins v. Yellen*, 594 U.S. 220, 253 (2021). Neither of those cases undermines the

---

[2] The Court once again considered a multimember body in *Mistretta v. United States* when passing on the constitutionality of the United States Sentencing Commission, which formally resides in the Judiciary. 488 U.S. 361 (1989). The Sentencing Report Act of 1984 empowered the President to appoint commissioners to the Sentencing Commission, with members "subject to removal by the President 'only for neglect of duty or malfeasance in office or for other good cause shown.'" *Id.* at 368 (quoting 28 U.S.C. § 991(a)). When considering whether the Act affords the President undue influence over federal judges who served as commissioners, the Court recognized that "the President's removal power under the Act is limited." *Id.* at 410. "Such congressional limitation on the President's removal power, like the removal provisions upheld in *Morrison v. Olson*, 487 U.S. 654 (1988), and *Humphrey's Executor* . . . , is specifically crafted to prevent the President from exercising 'coercive influence' over independent agencies." *Id.* at 410–411.

constitutionality of for-cause removal provisions for multimember bodies of experts heading an independent agency. *See Seila Law*, 591 U.S. at 228 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today.").

"Rather than create a traditional independent agency headed by a multimember board or commission, Congress elected to place the [Consumer Financial Protection Bureau ("CFPB")] under the leadership of a single Director." *Seila Law*, 591 U.S. at 207. In *Seila Law*, the Court observed that "[a]n agency with a structure like that of the CFPB is almost wholly unprecedented." *Id.* as 220; *see also id.* at 220–22 (searching for historical precedent to support the CFPB's structure). The Court further concluded that "[t]he CFPB's single-Director structure" contravenes the separation of powers "by vesting significant governmental power in the hands of a single individual accountable to no one," emphasizing that the director may act "*unilaterally*" and "[w]ith no colleagues to persuade." *Id.* at 224–25. Two other features of the CFPB undermined the constitutionality of the agency's structure. First, the director's five-year term meant that "some Presidents may not have any opportunity to shape [the agency's] leadership and thereby influence its activities." *Id.* at 225. Second, "[t]he CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential control." *Id.* at 226. For these reasons, the Court concluded that the CFPB's structure violated the separation of powers. *See id.* at 232.

None of the reasoning in *Seila Law* undermined the constitutionality of the traditional independent agency structure outlined in *Humphrey's Executor*. *See id.* at 218 (describing "exception[]" for "multimember expert agencies that do not wield substantial executive power"). Rather, the Court's reasoning reaffirmed the constitutionality of multimember boards with for-cause removal protections, as those agencies have a robust basis in this country's history, and

10

their members lack the power to act unilaterally.  *See* Pl.'s Mot. at 11 (emphasizing that Congress established the first such board in 1887).  The Court's rationale also relied on the CFPB's divergence from traditional agency structures when finding the for-cause removal protections unconstitutional.  *See, e.g.*, *Seila Law*, 591 U.S. at 205–07 (emphasizing facts showing drift from Elizabeth Warren's initial proposal for multimember board to Congress's enactment of single-headed agency).  The Court even opined that Congress could fix the problem by "for example, converting the CFPB into a multimember agency."  *Id.* at 237.

    *Collins* then represented a "straightforward application" of the Court's "reasoning in *Seila Law*" to the Federal Housing Finance Agency ("FHFA").  594 U.S. at 251; *see also Seila Law*, 591 U.S. at 222 (noting doubt as to the constitutionality of the FHFA's structure).  Similarly to the CFPB, the FHFA was "an agency led by a single Director" that "lack[ed] a foundation in historical practice and clashe[d] with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control."  594 U.S. at 251.

    *Humphrey's Executor* thus remains alive and well, and it dictates the outcome here.  The MSPB is "a traditional independent agency headed by a multimember board or commission," *Seila Law*, 591 U.S. at 207, and as such Congress may grant the Board's members for-cause removal protections.  The MSPB is "a multimember body of experts" that is "balanced along partisan lines."  *Seila Law*, 591 U.S. at 216; *see also Humphrey's Executor*, 295 U.S. at 624 (noting that the FTC is a "nonpartisan" "body of experts" that was intended to "act with entire impartiality").  The CSRA envisions that the Board "is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality."  *Humphrey's Executor*, 295 U.S. at 624.  The CSRA also "fixes a term of office."  *Id.* at 623.  The Board's members serve on overlapping, staggered seven-year terms, meaning that the President will have the "opportunity to shape [the

MSPB's] leadership and thereby influence its activities." [3]  *Seila Law*, 591 U.S. at 225.  The members' staggered terms permit them to "accumulate[] expertise" in the operation of federal agencies and federal employment law.  *Id.* at 218.  The MSPB's duties are "quasi judicial," *Humphrey's Executor*, 295 U.S. at 624, in that it conducts preliminary adjudications of federal employees' claims, which may then be appealed to Article III courts.  *See* 5 U.S.C. § 7703 (providing for review in the Federal Circuit); *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 423 (2017) (providing for review of mixed cases in district court).  The MSPB's rulemaking authority is limited to "regulations . . . necessary for the performance of its functions."  5 U.S.C. § 1204(h).  Congress further intended the agency to aid its legislative goals by regularly transmitting reports to Congress regarding the Board's functions.  *See* 5 U.S.C. §§ 1204(l), 1205.  It is additionally evident that Congress hoped to "preclude[] the President from influencing the [Board] in passing on a particular claim."  *Wiener*, 357 U.S. at 356.  The MSPB nonetheless remains politically accountable to both Congress and the President through the appropriations process in a manner inapplicable to independent agencies with their own funding sources, such as the CFPB and FHFA.  *See Selia Law*, 591 U.S. at 226; *Collins*, 594 U.S. at 231.

The MSPB also "do[es] not wield substantial executive power," *Seila Law*, 591 U.S. at 218, but rather spends nearly all of its time adjudicating "inward-facing personnel matters" involving federal employees, Pl.'s Mot. at 4.  The Board does not regulate the conduct of private parties, nor does it possess its own rulemaking authority except in furtherance of its judicial functions.  *See id.* at 12.  It cannot initiate its own personnel cases, but must instead "passively

---

[3] One MSPB member's term has now expired, and Harris's term expires on March 1, 2028.  *See* Pl.'s Mot. at 29 n.20; Pl.'s Reply at 13–14; SUMF ¶ 3.  President Trump will therefore have the opportunity to appoint at least two members to the MSPB during his term in office.

wait for them to be brought." *Id.* at 12; *see also* 5 U.S.C. § 1204 (defining the Board's powers and functions). Harris additionally points out that the MSPB *preserves* power within the executive branch by charging presidentially appointed Board members with mediation and initial adjudication of federal employment disputes, rather than shifting those decisions to Article III courts in the first instance. *See* Pl.'s Mot. at 14.

Several other features of the MSPB demonstrate its limited effects on the President's powers. The MSPB's jurisdiction is generally restricted to civil servants and does not include political appointees.[4] *See* 5 U.S.C. § 7511. Even among civil servants, members of the Senior Executive Service removed "for less than fully successful executive performance" are entitled only to an informal hearing before the Board. *See* 5 U.S.C. § 3592(a). Furthermore, the MSPB's decisions are generally not the final word. Federal employees may appeal the Board's decisions to Article III courts, *see* 5 U.S.C. § 7703(a), and the Director of the Office of Personnel Management may similarly seek review of any decision that he determines "will have a substantial impact on a civil service law, rule, regulation, or policy directive," *id.* § 7703(d)(1)–(2).

Finally, the MSPB's mission and purpose require independence. In enacting the CSRA, Congress exercised its power to regulate the civil service, defining certain prohibited personnel practices, to include discrimination, loyalty oaths, coercion to engage in political activity, and retaliation against whistleblowers. *See* 5 U.S.C. § 2302(b)(1)–(3), (8). Direct political control over the MSPB would have limited effect on the President's implementation of his policy agenda. It would instead neuter the CSRA's statutory scheme by allowing high-ranking

---

[4] Nor may the Board review the merits of determinations concerning an employee's eligibility to occupy a sensitive position that implicates national security. *See Kaplan v. Conyers*, 733 F.3d 1148, 1166 (Fed. Cir. 2013).

government officials to engage in prohibited practices and then pressure the MSPB into inaction.

The MSPB's independence is therefore structurally inseparable from the CSRA itself.  These

duties dovetail with *United States v. Perkins*, in which the Supreme Court held that Congress

may "limit, restrict, and regulate the removal" of inferior officers.  116 U.S. 483, 485 (1886).

Denying independence to the Board would undermine these constitutionally sound limitations on

the removal of civil servants.

Defendants cannot argue that *Humphrey's Executor* has been overturned, so they instead

suggest that even if the MSPB is a traditional multimember agency, it wields "'substantial'

executive power" in a manner found significant in *Seila Law*.  Defs.' Opp'n at 8 (quoting *Seila

Law*, 591 U.S. at 218).  Yet the Supreme Court has clarified that it did not mean *Humphrey's

Executor* to exclude removal protections for any official exercising authority within the

executive branch.  *See Morrison v. Olson*, 487 U.S. 654, 688–89 (1988); *see also Seila Law*, 591

U.S. at 216 (detailing "several organizational features that helped explain" the *Humphrey's

Executor* court's "characterization of the FTC as non-executive").  There is instead a "spectrum"

that runs from "'purely executive' officials who must be removable by the President at will if he

is to be able to accomplish his constitutional role" and those who serve "'quasi-legislative' or

'quasi-judicial'" roles, where the President's control is not "so central to the functioning of the

Executive Branch" as to require the President to be able to terminate the official at will.

*Morrison*, 487 U.S. at 690–91.  As the Court explained above, the Board's duties—which

primarily include adjudication of employment claims—do not represent "substantial" executive

power and instead take on a quasi-judicial role.  Furthermore, the MSPB's powers are no more

expansive than the FTC's functions upheld in *Humphrey's Executor*, which remains good law.

14

Several courts have deployed similar reasoning when rejecting challenges to the structures of traditional multimember agencies in the years since *Seila Law* and *Collins*. Last year, the Fifth Circuit upheld the structure of the Consumer Product Safety Commission ("CPSC"), concluding that the agency is "a prototypical 'traditional independent agency, run by a multimember board,'" is not directed by a single individual, and that the President may influence its activities through appointments or the appropriations process. *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 354–55 (5th Cir. 2024), cert. denied, 145 S. Ct. 414, 170 (2024). The Tenth Circuit turned away a comparable challenge to the agency, reasoning that *Humphrey's Executor* remains good law, that the CPSC is structured similarly to the FTC, and that limited civil and criminal enforcement powers do not undermine the constitutionality of its tenure protections. *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762 (10th Cir. 2024), cert. denied, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025). Courts have additionally found the FTC's structure constitutionally sound because the Supreme Court has not revisited *Humphrey's Executor*. *See Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1047 (5th Cir. 2023); *Meta Platforms, Inc. v. Fed. Trade Comm'n*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024). This Court, likewise, cannot reach a different outcome regarding the MSPB.

Because the MSPB falls within the scope of *Humphrey's Executor*, Congress has the power to specify that members of the MSPB may serve for a term of years, with the President empowered to remove those members only for inefficiency, neglect of duty, or malfeasance in office. The President thus lacks the power to remove Harris from office at will. Because the President did not indicate that he sought to remove Harris for inefficiency, neglect of duty, or

malfeasance in office, his attempt to terminate her was unlawful and exceeded the scope of his

authority.[5]

## B. Remedy

With the merits aside, the Court turns to the question of remedy.  Harris offers up three

avenues for relief: declaratory judgment, a permanent injunction, and a writ of mandamus.  *See*

Compl. ¶¶ 38–39, 42–44, 45–46; Pl.'s Mot. at 27–36.  The Court concludes that because any

attempt to remove Harris is unlawful, she is entitled to declaratory judgment that she remains a

properly appointed member of the MSPB.  The Court additionally determines that Harris has met

her burden for the permanent injunction she seeks, and that a writ of mandamus would be

appropriate if such injunctive relief were unavailable.

### 1. Declaratory Judgment

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its

jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

of any interested party seeking such declaration, whether or not further relief is or could be

sought."  28 U.S.C. § 2201(a).  It provides neither jurisdiction nor a cause of action, but rather a

form of relief when the case is already properly before the Court.  *See C&E Servs., Inc. of

Washington v. D.C. Water & Sewer Autho.*, 310 F.3d 197, 201 (D.C. Cir. 2002); *Glenn v.

Thomas Fortune Fay*, 222 F. Supp. 3d 31, 35 (D.D.C. 2016).  The Article III case-or-controversy

requirement "is no less strict when a party is seeking a declaratory judgment than for any other

---

[5] The parties do not debate the cause of action through which this legal challenge must flow—whether it be the APA, an *ultra vires* claim, or a separation of powers claim.  These distinctions can be meaningful.  *See, e.g.*, *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 199–201 (D.D.C. 2024) (examining the compatibility of an APA and *ultra vires* claim).  The Court does not interpret this issue to be jurisdictional, however, and does not address an question the parties themselves declined to raise.

relief." *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 963 (D.C. Cir. 1995) (citing *Altvater v. Freeman*, 319 U.S. 359, 363 (1943)). To establish that a matter is a "controversy" within the meaning of the Declaratory Judgment Act and Article III of the Constitution, a party "must 'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Hoffman v. Dist. of Columbia*, 643 F. Supp. 2d 132, 140 (D.D.C. 2009) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

"[A] declaratory judgment always rests within the sound discretion of the court," *President v. Vance*, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980) (citing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494 (1942)), and "[t]here are no dispositive factors a district court should consider in determining whether it should entertain an action brought under the Declaratory Judgment Act." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012)). Several factors may be helpful to the Court's consideration of "the propriety of granting a declaratory judgment," however, such as "whether it would finally settle the controversy between the parties"; "whether other remedies are available or other proceedings pending"; and "the public importance of the question to be decided." *Hanes Corp. v. Millard*, 531 F.2d 585, 592 n.4 (D.C. Cir. 1976). The Court might also consider "1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn*, 222 F. Supp. 3d at 36 (citing *President*, 627 F.2d at 365 n.76).

First, the Court finds a "controversy" here within the meaning of the Declaratory Judgment Act. The parties place before the Court a "substantial controversy" over the

lawfulness of the President's effort to terminate Harris without cause, and whether she remains a member of the MSPB. *Hoffman*, 643 F. Supp. 2d at 140; *see also* Pl.'s Mot. at 11–26; Defs.' Opp'n at 5–13. The parties have adverse legal interests, with Defendants arguing that the President has a power that Harris claims he does not. *See, e.g.*, Defs.' Opp'n at 5 (arguing that the President's removal power over principal officers is absolute). This controversy is also "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Hoffman*, 643 F. Supp. 2d at 140. The controversy here is not based, for instance, on "the occurrence of a future or contingent event," but has rather come to a head after the President attempted to terminate Harris. *C.F. Folks, Ltd. v. DC Jefferson Bldg., LLC*, 308 F. Supp. 3d 145, 150 (D.D.C. 2018).

The Court additionally finds that declaratory relief is appropriate here. A declaratory "judgment will serve a useful purpose in clarifying the legal relations" between Harris and Defendants and abate ongoing "uncertainty, insecurity, and controversy" over her status as a member of the MSPB. *Glenn*, 222 F. Supp. 3d at 36. The question is also one of significant "public importance," *Hanes Corp.*, 531 F.2d at 592 n.4, given that it concerns the structure and independence of a federal agency. Although "other remedies" may be available, *id.*, declaratory judgment remains appropriate to clarify Harris's legal status, particularly given the complexity of injunctive relief in this area. In addition, the Declaratory Judgment Act grants authority to enter declaratory judgment "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

Defendants argue that the Court cannot issue declaratory judgment because it cannot enjoin the President. *See* Defs.' Mot. at 21–22 (citing *Samuels v. Mackell*, 401 U.S. 66, 70 (1971)). First, the declaratory judgment here clarifies not just the President's legal relationship with MSPB members, but also subordinate officials' legal rights and duties. Second, the

Supreme Court clarified in *Samuels* that it did "not mean to suggest that a declaratory judgment should never be issued in cases of this type if it has been concluded that injunctive relief would be improper." *Samuels*, 401 U.S. at 73. "There may be unusual circumstances in which an injunction might be withheld because, despite a plaintiff's strong claim for relief under the established standards, the injunctive remedy seemed particularly intrusive or offensive." *Id.* "[I]n such a situation, a declaratory judgment might be appropriate and might not be contrary to the basic equitable doctrines governing the availability of relief." *Id.* Courts withhold injunctive relief against the President precisely because it is considered "particularly intrusive or offensive," and declaratory judgment remains warranted here given Harris's "strong claim for relief under the established standards." *Id.* Defendants additionally cite no controlling authority for the notion that declaratory judgment may not clarify the legal relationship between the President and other parties. To the contrary, appellate courts have previously affirmed the issuance of declaratory relief involving the President. *See Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (considering declaratory judgment to be a less drastic remedy than a writ of mandamus); *see also Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (affirming declaratory judgment that the President's actions under Line Item Veto Act were invalid).

For these reasons, the Court enters declaratory judgment in this case clarifying that Harris remains a member of the MSPB, and that she may not be removed from her position absent inefficiency, neglect of duty, or malfeasance in office.

### 2. Permanent Injunction

Harris additionally seeks a permanent injunction barring several officials—not including the President—from removing her or treating her as removed. *See* Compl. ¶¶ 45–46; Pl.'s Mot.

at 28–30; Pl.'s Proposed Order, ECF No. 22-1.  Defendants argue that Harris is not entitled to an injunction because the Court lacks the power to issue equitable relief "reinstating" an officer removed by the President.  Defs.' Opp'n at 14–18.  Defendants also contend that Harris has not suffered an irreparable injury and that the balance of the equities weigh in their favor.  *See id.* at 18–21.  The Court must therefore examine its power to issue equitable relief here before it considers whether to issue that relief.

### a. Availability of Injunctive Relief

Defendants argue that Harris's remedy must be limited to backpay, and that an injunction is inappropriate because that relief was not "traditionally accorded by courts of equity" to remedy an official's wrongful removal from office.  Defs.' Opp'n at 14 (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).  Plaintiff responds that federal courts have long granted injunctive relief reinstating federal employees, and that mandamus should be available in the alternative.  *See* Pl.'s Reply at 10–19.

In *Grupo Mexicano*, the Supreme Court considered whether "a United States District Court has the power to issue a preliminary injunction preventing the [debtor] defendant from transferring assets in which no lien or equitable interest is claimed."  527 U.S. at 310.  The Court explained that "equity is flexible; but in the federal system, at least, that flexibility is confined within the broad boundaries of traditional equitable relief."  *Id.* at 322.  "[E]quity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)."  *Id.* at 318 (quoting A. Dobie, Handbook of Federal Jurisdiction and Procedure 660 (1928)).  The Court concluded that because the Court of Chancery lacked "an equitable power to restrict a debtor's use of his unencumbered property

20

before judgment," a contemporary federal court lacks that power as well.  *Id.* at 322; *see also id.* at 319–20.  Defendants similarly reason that because the Court of Chancery did not issue injunctions returning public officials to their offices, this Court cannot either.  *See* Defs.' Opp'n at 14–15.  That contention stumbles, however, for at least two reasons.

The first is on-point Supreme Court guidance.  In *Sampson v. Murray*, the Supreme Court considered whether a probationary employee at the General Services Administration could receive a temporary restraining order enjoining her dismissal during an administrative appeal to the Civil Service Commission.  415 U.S. 61, 62–63 (1974).  The Court explained that a district court has "authority to grant interim injunctive relief to a discharged Government employee," *id.* at 63, but that the plaintiff before the Court did not make the elevated "showing of irreparable injury sufficient in kind and degree to override" the Government's usual autonomy over its internal affairs, *id.* at 84.  Loss of wages and reputation could be remedied through further proceedings and was not enough to warrant injunctive relief for a federal employee, *see id.* at 91–92, but that relief may be appropriate "in the genuinely extraordinary situation," rather than "in the routine case."  *Id.* at 92 n.68.  The Court specifically addressed *White v. Berry*, in which the Supreme Court reasoned that "a court of equity has no jurisdiction over the appointment and removal of public officers."  171 U.S. 366, 377 (1898) (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)).  The *Sampson* Court asserted that "[m]uch water has flowed over the dam since 1898," and that subsequent cases had recognized that federal courts are generally empowered to review the claims of discharged federal employees.  *Sampson*, 415 U.S. 71–72 (citing *Service v. Dulles*, 354 U.S. 363 (1957)); *see also Kloeckner*, 568 U.S. at 44–46 (discussing remedies for federal employee under the CSRA, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012)

(listing "reinstatement" as among "the kinds of relief that the CSRA empowers" courts to

provide). Harris's situation is additionally akin to that of the *Sampson* plaintiff because there is a

federal standard to which Harris's hiring and firing must adhere, and one that the Court must

enforce. *Sampson* thus instructs that equitable relief is available to Harris if she can show that

her termination represents a "genuinely extraordinary situation," rather than a "routine case."

*Sampson*, 415 U.S. at 92 n.68.[6]  *Sampson* is not unique; the Supreme Court has repeatedly

determined that plaintiff federal employees were entitled to reinstatement after termination

violated their legal rights. *See Service*, 354 U.S. at 388–89; *Vitarelli v. Seaton*, 359 U.S. 535,

546 (1959); *see also Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J.,

dissenting) (explaining that for a federal employee experiencing "unconstitutional

discrimination, equitable relief could include an injunction prior to termination or reinstatement

subsequent to termination").

The D.C. Circuit has also found injunctive relief against subordinate federal officials to

be available to restore presidential appointees to their offices, although the Government did not

raise the scope of historical equitable relief in those cases. *See Swan v. Clinton*, 100 F.3d 973,

976–81 (D.C. Cir. 1996); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023).[7]  In *Swan*,

the six-year term of a member of the Board of the National Credit Union Administration

("NCUA") had expired, but he remained in office because the relevant statute allowed members

to serve until their successors had qualified. *Swan*, 100 F.3d at 975–76.  President Clinton

---

[6] There can additionally be no dispute that federal courts may grant injunctive relief "with
respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr.,
Inc.*, 575 U.S. 320, 327 (2015) (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94,
110 (1902)).

[7] Cases before other courts add further evidence that this power exists. *See* Pl.'s Reply at
11–12 (collecting cases).

22

removed the board member, who then sued seeking declaratory judgment and an injunction ordering his reinstatement. *See id.* The court assessed the board member's standing to bring the case, focusing on whether his claims were judicially redressable. *Id.* at 976–81. The court was uncertain of its power to enjoin the President himself from removing the plaintiff from office, *see id.* at 977–78, but reasoned that it could instead "ensure the rule of law" by issuing "injunctive relief against subordinate officials" effectuating his reinstatement "*de facto* by" requiring his colleagues to treat him "as a member of the NCUA Board and allowing him to exercise the privileges of that office," *id.* at 978, 980. This encompassed, for instance, "including [the plaintiff official] in Board meetings, giving him access to his former office, recording his votes as official votes of a Board member, allowing him to draw the salary of a Board member *etc.*"[8] *Id.* at 980. The Circuit reprised this analysis in *Severino*, in which President Biden removed a member of the Administrative Conference of the United States Council, *see Severino*, 71 F.4th at 1041, and the plaintiff had standing because a court could "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment," *id.* at 1042–43 (quoting *Swan*, 100 F.3d at 980).[9]

Second, it is also clear that even if *Sampson*, *Swan*, and *Severino* did not make equitable relief available to Harris in a "genuinely extraordinary situation," she would nonetheless be entitled to a writ of mandamus—which is a remedy at law. *See Kalbfus v. Siddons*, 42 App. D.C.

---

[8] The Circuit ultimately concluded that the board member's claim failed on the merits because, even assuming that NCUA board members had removal protections, holdover members would be entitled to no such protection. *See Swan*, 100 F.3d at 983–88.

[9] Defendants argue that these cases are not on point because the courts there were considering the redressability of the plaintiffs' claims when evaluating their standing. *See* Defs.' Opp'n at 16; *Swan*, 100 F.3d 976–81; *Severino*, 71 F.4th at 1042–43. Yet the Circuit's reasoning is no mere dicta, as a federal court must determine that it has the power to grant effective relief before assuming jurisdiction over a case. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

310, 319–21 (D.C. Cir. 1914) (collecting cases); *see also* Pl.'s Reply at 15–16 (collecting

sources).  To the extent that English equity courts declined to issue injunctions reinstating

officials to their positions, they likely did so because the King's Bench, a court of law, would

readily issue mandamus instead.  *See Walkley v. City of Muscatine*, 73 U.S. 481, 483–84 (1867)

(explaining, relying on English cases, that "a court of equity is invoked" only where "a court of

law . . . is inadequate to afford the proper remedy"); *Parker v. Winnipiseogee Lake Cotton &

Woolen Co.*, 67 U.S. 545, 550–51 (1862) (similar).  English courts around the time of the

founding recognized this power and exercised it regularly.  *See, e.g.*, *R. v. Mayor of London*, 100

Eng. Rep. 96, 98 (1787) (recognizing power to issue mandamus reinstating public official);[10] *R.

v. Mayor and Aldermen of Doncaster* (1752), 96 Eng. Rep. 795 (restoring municipal official to

his office after removal by town council); *R. v. Mayor, Bailiffs, and Common Council of the

Town of Liverpool* (1759), 97 Eng. Rep. 533 (same);[11] *R. v. Mayor, Aldermen and Burgesses of

Doncaster* (1729), 92 Eng. Rep. 513 (same); 73 Eng. Rep. at 752 (discussing *Thompson v.

Edmonds*, in which the King's Bench restored a bailiff to his office because he "was removed"

by the mayor "without cause"); *R. v. Mayor, Aldermen, and Common Council of Gloucester*, 90

Eng. Rep. 1148 (restoring official to office of capital burgess).  Numerous treatises further

confirm this practice.  *See* 3 W. Blackstone, Commentaries *264–265 ("The writ of mandamus is

. . . a most full and effective remedy, in the first place, for refusal of admission where a person is

entitled to an office or place in any such [municipal] corporation; and, secondly, for wrongful

---

[10] During this case, respected trial lawyer Thomas Erskine explained that "[w]henever a
person is improperly suspended or removed from an office, whether it concern public or private
duties, if he has a certain term in it, and there are profits annexed to it, and the party has no other
specific legal remedy, the Court will grant mandamus to restore him."  100 Eng. Rep. at 97.

[11] Here, Lord Mansfield explained that when officials respond to an action for
mandamus, "the return must set out all the necessary facts, precisely; to shew that the person is
removed in legal and proper manner, and for a legal cause."  97 Eng. Rep. at 537.

removal, when a person is legally possessed."); Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus as it Obtains Both in England and in Ireland* 221 (1853) ("The writ of mandamus . . . has by a great number of cases held to be grantable . . . to restore him who has been wrongfully displaced, to any office, function, or franchise of a public nature . . . ."); *id.* at 224 (distinguishing an officer "at pleasure" who may be removed without cause).[12] Even the treatise cited in Defendants' opposition explains that a court sitting in equity would "not interfere by injunction" in such cases simply because it would instead "leave that question to be determined by a legal forum." 2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); *see also* Defs.' Opp'n at 15. This was the state of the law at the time of the founding, as well as when Congress passed the All Writs Act as part of the Judiciary Act of 1789. *See Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985). For this reason, the Supreme Court was careful in both *In re Sawyer* and *White v. Berry* to specify that mandamus was available "to determine the title to a public office" in "the courts of law." *In re Sawyer*, 124 U.S. at 212; *White*, 171 U.S. at 377.[13]

---

[12] Later treatises provide additional support for use of the writ of mandamus "for the purpose of restoring an individual to an office, where he has been illegally deprived of the possession thereof." Horace G. Wood, *A Treatise on the Legal Remedies of Mandamus and Prohibition, Habeas Corpus, Certiorari and Quo Warranto* 11 (1891). "When the title to the office is indisputable," proceedings for the writ of *quo warranto* would be "dilatory" and "a mandamus would be proper and should be awarded." *Id.* at 12 (quoting 7 How., 128); *see also* 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909) ("The jurisdiction to determine the title to a public office belongs only to courts of law and is exercised . . . by mandamus . . . and the mode of procedure established by the common law or by statute"); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 (1911) (same).

[13] Defendants argue that Harris was effectively removed from office and seeks a court order returning her to it. *See* Defs.' Opp'n at 15. The D.C. Circuit has clarified that this is not the case, and that Harris was never in fact removed. *See Kalbfus*, 42 App. D.C. at 321 ("In the present case the removal of the relator having been illegal and void, the office never became vacant . . . .").

25

As the Court explains below, however, a writ of mandamus can issue under our contemporary jurisprudence only when "the party seeking issuance of the writ ha[s] no other adequate means to attain the relief he desires." *Kerr v. U. S. Dist. Ct. for N. Dist. of California*, 426 U.S. 394, 403 (1976) (citing *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). Because the Court reads *Sampson*, *Swan*, and *Severino* to allow it to issue an injunction, it concludes that this injunction represents "adequate means" to provide Harris's requested relief, barring a mandamus remedy. *Kerr*, 426 U.S. at 403. This represents a curious reversal from norms before English courts, where reinstatement of officials through legal means was preferred over restoration through equitable means. *See Swan*, 100 F.3d at 976–81; *Severino*, 71 F.4th at 1042–43. Yet the broader point is that this Court may provide Harris *some* form of effective relief preventing her unlawful termination from the MSPB, whether it be through an injunction or a writ of mandamus. *See Swan*, 100 F.3d at 977 n.1 (explaining that a request for injunction and request for writ of mandamus can be "essentially" the same thing in some contexts).

Finally, Defendants argue that the Court cannot enjoin the President or enjoin others in a manner that restricts his Article II authority. *See* Defs.' Opp'n at 16. To be clear, Harris does not ask the Court to enjoin President Trump, *see, e.g.*, Pl.'s Proposed Order, and the Court does not do so.[14] Yet Defendants cite no authority for the proposition that a court lacks the power to enjoin the President's subordinates to restrain the President's violation of law. In fact, that is

---

[14] The availability of injunctive relief against the President may depend in part on whether compliance with 5 U.S.C. 1202(d) represents a ministerial rather than executive duty, a question the Supreme Court has "left open." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion); *see also State of Mississippi v. Johnson*, 71 U.S. 475, 498 (1866) (declining to decide whether a court may require the President "to perform a purely ministerial act," and defining a "ministerial duty" as "one in respect to which nothing is left to discretion); *McCray v. Biden*, 574 F. Supp. 3d 1, 9 (D.D.C. 2021) ("*Franklin*, however, did not absolutely slam the door shut on presidential injunctions."). Of course, the Court need not decide this question here.

precisely the remedy the Supreme Court affirmed in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952) (describing preliminary injunction restraining Secretary of Commerce from following President Truman's orders and "continuing the seizure and possession of the [steel] plant"). And in *Swan v. Clinton*, the D.C. Circuit concluded that a district court could enjoin the President's subordinates in order to effectuate a federal official's reinstatement. *See* 100 F.3d at 979; *see also id.* (concluding that "injunctive relief against such officials could substantially redress [the terminated official's] injury"); *see also Severino*, 71 F.4th at 1042–43. Having assured itself that injunctive relief is available here, the Court proceeds to consider whether a permanent injunction is warranted.[15]

### b. Factors for Permanent Injunction

An injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Yet "it goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief." *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quoting *Horne v. Flores*, 557 U.S. 433, 450 (2009)). A permanent injunction is a "forward-looking" remedy, *Gratz v. Bollinger*, 539 U.S. 244, 284 (2003), the "principal purpose" of which is to "deter future violations, and not to punish the violator," *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C. Cir. 1978). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). A plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies

---

[15] Defendants additionally suggest that "when executive officers have challenged their removal by the President, they have traditionally sought back pay, not reinstatement." Defs.' Opp'n at 13. The Court fails to see how it might lack the power to issue injunctive relief here simply because the plaintiffs in *Wiener* and *Humphrey's Executor* decided to seek another remedy.

available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (same).

For the same reasons the Court discussed in its previous opinion, Harris has established that she has suffered irreparable harm and will likely suffer irreparable harm in the future absent injunctive relief. *See* Mem. Op. at 11–19; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 55 (D.D.C. May 21, 2021) ("While the irreparable-harm requirement is recited in the past tense, it is clear that future harm may qualify." (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010))). Congress intended the MSPB and its members to carry out their limited duties with a degree of independence from the President, guided primarily by his selection of members for the multimember board rather than "the Damocles' sword of removal." *Wiener*, 357 U.S. at 356. As the Court reasoned in its previous memorandum opinion, the MSPB's independence would evaporate if the President could terminate its members without cause, even if a court could later order them reinstated. *See* Mem. Op. at 16. Harris has undoubtedly experienced an injury to this independence in her capacity as a member of the MSPB following the President's attempt to terminate her without cause, and any future attempts would prove just as harmful to that autonomy.

28

Harris additionally suffers irreparable harm because she has been "depriv[ed] of [her] statutory right to function" as a member of the MSPB, and any further attempts to separate her from her position will exacerbate this injury. *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). The termination email Harris received resulted in the inability to pursue her "statutory mission" to protect employees from prohibited personnel practices, such that "the loss of the ability to do what Congress specifically directed [her] to do cannot be remediated with anything other than equitable relief." *Dellinger v. Bessent*, No. 25-cv-0385, 2025 WL 471022, at *11 (D.D.C. Feb. 12, 2025). In addition, unlike most other federal employees, Harris was duly appointed by the President and confirmed by the Senate to a position carrying a term of years with specific reasons for her removal.

The Court finds that this harm represents a "genuinely extraordinary situation" meriting injunctive relief related to a federal employee's discharge. *Sampson*, 415 U.S. at 92 n.68; *see also* Mem. Op. at 12–13 (discussing *Sampson*). The clear federal statute granting Harris for-cause removal protections, coupled with longstanding precedent upholding the constitutionality of analogous provisions, overcomes the "latitude" traditionally afforded the Government "in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83. The plaintiff in *Sampson*, who failed to meet this standard, sought an injunction temporarily enjoining her dismissal during an administrative appeal. *See id.* at 63. Yet the parties point to no administrative pathway here through which Harris could seek reinstatement following improper termination. Furthermore, whereas the *Sampson* plaintiff was a probational employee, *see id.* at 62, Harris is a member of the board of an independent agency, was appointed by the President and confirmed by the Senate, and enjoys tenure protections to preserve her independence.

For similar reasons, it is also apparent that "remedies available at law, such as monetary damages, are inadequate to compensate for" Harris's injuries. *eBay Inc.*, 547 U.S. at 391. Defendants argue that loss of salary generally does not represent irreparable harm. *See* Defs.' Opp'n at 19. As the Court has explained, however, this is not a standard employment action that can be remedied through back pay and later reinstatement, and Harris's claims do not revolve around her salary. *See* Mem. Op. at 15.

Defendants additionally cite *Raines v. Byrd*, 521 U.S. 811 (1997), for the notion that "a loss of political power" does not represent injury. Defs.' Mot. at 15. *Raines* is a case about legislators' standing to sue over legislation they perceive to cede power to the Executive Branch, and the case has minimal application to the irreparable injury analysis here. *See* 521 U.S. at 820–21. Harris is not a member of Congress, nor is standing at issue. The Supreme Court reasoned in *Raines* that any injury would be far too diffuse to support the legislators' standing, as it was spread across both Houses of Congress, and the legislators did not claim injury arising from "something to which they *personally* are entitled." *Id.* at 821. If anything, *Raines* supports Harris's claim to injury based on exclusion from her office: she has "been singled out for specially unfavorable treatment as opposed to other Members," and has lost something to which she is "personally" entitled. *Id.*

Finally, injunctive relief in this case is in the public interest, and the balance of the equities tips in Harris's favor. Given that federal law limits the conditions under which Harris's tenure may be terminated, Supreme Court precedent supports the constitutionality of those conditions, and Defendants do not argue that those conditions were met here, the Court finds that it is in the public interest to issue injunctive relief. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and

operations.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  So too is there substantial public interest in the for-cause removal protections Congress has given to certain members of independent agencies.  Furthermore, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required."  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Defendants suggest that the public interest weighs against injunctive relief here because "[s]uch a remedy would undermine the accountability of the Executive Branch instilled by the Constitution," and the President "cannot be compelled to retain the services of a principal officer."  Defs.' Opp'n at 20–21.  This argument largely relies on Defendants' success on the merits, and the Court has already determined that the President lacks the power to remove Harris at will.  Defendants additionally argue that "the public interest is better served by an MSPB member who holds the President's confidence."  *Id.* at 21.  Yet Defendants decline to explain exactly how the public interest would be better served by removing Harris from her position. They do not dispute any of Harris's factual assertions, including her efforts to consider, deliberate, and vote on 35 cases per week to clear the MSPB's backlog of nearly 3,800 cases. *See* SUMF ¶¶ 12–28.  This effort was successful, as by early this year the inherited cases had all but disappeared.  *See id.* ¶ 20.  Recall that many of these cases involve allegations that federal agencies engaged in prohibited personnel practices, such as targeting of federal employees based on political affiliation; retaliation against whistleblowers reporting violations of law, waste, fraud and abuse; discrimination; and USERRA violations, among others.  *See* Pl.'s Mot. at 4–5 (collecting cases).  Defendants make no effort to enlighten the Court as to how Harris's handling

of these cases might differ from the President's preferred approach, let alone in a manner that might tilt the public interest factor in their favor. Defendants additionally overlook the fact that if Harris or her colleagues were ever to become inefficient, neglect their duty, or engage in malfeasance in office, the President would be empowered to remove them for cause. *See* 5 U.S.C. § 1202(d). The Court thus finds nothing in Defendants' arguments that might support a public interest against injunctive relief here.

The Court additionally notes that in opposing injunctive relief in its entirety, Defendants have declined to engage with the scope of Harris's proposed relief. *See generally* Proposed Order; Defs.' Opp'n. The Court will nonetheless tailor its declaratory and injunctive relief to meet Harris's entitlement under the law.[16]

### 3. Writ of Mandamus

Harris requests that the Court issue a writ of mandamus if no other relief is available. *See* Pl.'s Mot. at 34–35. Defendants argue that the President has no clear nondiscretionary duty here, as his selection of "who should lead an Executive Branch agency is certainly not a mere ministerial task." Defs.' Mot. at 22.

"The preemptory common-law writs are among the most potent weapons in the judicial arsenal." *Will v. United States*, 389 U.S. 90, 107 (1967). A district court has "original jurisdiction of any action in the nature of mandamus" only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy

---

[16] Although injunctive relief is merited, the Court narrows Harris's request slightly. Harris seeks a permanent injunction prohibiting several Defendants from removing her or treating her as removed. *See* Proposed Order. Yet § 1202(d) permits the President to remove her for inefficiency, neglect of duty, or malfeasance in office. The Court nonetheless notes the undisputed record demonstrating that Harris and her colleagues have carried out their duties to decide cases in addition to clearing a significant backlog.

available to [the] plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022)

(quoting *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021)). "[M]andamus jurisdiction

under § 1361 merges with the merits." *Muthana*, 985 F.3d at 910 (quoting *Lovitky v. Trump*, 949

F.3d 753, 759 (D.C. Cir. 2020)). "[E]ven if the plaintiff overcomes all these hurdles, whether

mandamus relief should issue is discretionary." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir.

2005).

The Court finds the first two requirements for mandamus relief to be satisfied. A court

"can analyze the clear right to relief and clear duty to act requirements for mandamus

'concurrently.'" *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (quoting *Lovitky*, 949

F.3d at 760). "[T]o meet the 'clear duty to act' standard, '[t]he law must not only authorize the

demanded action, but require it; the duty must be clear and indisputable.'" *Ferriero*, 60 F.4th at

715 (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931). Based on the

Court's holding that federal law precludes the President's power to remove Harris at will, the

Court finds a duty here that is clear and indisputable, and under binding Supreme Court

precedent there is no "room for an honest difference of opinion" on the part of federal officials.

*Reichelderfer v. Johnson*, 72 F.2d 552, 554 (D.C. Cir. 1934). In other words, the statute does not

provide room for executive discretion—the President has no menu of options to pick from when

he categorically may not remove Harris without cause. In making this determination, the Court

additionally looks to the voluminous precedent demonstrating that courts of law issued

mandamus relief in similar situations at the time Congress passed the All Writs Act in 1789 and

over the ensuing centuries.

As the Court previewed earlier, however, it appears at present that Harris has a separate,

"adequate remedy" available in the form of a permanent injunction. *In re Nat'l Nurses United*,

47 F.4th at 752 n.4.  The Court thus determines that her request for mandamus relief fails on that basis alone.  Were equitable injunctive relief unavailable here, however, the Court would not hesitate to "vigilantly enforce federal law" and "award[] necessary relief" through a writ of mandamus as an alternative remedy at law.  *DL*, 860 F.3d at 726.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff Cathy A. Harris's motion for summary judgment is **GRANTED**; and it is

**DECLARED** that Plaintiff Cathy A. Harris remains a member of the Merit Systems Protection Board, having been confirmed by the Senate on May 25, 2022, and sworn in on June 1, 2022, and that she may be removed by the President prior to the expiration of her term in office only for inefficiency, neglect of duty, or malfeasance in office pursuant to 5 U.S.C. § 1202; and it is

**FURTHER ORDERED** that Plaintiff Cathy A. Harris shall continue to serve as a member of the Merit Systems Protection Board until her term expires pursuant to 5 U.S.C. § 1202, unless she is earlier removed for inefficiency, neglect of duty, or malfeasance in office under that statute.  Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from removing Harris from her office without cause or in any way treating her as having been removed without cause, denying or obstructing Harris's access to any of the benefits or resources of her office, placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the Merit Systems Protection Board in Harris's position; and it is

**FURTHER ORDERED** that the Court's Temporary Restraining Order is **VACATED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously

issued.

Dated:  March 4, 2025                                    RUDOLPH CONTRERAS
                                                        United States District Judge